Case No. 24-12682-C

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

MOBILE BAYKEEPER, INC.,
*Plaintiff-Appellant,*

v.

ALABAMA POWER COMPANY,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Southern District of Alabama, No. 1:22-cv-00382-KD-B

---

**PLAINTIFF-APPELLANT MOBILE BAYKEEPER, INC.'S
PRINCIPAL BRIEF**

---

Barry Brock
Christina Tidwell
Ryan Anderson
**SOUTHERN ENVIRONMENTAL
LAW CENTER**
2829 Second Avenue S., Suite 282
Birmingham, AL 35233
Telephone: (205) 745-3060
bbrock@selcal.org
ctidwell@selcal.org
randerson@selcal.org

Nicholas Torrey
**SOUTHERN ENVIRONMENTAL
LAW CENTER**
601 W. Rosemary St, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
ntorrey@selcnc.org

*Attorneys for Plaintiff-Appellant*

---

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

**AMENDED CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

11th Cir. R. 26.1 requires that a Certificate of Interested Persons and Corporate Disclosure Statement must be included within the principal brief filed by any party, and included with any petition, answer, motion or response filed by any party. Below is the list of the trial judge, and all attorneys, persons, associations of persons, firms, partnerships or corporations presently known to Appellant that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.[1]

1. ***112 14th St S Holdings LLC, Affiliate of The Southern Company***

2. ***113 Thirteenth Street South Holdings LLC, Affiliate of The Southern Company***

3. ***1200 Second Avenue South Holdings LLC, Affiliate of The Southern Company***

4. ***1209 First Avenue South Holdings LLC, Affiliate of The Southern Company***

---

[1] Additions to the Plaintiff-Appellant's CIP as initially filed are shown as bolded and italicized. The additions reflect the parties included in the Defendant-Appellee Alabama Power Company's CIP filed on September 13, 2024. Changes to Plaintiff-Appellant's CIP are shown with an asterisk.

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

5.    *1227 First Avenue South Holdings, LLC, Affiliate of The Southern Company*

6.    *1301 First Avenue Holdings LLC, Affiliate of The Southern Company*

7.    *2016 ESA HoldCo, LLC, Affiliate of The Southern Company*

8.    *2016 ESA Project Company, LLC, Affiliate of The Southern Company*

9.    *230 Second Avenue South Holdings LLC, Affiliate of The Southern Company*

10.   *Accelerate Wind, Inc., Affiliate of The Southern Company*

11.   *Adobe Solar, LLC, Affiliate of The Southern Company*

12.   *AGL Energy Services, LLC, Affiliate of The Southern Company*

13.   *AGL Macon Holdings, Inc., Affiliate of The Southern Company*

14.   *AGL Resources Inc. (fka SGR Holdings, Inc.), Affiliate of The Southern Company*

15.   *AGL Services Company, Affiliate of The Southern Company*

16.   *AGL Southeast LNG, L.L.C., Affiliate of The Southern Company*

17.   Alabama Power Company, Defendant-Appellee, Subsidiary of The Southern Company*

18.   *Alabama Property Company, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

19. ***AlaDyn Holdings LLC, Affiliate of The Southern Company***

20. ***Align Energy Inc., Affiliate of The Southern Company***

21. Anderson, Ryan S., Counsel for Plaintiff-Appellant

22. ***Anson Land Holdings, LLC, Affiliate of The Southern Company***

23. ***Apex Nevada Solar, LLC, Affiliate of The Southern Company***

24. ***Arges Incorporated, Affiliate of The Southern Company***

25. ***Atlanta Gas Light Company, Affiliate of The Southern Company***

26. Balch & Bingham LLP, Counsel for Defendant-Appellee

27. ***Beech Ridge Energy II Holdings, LLC, Affiliate of The Southern Company***

28. ***Beech Ridge Energy II, LLC, Affiliate of The Southern Company***

29. Bell Jr., Raymond L., Counsel for Defendant-Appellee

30. Betbeze, Jaime W., Counsel for Defendant-Appellee

31. ***Bethel Wind Farm Class B Holdings, LLC, Affiliate of The Southern Company***

32. ***Bethel Wind Farm Holdings, LLC, Affiliate of The Southern Company***

33. ***Bethel Wind Farm LLC, Affiliate of The Southern Company***

34. ***Birdstop Inc., Affiliate of The Southern Company***

35. Bivins, The Honorable Sonja F., Magistrate Judge

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

36.   ***Blackwell Solar Holding, LLC, Affiliate of The Southern Company***

37.   ***Blackwell Solar, LLC, Affiliate of The Southern Company***

38.   ***BNB Lamesa Solar LLC, Affiliate of The Southern Company***

39.   ***Boulder Solar Power Parent, LLC, Affiliate of The Southern Company***

40.   ***Boulder Solar Power, LLC, Affiliate of The Southern Company***

41.   Brock, Barry A., Counsel for Plaintiff-Appellant

42.   ***BSP Holding Company, LLC, Affiliate of The Southern Company***

43.   Burkhart, Charles A., Counsel for Defendant-Appellee

44.   Burns, Steven A., Counsel for Defendant-Appellee

45.   ***Cactus Flats Holdings, LLC, Affiliate of The Southern Company***

46.   ***Calipatria, LLC, Affiliate of The Southern Company***

47.   ***Campo Verde Solar, LLC, Affiliate of The Southern Company***

48.   ***Chattanooga Gas Company, Affiliate of The Southern Company***

49.   ***Clean Energy Development, LLC, Affiliate of The Southern Company***

50.   ***Cloverly Inc., Affiliate of The Southern Company***

51.   ***Customer Care Services, Inc., Affiliate of The Southern Company***

52.   ***Dalton Lateral, Affiliate of The Southern Company***

53.   ***Desert Stateline Holdings, LLC, Affiliate of The Southern Company***

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

54. *Desert Stateline, LLC, Affiliate of The Southern Company*

55. *Deuel Harvest Wind Energy Holdings, LLC, Affiliate of The Southern Company*

56. *Deuel Harvest Wind Energy, LLC, Affiliate of The Southern Company*

57. *Diamond State Generation Partners, LLC, Affiliate of The Southern Company*

58. *Dogwood Enterprise Holdings, Inc., Affiliate of The Southern Company*

59. DuBose, The Honorable Kristi K., District Court Judge

60. *East Pecos Solar, LLC, Affiliate of The Southern Company*

61. *Energy Risk Integrated Services Corporation, Affiliate of The Southern Company*

62. *Evergreen Enterprise Holdings LLC, Affiliate of The Southern Company*

63. *GAMOG Lease Holding G, LLC, Affiliate of The Southern Company*

64. *GAMOG Lease Holding H, LLC, Affiliate of The Southern Company*

65. *GAMOG Lease Holding I, LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

66.   *GAMOG Lease, Inc., Affiliate of The Southern Company*

67.   *GAS Utility Finance Corp., Affiliate of The Southern Company*

68.   *Georgia Land Holdings & Development, LLC, Affiliate of The Southern Company*

69.   *Georgia Natural Gas Company, Affiliate of The Southern Company*

70.   *Georgia Power Childcare, LLC, Affiliate of The Southern Company*

71.   *Georgia Power Company, Subsidiary of The Southern Company*

72.   *Glass Sands Wind Energy, LLC, Affiliate of The Southern Company*

73.   *Global Energy Resource Insurance Corporation, Affiliate of The Southern Company*

74.   *Grant County Interconnect, LLC, Affiliate of The Southern Company*

75.   *Grant Plains Wind, LLC, Affiliate of The Southern Company*

76.   *Grant Wind, LLC, Affiliate of The Southern Company*

77.   *Granville Solar, LLC, Affiliate of The Southern Company*

78.   *Grid Edge Engineering, Inc., Affiliate of The Southern Company*

79.   Haden, Ed R., Counsel of Record for Defendant-Appellee

80.   *HD Data, Inc., Affiliate of The Southern Company*

81.   *Hesco Parkside LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

82. ***Hillabee Acquisition Company, LLC, Affiliate of The Southern Company***

83. Holleman, Frank S., Counsel for Plaintiff-Appellant

84. ***Horizon Pipeline Company, L.L.C., Affiliate of The Southern Company***

85. ***Illinois Energy Solutions, USA, LLC, Affiliate of The Southern Company***

86. ***Illinois Energy, USA, LLC, Affiliate of The Southern Company***

87. ***Jericho Gap Wind, LLC, Affiliate of The Southern Company***

88. ***Kay Wind, LLC, Affiliate of The Southern Company***

89. ***LakeTown Archers Point LLC, Affiliate of The Southern Company***

90. ***LakeTown Coosa Run LLC, Affiliate of The Southern Company***

91. ***LakeTown Kennebec LLC, Affiliate of The Southern Company***

92. ***LakeTown LLC, Affiliate of The Southern Company***

93. ***LakeTown Mills Creek LLC, Affiliate of The Southern Company***

94. ***LakeTown Stillwood LLC, Affiliate of The Southern Company***

95. ***LakeTown Talisi, LLC, Affiliate of The Southern Company***

96. ***Land Properties, Affiliate of The Southern Company***

97. ***Lost Hills Blackwell Holdings, LLC, Affiliate of The Southern Company***

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

98.    *Lost Hills Solar Holdco, LLC, Affiliate of The Southern Company*

99.    *Lost Hills Solar, LLC, Affiliate of The Southern Company*

100.   *Macho Springs Solar 2, LLC, Affiliate of The Southern Company*

101.   *Macho Springs Solar, LLC, Affiliate of The Southern Company*

102.   *Magnolia Enterprise Holdings, Inc., Affiliate of The Southern Company*

103.   Maynard Nexsen P.C., Counsel for Defendant-Appellee

104.   *Millers Branch Solar, LLC, Affiliate of The Southern Company*

105.   *Mississippi Power Company, Subsidiary of The Southern Company*

106.   Mobile Baykeeper, Inc., Plaintiff-Appellant

107.   Moore, Richard W., Counsel for Plaintiff-Appellant

108.   *Morelos Solar, LLC, Affiliate of The Southern Company*

109.   *Nicor Energy Ventures Company, Affiliate of The Southern Company*

110.   *Nicor Horizon, Inc., Affiliate of The Southern Company*

111.   *Nicor Oil and Gas Corporation, Affiliate of The Southern Company*

112.   *NI-Gas Exploration, Inc., Affiliate of The Southern Company*

113.   *North Star Solar, LLC, Affiliate of The Southern Company*

114.   *Northern Illinois Gas Company (dba Nicor Gas Company), Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

115. *Northern New England Energy Company, Affiliate of The Southern Company*

116. *Noteworthy AI Inc., Affiliate of The Southern Company*

117. *NS Solar Holdings, LLC, Affiliate of The Southern Company*

118. *NUI Corporation, Affiliate of The Southern Company*

119. *NUI Saltville Storage, Inc., Affiliate of The Southern Company*

120. *NUON Lease Holding D, LLC, Affiliate of The Southern Company*

121. *NUON Lease Holding E, LLC, Affiliate of The Southern Company*

122. *NUON Lease Holding F, LLC, Affiliate of The Southern Company*

123. *NUON Lease, Inc., Affiliate of The Southern Company*

124. *Observation Without Limits LLC, Affiliate of The Southern Company*

125. *Omega Realty Holdings V LLC, Affiliate of The Southern Company*

126. *OrlaGroup, LLC, Affiliate of The Southern Company*

127. *Ottawa Acquisition LLC, Affiliate of The Southern Company*

128. *Parrey Holding Company, LLC, Affiliate of The Southern Company*

129. *Parrey LLC (Henrietta), Affiliate of The Southern Company*

130. *Parrey Parent, LLC, Affiliate of The Southern Company*

131. Parrott, Evan N., Counsel for Defendant-Appellee

132. *Passadumkeag Windpark, LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

133. *PDC Holdings LLC, Affiliate of The Southern Company*

134. *PDC Member LLC, Affiliate of The Southern Company*

135. *PDC SPE LLC, Affiliate of The Southern Company*

136. *PennEast Pipeline Company, LLC, Affiliate of The Southern Company*

137. *Piedmont-Forrest Corporation, Affiliate of The Southern Company*

138. *Pivotal Jefferson Island Storage & Hub, LLC, Affiliate of The Southern Company*

139. *Pivotal Propane of Virginia, Inc., Affiliate of The Southern Company*

140. *Powell Steam Plant LLC, Affiliate of The Southern Company*

141. *PowerSecure Canada Energy Services, Inc., Affiliate of The Southern Company*

142. *PowerSecure Manufacturing, Inc. (f/k/a Reid's Trailer, Inc.) (d/b/a PowerFab), Affiliate of The Southern Company*

143. *PowerSecure, Inc., Affiliate of The Southern Company*

144. *Prosper Birmingham Health Tech Accelerator Fund I LP, Affiliate of The Southern Company*

145. *QuantHub LLC, Affiliate of The Southern Company*

146. *RE Garland A LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

147. *RE Garland Holdings LLC, Affiliate of The Southern Company*

148. *RE Garland LLC, Affiliate of The Southern Company*

149. *RE Gaskell West 1 LLC, Affiliate of The Southern Company*

150. *RE Rosecrock LLC, Affiliate of The Southern Company*

151. *RE Roserock Holdings, LLC, Affiliate of The Southern Company*

152. *RE Silverlake Holdings, LLC, Affiliate of The Southern Company*

153. *RE Tranquillity BAAH LLC, Affiliate of The Southern Company*

154. *RE Tranquillity Holdings LLC, Affiliate of The Southern Company*

155. *RE Tranquillity LLC, Affiliate of The Southern Company*

156. *Reading Wind Energy Class B Holdings, LLC, Affiliate of The Southern Company*

157. *Reading Wind Energy Holdings, LLC, Affiliate of The Southern Company*

158. *Reading Wind Energy, LLC, Affiliate of The Southern Company*

159. *Red Hills Operations, Inc., Affiliate of The Southern Company*

160. *Reese Street LLC, Affiliate of The Southern Company*

161. *Reese Telecommunications, Inc., Affiliate of The Southern Company*

162. *Renewco-Meadow Branch, LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

163. *Rutherford Farm, LLC, Affiliate of The Southern Company*

164. *Salt Fork Wind, LLC, Affiliate of The Southern Company*

165. *SE Choctaw II, L.L.C., Affiliate of The Southern Company*

166. *SE Choctaw, Inc., Affiliate of The Southern Company*

167. *SE Choctaw, L.L.C., Affiliate of The Southern Company*

168. *SE Finance Capital Corporation II, Affiliate of The Southern Company*

169. *SE Hawaii, Inc., Affiliate of The Southern Company*

170. *SE Lease, Inc., Affiliate of The Southern Company*

171. *SE Puna Lease, L.L.C., Affiliate of The Southern Company*

172. *SE Ravenswood Lease, L.L.C., Affiliate of The Southern Company*

173. *Sequent Holdings, LLC, Affiliate of The Southern Company*

174. *Sequent, LLC, Affiliate of The Southern Company*

175. *SG2 Holdings, LLC, Affiliate of The Southern Company*

176. *SG2 Imperial Valley LLC, Affiliate of The Southern Company*

177. *Shipshape Solutions Inc., Affiliate of The Southern Company*

178. Shirley, Sean W., Counsel for Defendant-Appellee

179. *Skookumchuck Wind Energy Project, LLC, Affiliate of The Southern Company*

180. *South Cheyenne Solar, LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

181. ***Southeast LNG Distribution Company, LLC, Affiliate of The Southern Company***

182. ***Southeast Opportunity Zone Fund I LLP, Affiliate of The Southern Company***

183. ***Southern Communication Services, Inc. d/b/a Southern Line, Subsidiary of The Southern Company***

184. Southern Company (Stock Symbol "SO"), Parent Corporation for Alabama Power Company

185. ***Southern Company Electrotechnologies, Inc., Affiliate of The Southern Company***

186. ***Southern Company Funding Corporation, Subsidiary of The Southern Company***

187. ***Southern Company Gas Capital Corporation, Affiliate of The Southern Company***

188. ***Southern Company Gas Investments, Inc., Affiliate of The Southern Company***

189. ***Southern Company Gas Pipeline Holdings LLC, Affiliate of The Southern Company***

190. ***Southern Company Gas Renewables, LLC, Affiliate of The Southern Company***

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

191. *Southern Company Gas, Subsidiary of The Southern Company*

192. *Southern Company Holdings, Inc., Subsidiary of The Southern Company*

193. *Southern Company Services, Inc., Subsidiary of The Southern Company*

194. *Southern Electric Generating Company, Affiliate of The Southern Company*

195. *Southern Electric Railroad Company LLC, Affiliate of The Southern Company*

196. Southern Environmental Law Center, Counsel for Plaintiff-Appellant*

197. *Southern Generation Technologies, LLC, Affiliate of The Southern Company*

198. *Southern Management Development, LLC, Affiliate of The Southern Company*

199. *Southern Natural Gas Company L.L.C., Affiliate of The Southern Company*

200. *Southern Nuclear Development, LLC, Affiliate of The Southern Company*

201. *Southern Nuclear Operating Company, Inc., Subsidiary of the Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

202. *Southern Nuclear Services, LLC, Affiliate of The Southern Company*

203. *Southern Power Company, Subsidiary of The Southern Company*

204. *Southern Power O&M, LLC, Affiliate of The Southern Company*

205. *Southern PowerSecure Holdings, Inc., Subsidiary of The Southern Company*

206. *Southern Renewable Energy, Inc., Affiliate of The Southern Company*

207. *Southern Renewable Partnerships, LLC, Affiliate of The Southern Company*

208. *Southern Telecom, Inc., Affiliate of The Southern Company*

209. *SouthStar Energy Services LLC, Affiliate of The Southern Company*

210. *SP Butler Solar Farm, LLC, Affiliate of The Southern Company*

211. *SP Butler Solar, LLC, Affiliate of The Southern Company*

212. *SP Cactus Flats Class B Holdings, LLC, Affiliate of The Southern Company*

213. *SP Cactus Flats Wind Energy, LLC, Affiliate of The Southern Company*

214. *SP Cimarron Capital, LLC, Affiliate of The Southern Company*

215. *SP Cimarron I, LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

216. *SP Decatur County Solar, LLC, Affiliate of The Southern Company*

217. *SP Decatur Parkway Solar, LLC, Affiliate of The Southern Company*

218. *SP Deuel Harvest Wind Energy Class B Holdings, LLC, Affiliate of The Southern Company*

219. *SP Deuel Harvest Wind Energy Holdings, LLC, Affiliate of The Southern Company*

220. *SP Diamond State Class B Holdings, LLC, Affiliate of The Southern Company*

221. *SP Energy Trading, LLC, Affiliate of The Southern Company*

222. *SP Garland Solar Storage, LLC, Affiliate of The Southern Company*

223. *SP Gaskell West 1 Holdings, LLC, Affiliate of The Southern Company*

224. *SP Gaskell West 1 Class B Holdings, LLC, Affiliate of The Southern Company*

225. *SP Pawpaw Solar, LLC, Affiliate of The Southern Company*

226. *SP Roserock Investment, Inc., Affiliate of The Southern Company*

227. *SP Sandhills Solar, LLC, Affiliate of The Southern Company*

228. *SP Skookumchuck Holdings, LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

229. *SP Skookumchuck Investment, LLC, Affiliate of The Southern Company*

230. *SP Solar Farms, LLC, Affiliate of The Southern Company*

231. *SP Solar GP, Inc., Affiliate of The Southern Company*

232. *SP Solar Holdings 1, LP, Affiliate of The Southern Company*

233. *SP Solar Storage Class B Holdings, LLC, Affiliate of The Southern Company*

234. *SP Solar Storage Development Holdings, LLC, Affiliate of The Southern Company*

235. *SP Solar Storage OpCo, LLC, Affiliate of The Southern Company*

236. *SP TEP Class B Holdings I, Inc., Affiliate of The Southern Company*

237. *SP TEP Formations, Inc., Affiliate of The Southern Company*

238. *SP Tranquillity Solar Storage, LLC, Affiliate of The Southern Company*

239. *SP Transmission 1, LLC, Affiliate of The Southern Company*

240. *SP Transmission, LLC, Affiliate of The Southern Company*

241. *SP Wildhorse Class B Holdings, LLC, Affiliate of The Southern Company*

242. *SP Wildhorse Holdings, LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

243. *SP Wind Development Holdings, LLC, Affiliate of The Southern Company*

244. *SP Wind Holdings II, LLC, Affiliate of The Southern Company*

245. *SP Wind Holdings, LLC, Affiliate of The Southern Company*

246. *Spectrum Nevada Solar, LLC, Affiliate of The Southern Company*

247. *SPR Development Holdings, LLC, Affiliate of The Southern Company*

248. *St. Lucie Holdings Cana, LLC, Affiliate of The Southern Company*

249. *Sumter Solar, LLC, Affiliate of The Southern Company*

250. *SVCI, Inc., Affiliate of The Southern Company*

251. *Techstars Corporate Partner 2017 LLC, Affiliate of The Southern Company*

252. Tidwell, Christina A., Counsel for Plaintiff-Appellant

253. *Titan Wind, LLC, Affiliate of The Southern Company*

254. Torrey, Nicholas S., Counsel for Plaintiff-Appellant

255. *Tyler Bluff Wind Project, LLC, Affiliate of The Southern Company*

256. *Virginia Natural Gas, Inc., Affiliate of The Southern Company*

257. *Wake Wind Class B Holdings, LLC, Affiliate of The Southern Company*

258. *Wake Wind Energy LLC, Affiliate of The Southern Company*

Mobile Baykeeper, Inc. v. Alabama Power Company
Case No. 24-12682-C

259. **Wake Wind Holdings LLC, Affiliate of The Southern Company**

260. **Wayne County Development, LLC, Affiliate of The Southern Company**

261. **Whygrene Inc., Affiliate of The Southern Company**

262. **Wildhorse Wind Energy, LLC, Affiliate of The Southern Company**

263. **WWH, LLC, Affiliate of The Southern Company**

264. **Xcclerate Holdings LLC, Affiliate of The Southern Company**

Plaintiff-Appellant further states that Defendant-Appellee Alabama Power Company is a wholly-owned subsidiary of the Southern Company, which is a publicly traded corporation on the New York Stock Exchange with the ticker symbol "SO."

s/Barry A. Brock
Barry A. Brock
*One of the Attorneys for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves familiar principles of standing and ripeness but offers this Court its first opportunity to apply these principles to a citizen suit under the Resource Conservation and Recovery Act ("RCRA") for violations of the federal Coal Combustion Residuals ("CCR") Rule. Accordingly, Mobile Baykeeper ("Baykeeper") respectfully requests oral argument.

# TABLE OF CONTENTS

AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ...................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT................................................. i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF CITATIONS................................................................................. v

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION .......1

STATEMENT OF THE ISSUES ....................................................................1

STATEMENT OF THE CASE.......................................................................2

    I.   Introduction ....................................................................................2

    II.   Factual Background........................................................................2

    III.   Legal Background ...........................................................................4

    IV.   Performance Standards...................................................................6

    V.   Alabama Permit ..............................................................................8

    VI.   EPA's Notice of Potential Violation and Settlement ...................9

    VII.   Decision Below ..............................................................................10

STANDARD OF REVIEW .........................................................................14

SUMMARY OF THE ARGUMENT ....................................................................15

ARGUMENT ............................................................................................18

    I.   Baykeeper Has Standing to Bring This Citizen Suit. ....................18

A.    Baykeeper's Injuries are Fairly Traceable to APC's Violations.................18

1.    The Court's "Injured in the Same Way" Rationale Is Not a Proper Basis to Reject Baykeeper's Standing......................................................................20

2.    Coal Ash Pollution Pre-dating Closure Implementation Is Not a Valid Basis to Reject Standing....................................................................................24

B.    The Requested Remedy Will Redress Baykeeper's Injuries......................30

1.    Baykeeper Is Not Seeking Relief for "Procedural Injury" Alone. .........32

2.    The Court Improperly Applied Temporal and Completeness Elements to Redressability..............................................................................................32

3.    The Order Contains Erroneous, Unsupported Factual Statements in Support of the Standing Ruling.......................................................................35

4.    Baykeeper Has Standing Now to Assert Justiciable Claims Under RCRA Section 6972(a)(1)(A). .............................................................................37

II.    This Case Is Ripe for Adjudication. ..............................................................38

A.    The Order Violates the Separation of Powers. ...........................................38

B.    This Citizen Enforcement Action Satisfies the Ripeness Standard. ..........40

1.    Blocking Enforcement Harms Baykeeper Now.......................................42

C.    This Case Is Fit for Adjudication Now.......................................................46

III.    The Order Should be Reversed and Remanded Due to Erroneous and Unsupported Factual Determinations. ...................................................................51

CONCLUSION ...................................................................................56

CERTIFICATE OF COMPLIANCE ........................................................56

CERTIFICATE OF SERVICE ................................................................56

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*Ala. Power Co. v. U.S. Dep't of Energy*,

    307 F.3d 1300 (11th Cir. 2002) ..........................................................40

*Am. Air Liquide, Inc. v. Comm'r*,

    45 F.App'x 721 (9th Cir. 2002) ..........................................................41

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,

    326 F.3d 505 (4th Cir. 2003) ..............................................................15

*Ass'n of Irritated Residents v. EPA*,

    10 F.4th 937 (9th Cir. 2021) ...............................................................19

*Bankston v. Ala. Pub. Serv. Comm'n*,

    No. 2:21-cv-469, 2024 WL 4363138 (M.D. Ala. Sept. 30, 2024) .....................54

*Bennett v. Spear*,

    520 U.S. 154 (1997)....................................................................25, 31

*Bischoff v. Osceola Cnty., Fla.*,

    222 F.3d 874 (11th Cir. 2000) ............................................................53

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,

    781 F.3d 1271 (11th Cir. 2015) .....................................................15, 30

*Cordoba v. DirectTV, LLC*,

    942 F.3d 1259 (11th Cir. 2019) ...........................................................19

*Cox v. Taylor*,

    256 F.3d 281 (5th Cir. 2001) ...............................................19, 23, 29

*Digital Properties v. City of Plantation*,

    121 F.3d 586 (11th Cir. 1997) .......................................................49, 50

*Duke Power Co. v. Carolina Env't Study Grp.*,

    438 U.S. 59 (1978)...............................................................................30

*Elec. Energy, Inc. v. EPA*,

    106 F.4th 31 (D.C. Cir. 2024)...............................................................7

*\*Fla. Panthers v. Collier Cnty, Fla.*,

    2016 WL 1394328 (M.D. Fla. 2016)..................................................50

*\*Focus on the Family v. Pinellas Suncoast Transit Auth.*,

    344 F.3d 1263 (11th Cir. 2003) .........................................................19

*Goldberg v. Kelly*,

    397 U.S. 254 (1970)............................................................................52

*Harris v. Mexican Specialty Foods*,

    564 F.3d 1301 (11th Cir. 2009) .........................................................50

*Klinedinst v. Swift Inv., Inc.*,

    260 F.3d 1251 (11th Cir. 2001) .........................................................35

*Larson v. Valente,

    456 U.S. 228 (1982).........................................................................33

Lawrence v. Dunbar,

    919 F.2d 1525 (11th Cir. 1990) ...........................................................54

Lincoln v. Bd. of Regents of Univ. Sys. of Ga.,

    697 F.2d 928 (11th Cir. 1983) .............................................................55

Local 336, Am. Fed'n of Musicians, AFL-CIO v. Bonatz,

    475 F.2d 433 (3d Cir. 1973) ..........................................................53, 54

*Lujan v. Defs. of Wildlife,

    504 U.S. 555 (1992)......................................................................19, 30

*Made in the USA Found. v. United States,

    242 F.3d 1300 (11th Cir. 2001) .....................................................31, 37

Massachusetts v. EPA,

    549 U.S. 497 (2007)............................................................................33

*McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.,

    501 F.3d 1244 (11th Cir. 2007) .....................................................14, 51

Me. People's All. v. Mallinckrodt, Inc.,

    471 F.3d 277 (1st Cir. 2006)............................................................5, 19

Morrison v. Amway Corp.,

    323 F.3d 920 (11th Cir. 2003) .............................................................54

*Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*,

    494 F.Supp.2d 401 (M.D. La. 2007).................................................................54

*Roanoke River Basin Ass'n v. Duke Energy Progress, LLC*,

    No. 1:17-cv-707, 2018 WL 2417862 (M.D.N.C. May 29, 2018) ..........29, 46, 50

*\*S. River Watershed All., Inc. v. Dekalb Cnty.*,

    69 F.4th 809 (11th Cir. 2023) ...............................................................34

*State Ins. Fund v. Ace Transp. Inc.*,

    195 F.3d 561 (10th Cir. 1999) ...............................................................55

*Steele v. Nat'l Firearms Act Branch*,

    755 F.2d 1410 (11th Cir. 1985) ...........................................................53, 54

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,

    559 U.S. 662 (2010)..............................................................................40

*Sw. Elec. Power Co. v. EPA*,

    920 F.3d 999 (5th Cir. 2019) ................................................................3

*\*Swann v. Secretary, Georgia*,

    668 F.3d 1285 (11th Cir. 2012) .............................................................22

*Texas v. United States*,

    523 U.S. 296 (1998)..............................................................................49

*TransUnion, LLC v. Ramirez*,

    594 U.S. 413 (2021)..............................................................................24

*Trump v. Hawaii*,

    138 S. Ct. 2392 (2018) .........................................................................19

*United States v. Dekalb Cnty., Ga.*,

    Civ. No. 1:10-cv-04039-SDG (N.D. Ga. Sept. 22, 2021) .................................34

*\*United States v. SCRAP*,

    412 U.S. 669 (1973) ...........................................................................19

*Util. Solid Waste Activities Grp. v. EPA*,

    901 F.3d 414 (D.C. Cir. 2018) .............................................................3, 4

*\*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

    429 U.S. 252 (1977) .........................................................................24, 25

*\*Walters v. Fast AC, LLC*,

    60 F.4th 642 (11th Cir. 2023) ...........................................................19, 21, 22

*Warshak v. United States*,

    532 F.3d 521 (6th Cir. 2008) ................................................................41

*Wash. State Grange v. Wash. State Republican Party*,

    552 U.S. 442 (2008) ...........................................................................41

*Wesco Ins. Co. v. M.O.S. Express, Inc.*,

    No. CV 2:21-00374-KD-N, 2021 WL 6206354 (S.D. Ala. Dec. 13,
2021) ...........................................................................................41

*Wesco Ins. Co. v. M.O.S. Express, Inc.*,

  No. CV 2:21-00374-KD-N, 2022 WL 19352 (S.D. Ala. Jan. 3,

  2022) .................................................................................................41

*\*Wilderness Soc'y v. Alcock*,

  83 F.3d 386 (11th Cir. 1996) ........................................................39, 45

*Wilding v. DNC Servs. Corp.*,

  941 F.3d 1116 (11th Cir. 2019) ....................................................19, 30

*Williams v. Ala. Dep't of Transp.*,

  119 F.Supp.2d 1249 (M.D. Ala. 2000) .................................................38

*\*Williamson v. Tucker*,

  645 F.2d 404 (5th Cir. 1981) .....................................14, 15, 52, 53, 55

**Statutes**

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

42 U.S.C. § 6901 *et seq.*.............................................................................1, 4

42 U.S.C. § 6945 .....................................................................................8, 28

*\*42 U.S.C. § 6972 ............................................................1, 27, 29, 37, 38

**Other Authorities**

*\*40 C.F.R. § 257.1 ......................................................................................28

*\*40 C.F.R. § 257.52 ......................................................................................8

*40 C.F.R. § 257.101 ...........................................................................6, 20

*40 C.F.R. § 257.102 ...................................................6, 26, 32, 43, 45

75 Fed. Reg. 35,128 (June 21, 2010) ...................................................4

80 Fed. Reg. 21,301 (Apr. 17, 2015) ...............................5, 8, 27, 28

Fed. R. Civ. P. 12(b)(1)...............................................................11, 13, 54

Fed. R. Civ. P. 12(b)(6)...............................................................11, 13

Fed. R. Civ. P. 59(e).....................................................................13

Fed. R. Evid. 201 ...........................................................................10

H.R.Rep. No. 94–1491 ..................................................................5

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This case requires application of the CCR Rule promulgated under RCRA. 42 U.S.C. § 6901 *et seq.* The District Court ("Court") exercised jurisdiction pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331. Baykeeper appeals from the Court's January 4, 2024, Order granting Alabama Power Company's ("APC's") motion to dismiss. Baykeeper filed a motion to reconsider on February 1, tolling the period for appeal. The Court denied that motion on July 22.

Baykeeper timely filed its notice of appeal on August 20. This appeal is from a final judgment dismissing Baykeeper's claims. The Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Did the Court err in dismissing Baykeeper's claims under 42 U.S.C. § 6972 for violations of the federal CCR Rule for lack of standing?

II.    Did the Court err in ruling that Baykeeper's claims that APC is currently violating the CCR Rule's closure standards are not ripe for adjudication?

III.    Did the Court err by relying on erroneous findings or assumptions of fact, without discovery, or development of a factual record, to decide jurisdiction at the motion to dismiss stage?

## STATEMENT OF THE CASE

### I.    Introduction

Baykeeper challenges APC's closure of its massive, leaking coal ash impoundment at its James M. Barry Electric Generating Plant ("Barry") in Mobile County, Alabama. APC is implementing an illegal closure that will permanently leave millions of tons of coal ash and toxic pollutants sitting in groundwater in an unlined impoundment on the banks of the Mobile River, in a floodplain in the Mobile-Tensaw Delta, where it will continue leaching pollutants and remain at risk of floods and hurricanes in perpetuity.

 APC's closure has been approved by an Alabama-issued permit and is now several years into construction. The federal standards at issue are enforceable now, and Baykeeper is being harmed now by this unlawful closure. Baykeeper therefore asks this Court to reverse the District Court's dismissal of this enforcement action on standing and ripeness grounds. Baykeeper alternatively asks this Court to reverse because the District Court dismissed the case for lack of subject matter jurisdiction, on fact issues intertwined with the merits, without discovery or development of a factual record.

### II.    Factual Background

At Plant Barry, APC stores over twenty-one million tons of coal ash in an unlined impoundment. Coal ash is waste from burning coal and contains toxic

pollutants like arsenic and mercury. Doc. 1 ¶ 42.[1] Coal ash impoundments "are essentially pits where wastewater sits, solids (sometimes) settle out, and toxins leach into groundwater." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1003 (5th Cir. 2019).

Earthen dikes contain the Barry impoundment within a meander loop of the Mobile River. The impoundment is constructed in wetlands and on top of Sisters Creek; it sits within the 100-year floodplain of the River in the Delta. Doc. 1 ¶ 40. The water levels in the impoundment are subject to substantial rises with floods, storms, and hurricanes.

The impoundment is also subject to catastrophic failure and spilling coal ash into the River and the Delta. *Id.* ¶¶ 12, 41-42. As explained by the D.C. Circuit,

> [S]urface impoundments . . . pose threats to human health and the environment. The risks generally stem from the fact that "thousands, if not millions, of tons [of coal ash are] placed in a single concentrated location." These disposal sites are at risk of structural failure, particularly where they are located in unstable areas such as wetlands . . . The sheer volume of Coal Residuals at these sites, moreover, can force contaminants into the underlying soil and groundwater.

*Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 421-22 (D.C. Cir. 2018) (internal citation omitted). The ash in the Barry impoundment is saturated in water several feet deep. Doc. 1 ¶¶ 1-2, 41. APC's consultant determined that the materials under the impoundment are "leaky," and the groundwater is in hydraulic connection

---

[1] "Doc." refers to the District Court's docket entry followed by the page number generated by the District Court's filing system or paragraph numbers.

with the River and an underlying aquifer. *Id.* ¶¶ 41, 47. The impoundment has been polluting groundwater with contaminants like arsenic for decades. Doc. 61 at 5. The Alabama Department of Environmental Management ("ADEM") cited APC for water contamination at Plant Barry in a 2018 Administrative Order due to high levels of arsenic and cobalt in groundwater. *Id.* In 2020, APC found significant increases for pollutants like arsenic, boron, calcium, chloride, cobalt, and fluoride. *Id.* "Surface water bodies . . . are . . . at risk of contamination through harmful constituents that migrate through groundwater . . . which can lead to environmental harms such as 'wetland vegetative damage, fish kills, amphibian deformities, *** [and] plant toxicity.'" *USWAG*, 901 F.3d at 422 (quoting 75 Fed. Reg. 35,128, 35,172 (June 21, 2010)).

Other Southeastern utilities have closed similar waterfront impoundments by moving coal ash to dry, lined storage away from waterways. These utility-owned coal ash impoundments in the Carolinas have been or are being excavated; Dominion Energy is excavating all its unlined waterfront coal ash impoundments in Virginia; and Georgia Power is excavating over sixty million tons of coal ash from unlined waterfront impoundments in Georgia. Doc. 1 ¶ 37.

## III.    Legal Background

The Environmental Protection Agency ("EPA") adopted the CCR Rule pursuant to RCRA, 42 U.S.C. § 6901 *et seq.*, in 2015 following catastrophic failures

4

of coal ash impoundments at Kingston, Tennessee and the Dan River facility in Virginia. Doc. 1 ¶ 18. Baykeeper filed this action to enforce RCRA and the CCR Rule against APC's illegal closure of its Barry impoundment.

Congress enacted RCRA in 1976, with the avowed intention of closing "the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials . . . ." *Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 287 (1st Cir. 2006) (citing H.R.Rep. No. 94–1491, pt. 1, at 4, reprinted in 1976 U.S.C.C.A.N. 6238, 6241). Complementing this statutory mandate, the CCR Rule's purpose is to stop the leaching of coal ash pollutants into the surrounding waters— the injury at the heart of Baykeeper's Complaint. Importantly, the Rule is designed to remediate existing legacy pollution from coal ash impoundments. As EPA stated in the Preamble to the Rule, "many existing CCR surface impoundments are *currently leaking* . . . . *These are the risks the disposal rule specifically seeks to address.*" 80 Fed. Reg. 21,301, 21,343 (Apr. 17, 2015) (emphasis added). The Preamble also states that a "significant component supporting EPA's determination that the technical requirements will achieve the level of protection required under section 4004(a) is the performance standards that the rules lay out." *Id.* at 21,335. Thus, the Rule's closure performance standards are critical to remedying ongoing coal ash pollution from leaking impoundments like Plant Barry.

Utilities have two options for closing a coal ash impoundment under the CCR Rule: closure-in-place (also called cap-in-place), in which a cover is placed over an unlined impoundment, or closure by removal of the ash. A utility must select a closure method that will comply with closure performance standards. 40 C.F.R. § 257.101(a)(1). APC's ongoing closure process involves leaving coal ash in the unlined impoundment, building another dike, and putting a cap on top. The waste remains saturated feet deep in contaminated groundwater connected to an aquifer and the Mobile River.

## IV.    Performance Standards

To comply with the Rule, APC's closure "must" meet three performance standards: 1) eliminate free liquids "prior to installing the final cover system," 2) "ensure" that closure of the unlined impoundment "will" "preclude the probability of future impoundment" of liquids and solids, and 3) "ensure" that closure "will" control, minimize or eliminate, to the maximum extent feasible, the infiltration of liquids into the coal ash and release of pollution from the impoundment. 40 C.F.R. § 257.102(d)(2)(i); *id.* at § 257.102(d)(1)(ii); *id*. at §257.102(d)(1)(i). In application, these standards prohibit closure that leaves ash saturated in water.

APC admits its cap-in-place closure leaves approximately one million tons of coal ash saturated in water. Doc. 99 at 9, n.4. EPA estimates the amount at five million tons. Doc. 64-2 at 9. APC did not dispute below that its ongoing closure will

leave water in the impoundment; will impound water and solids; and will continue to contaminate the surrounding environment. *See generally* Doc. 60 (addressing only interpretations of the CCR Rule).

APC argues it can legally cap-in-place with coal ash saturated in water, but its position has been roundly rejected. EPA and the D.C. Circuit have made it abundantly clear that leaving ash in groundwater violates the CCR Rule: "The closure in-place standards are designed to ensure that the waste in the closed unit has been dried out and is kept dry so that leachate cannot form in the closed unit and subsequently be released to the environment." Doc. 61-2 at 67-68; *Elec. Energy, Inc. v. EPA*, 106 F.4th 31, 41 (D.C. Cir. 2024) (The Rule "makes clear that operators cannot close their surface impoundments with groundwater leaching in and out of the unit and mixing with the coal residuals.").

EPA has explained that the Rule's requirements apply ahead of closure: it "requires a facility to *ensure the CCR unit will be closed* in a manner that *will*" meet the performance standards. Doc. 61-1 at 40 (emphasis added). Indeed, these performance standards determine which closure method a utility may *select* in the first place: "a facility must meet all of the performance standards for the closure option it has selected, and *if it cannot meet all of the performance standards for one option, then it must select the other option and meet all of the performance standards*

7

*for that option*." *Id.* at 28 (citations omitted) (emphasis added). These standards "must be met at every unit." *Id*. at 33.

In 2016, Congress passed the Water Infrastructure Improvements for the Nation ("WIIN") Act, which provides that states can operate CCR Rule permitting programs. 42 U.S.C. § 6945(d). However, states must apply to EPA for approval and certification that the state program requires compliance with the Rule or with state requirements at least as protective as those in the Rule. *Id*. § 6945(d)(1)(B). ADEM applied to EPA to operate a CCR Rule permitting program. Doc. 60 at 13. EPA issued a proposed denial of Alabama's program in August 2023. Doc. 84-1. In June 2024, EPA issued a final denial finding that Alabama's program did not meet the minimum standards of the Rule. Doc. 114-1.

## V.    Alabama Permit

ADEM issued a permit to APC to cap-in-place the Barry impoundment under state regulations in 2021, prior to the EPA's denial of Alabama's program. The closure authorized in this permit does not comply with federal standards. A utility closing an unlined CCR impoundment must comply with both state and federal requirements. 40 C.F.R. § 257.52. Indeed, EPA adopted the Rule in part because of "significant gaps in state programs," "particularly with respect to the oversight of surface impoundments." 80 Fed. Reg. at 21,322. "[A] facility must still comply with the CCR rule requirements, even if the state has issued a permit that contains less

8

stringent conditions or requirements than those in the CCR rule." Doc. 61 at 9, n.8. As a result, despite the state permit, the federal standards being enforced here apply to Baykeeper's claims.

## VI. EPA's Notice of Potential Violation and Settlement

On January 31, 2023, after this action was filed, EPA issued a Notice of Potential Violations ("NOPV") for Plant Barry. Doc. 62-1. EPA confirmed that "the unlined Ash Pond is closing with an EPA-estimated 23% of the CCR ash remaining in contact with groundwater after consolidation," or approximately five million tons of coal ash, and that APC's closure of the impoundment with ash in groundwater violates all three of the CCR Rule's closure performance standards. *Id.* at 9-12. On December 6, 2023, EPA invited APC to participate in discussions, Doc. 102-1 at 2, and APC agreed. Doc. 106-1 at 2.

In January 2024, APC announced plans to remove some unspecified amount of coal ash from the Barry impoundment by having it recycled for use in concrete. However, APC's state permit, which requires cap-in-place, has not been changed, and APC is under no legal obligation to carry out the recycling plans. Nor is there any assurance that APC will ultimately remove the millions of tons of ash in the bottom of the impoundment saturated deep in groundwater. As an APC spokesperson stated, "Our plans for all ash ponds remain the same—to close in place . . . ." Doc. 111 at 25, n.12.

On September 26, 2024, EPA finalized a consent agreement with APC where APC agreed to correct alleged violations related to groundwater monitoring and its Emergency Action Plan and to pay a civil penalty. The agreement does not resolve the primary issue—closure of the Barry impoundment nor the closure violations cited in EPA's NOPV; the agreement does not affect Baykeeper's claims.[2]

## VII.    Decision Below

Baykeeper filed this citizen suit in September 2022 because APC is implementing a cap-in-place closure of the Barry impoundment that violates the requirements of the Rule to eliminate free liquids, preclude the probability of future impoundment, and curtail, to the maximum extent feasible, infiltration of liquids into the waste or releases of coal ash pollution from the impoundment. Doc. 1 at 16-17 (Counts I-III).

Baykeeper seeks a declaratory judgment that APC is violating the closure standards of the Rule and the open dumping provision of RCRA. Baykeeper also

---

[2] The agreement, called a Consent Agreement and Final Order, can be found on the EPA's website at EPA, Consent Agreement in Docket No. RCRA-04-2024-4200(b) (Sept. 26, 2024), https://yosemite.epa.gov/oa/rhc/epaadmin.nsf/Advanced%20Search/45A2A646336 59FD885258BA4007E92C3/$File/Alabama%20Power%20Company%20Plant%2 0Barry.CAFO.9.26.24.RCRA-04-2024-4200(b).pdf. The Court may take judicial notice of the agreement under Federal Rule of Evidence 201 because the agreement is not subject to reasonable dispute and can be determined from a source whose accuracy cannot reasonably be questioned.

seeks an injunction preventing APC from further implementing its illegal closure. *Id.* at 17.

In December 2022, APC moved to dismiss Baykeeper's complaint under Rule 12(b)(6). Doc. 60. APC made a textual argument, claiming that Baykeeper failed to state a claim because its plan complies with the CCR Rule. APC also argued that Baykeeper was estopped from bringing these claims because it made the same arguments in state permit proceedings.

In its reply, APC for the first time argued that the case is not ripe, Doc. 63 at 6, though it did not amend its motion to seek dismissal under Rule 12(b)(1).

The motion was referred to Magistrate Judge Bivins. After oral argument, Doc. 75, Judge Bivins issued a Report & Recommendation ("R&R") rejecting APC's estoppel argument. Doc. 91 at 26. Judge Bivins also rejected APC's ripeness argument, correctly holding that Baykeeper's alleged harm is concrete, ongoing, and not contingent on hypothetical future events. *Id.* at 35. Further, Judge Bivins determined that "[t]here is nothing before the Court that suggests that a remedy cannot be fashioned, or that judicial involvement will somehow torpedo administrative efforts." *Id.* Last, Judge Bivins found that Baykeeper stated a claim by "adequately explain[ing] why it believes that Alabama Power's CCR closure plan does not comply with the federal CCR Rule and RCRA." *Id.* at 36.

On November 2, 2023, District Judge DuBose issued an order requiring the parties to file a 10-page brief addressing standing, and a joint disclosure statement on EPA's review of Alabama's CCR Program and ongoing coal ash proceedings between ADEM and EPA. Doc. 96.  Both parties filed standing briefs largely focused on one element—injury-in-fact, Docs. 99, 101, then participated in oral argument. Doc. 110.

Rejecting the R&R, the Court dismissed Baykeeper's claims for lack of standing and ripeness. Doc. 108 at 40. As to standing, the Court found Baykeeper established injury-in-fact but held that its injuries were neither traceable to APC's conduct nor redressable. *Id.* at 24-25; 28. The Court further held that this case is not ripe. *Id.* at 39. The Court focused on prudential concerns and speculated that external contingencies could alter APC's closure methods. *Id.* at 36. Several of the Court's rationales and factual assumptions regarding the timing and effect of closure had not been raised by any party's briefs.

Baykeeper filed a motion to reconsider, addressing the issues and factual assumptions regarding harms from noncompliant closure and the remedial effects of compliant closure raised in the Court's Order. To address the factual misapprehensions raised for the first time in the Order, Baykeeper submitted a declaration of an expert hydrologist who testified that compliant closure activities have led to reductions in pollution soon after compliant closure *starts* and

permanently eliminate the environmental impacts and risks over time. *See* Doc. 111-1 ¶ 55.

This appeal presents an unusual procedural history due to the process employed by the Court to adjudicate standing and ripeness. APC's motion to dismiss pursuant to Rule 12(b)(6) did not challenge standing. After that motion had been briefed, argued, and adjudicated in an R&R, the Court raised a *sua sponte* challenge to Baykeeper's standing. Thereafter, the Court conducted a *factual* attack on the Complaint pursuant to Rule 12(b)(1), on separate grounds, without weighing evidence or developing a factual record. That process culminated in the Court making erroneous factual conclusions or assumptions in the Order, which were never asserted by either party on APC's motion to dismiss.[3] The Order grants APC's motion under a different Rule 12 standard, based on extrinsic facts never asserted by any party.

Baykeeper had no opportunity to rebut the Court's factual assumptions because they were not contained in any filing prior to the Order. Baykeeper filed an expert declaration refuting the Court's factual assumptions with its Rule 59(e) motion, Doc. 111-1, but the Court declined to reconsider—though it conceded the

---

[3] As the Court noted, a factual attack challenges the existence of subject matter jurisdiction "irrespective of the pleadings" and allows the court to consider information outside the pleadings and make factual findings to resolve the motion. Doc. 108 at 17 (internal quotation and citations omitted).

evidence "may have affected the Court's legal conclusion" on redressability if the Court had reviewed it earlier. Doc. 116 at 3. The Court's erroneous reliance on unsupported facts impacted all of its jurisdictional rulings.

## STANDARD OF REVIEW

The Court dismissed Baykeeper's Complaint, without prejudice, for lack of subject matter jurisdiction under the doctrines of standing and ripeness. Doc. 108 at 40.

A federal district court may dismiss for lack of subject matter jurisdiction on three bases: (1) the complaint alone (facial challenge); (2) the complaint plus undisputed facts in the record; or (3) the complaint plus undisputed record facts and the court's resolution of disputed facts (factual challenges). *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981)). Here, the Court rejected the R&R and considered the Complaint plus extrinsic (and erroneous and disputed) factual assumptions it supplied without any factfinding process.

Accordingly, *de novo* review applies: "In reviewing the district court's decision to grant the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), lack of subject matter jurisdiction, this Court reviews the legal conclusions of the district court *de novo*." *Id.* at 1250. This Court must also determine "whether the district

court's application of the law is correct and, if the decision is based on undisputed facts, whether those facts are indeed undisputed." *Williamson*, 645 F.2d at 413.

## SUMMARY OF THE ARGUMENT

To establish standing, Baykeeper was required to show: "(1) 'injury-in-fact'; (2) 'a causal connection between the asserted injury-in-fact and the challenged action of the defendant'; and (3) 'that the injury will be redressed by a favorable decision.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1279 (11th Cir. 2015). "In the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003).

The Court correctly concluded, based on the Complaint and declarations by Baykeeper members, that Baykeeper showed concrete injuries in that contamination from the Barry impoundment is "causing or contributing to the recreational and aesthetic injuries Baykeeper members currently suffer." Doc. 108 at 23.

The Court found traceability lacking because: (1) Baykeeper would be injured in the same way if APC had never initiated closure procedures; and (2) the pollution causing Baykeeper's injuries "pre-existed" APC's implementation of closure procedures. This reasoning conflicts with standing doctrine and the purposes of the CCR Rule and RCRA and citizens' right to enforce them. APC is legally required to close the Barry impoundment; it had to commence closure operations. The pertinent

question is how Baykeeper will be harmed if the impoundment is closed legally versus illegally—not what harm would result if APC did nothing.

Second, the Court created an improper standard in rejecting standing. As set out in the Complaint, Baykeeper's injuries arise from pollution that is occurring now due to APC's failure to close in compliance with the Rule's protective standards, but the Court held those injuries were not justiciable because the pollution began prior to APC's unlawful closure activity. There is no such bar to standing recognized in the law.

The Court ruled that ordering compliance with the Rule's closure standards would alleviate a "procedural" injury rather than Baykeeper's concrete injuries. Not so. Amending the closure plan will alter the closure of the leaking impoundment, which will redress Baykeeper's injuries. A compliant plan is a necessary step in compelling legal closure.

The Court also added an unprecedented temporal requirement that the relief granted must completely abate the pollution and redress Baykeeper's injuries "soon." This Court has never recognized such a requirement for standing and doing so here is not feasible because remediation in environmental cases often takes years or decades to complete. Partial or incremental redress of Baykeeper's injuries, even if indirect, is sufficient to establish standing.

16

The Order's ripeness ruling violates the separation of powers. Congress determined the only proceeding that bars a citizen suit of this type is enforcement by EPA in court, but there is no EPA court action and the Court's speculation regarding the effect of EPA's NOPV at Plant Barry, and related negotiations with APC, is not a valid constitutional or prudential reason to block or delay this case.

The Order's ruling that deferring consideration of Baykeeper's claims until 2031 would cause no incremental harm is wrong. The assumption of fact was made without a record and conflicts with expert testimony in the record. With a proper factual record, the Court could not have reached this erroneous conclusion.

The Order improperly relies on speculation about contingencies and collateral proceedings to manufacture a prudential basis to declare the case unripe. But the NOPV issued by EPA is not a bar to this case, by statute. And the denial of Alabama's coal ash permitting program does not change this case at all—APC is subject to the CCR Rule's standards now just as it was before EPA denied Alabama's application. It was improper to rely on speculation about contingent events to begin with; and the contingencies the Court cited do not make this case nonjusticiable.

There is no speculation about Baykeeper's injuries or the underlying conduct causing or contributing to them—the ongoing illegal closure of the Barry impoundment by APC. The case is as ripe as it could ever be.

17

Finally, the Court's rulings were based on unfounded factual statements on key issues, including the nature of Baykeeper's injuries and the impact of closure methods on those injuries, which were not developed through discovery or any evidentiary proceedings. These factual assumptions were not undisputed and were in fact incorrect. They were refuted by Baykeeper's expert hydrologist in the record. If the Court deemed it necessary to make factual determinations on jurisdictional issues, it was required to give Baykeeper the opportunity to conduct discovery and present evidence to support jurisdiction, but it did not do so. This Circuit's law is clear that fact issues concerning the existence of standing should be resolved at a pretrial evidentiary hearing or during trial, not by motion to dismiss. Additionally, summary judgment proceedings should be used where, as here, determination of facts material to jurisdiction is intertwined with the merits of the action. The Court invaded the merits in making determinations about the meaning of the Rule, and the ways compliant closure would or would not stop the pollution causing Baykeeper's injuries, and when. These serious procedural deficiencies warrant reversal in addition to the Court's erroneous legal conclusions.

## ARGUMENT

**I. Baykeeper Has Standing to Bring This Citizen Suit.**

### A. Baykeeper's Injuries are Fairly Traceable to APC's Violations.

The traceability element requires showing that the plaintiff's injuries are causally connected to the defendant's conduct. That is, the injury must be "fairly

traceable." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To be sure, traceability is not an exacting standard." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023).

The required causal connection is not a proximate cause standard. *Cordoba v. DirecTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019). Allegations of *indirect* injuries will suffice to establish traceability. *See United States v. SCRAP*, 412 U.S. 669, 688 (1973); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes."); *Cordoba*, 942 F.3d at 1271(same). "To satisfy Article III's causation requirement, the named plaintiffs must allege that their injuries are 'connect[ed] with the conduct of which [they] complain.'" *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125–26 (11th Cir. 2019) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). Cases under RCRA are subject to traditional standing analysis. *Me. People's All.*, 471 F.3d at 283.

It is sufficient to show that defendant's conduct contributes to the harm or perpetuates it. *See Cox v. Taylor*, 256 F.3d 281, 305 (5th Cir. 2001) (holding concrete injuries caused by illegal dumps were traceable because it was "likely conditions at the . . . dumps would have been ameliorated if [defendant] had acted to set the process in motion"); *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir.

2021) (holding injuries caused by pre-existing air pollution were traceable to state implementation plan designed to reduce the pollution).

Despite recognizing these principles of standing, the Court applied a much more stringent test including factors that are not applicable.

### 1. The Court's "Injured in the Same Way" Rationale Is Not a Proper Basis to Reject Baykeeper's Standing.

The Order cites traceability cases finding no causal link where the plaintiff "would have been injured in precisely the same way without the defendant's alleged misconduct." Doc. 108 at 25. The Order states: "Baykeeper's members 'would have been injured in precisely the same way' had Alabama Power never begun closing the Plant Barry Ash Pond." *Id.* at 27-28 (citation omitted). APC never made this argument and the causation determinations in those cases are clearly inapplicable to this case.

APC is required by law to close the Barry impoundment—the Rule requires all active utility coal ash impoundments to close. 40 C.F.R. § 257.101(a)(1). That requirement is the foundation of this lawsuit. There is no scenario in which the Barry impoundment would *not* be closed. It will either close in compliance with the Rule, or it will close in violation of the Rule. The Court's misguided framing ignores the intent and the requirements of the Rule, and its foundational statute—RCRA. The Rule was promulgated to address the ongoing, legacy pollution from the impoundment, and APC had no choice about closing it in compliance with the Rule's

standards, within a specified timeframe. Non-compliant closure will cause or contribute to Baykeeper's injuries by leaving coal ash in groundwater, leaching pollutants into the surrounding waters. This is exactly why Congress and EPA gave Baykeeper a legal right to challenge non-compliant closure procedures.

Thus, the Court's analytical framing of the causation question as to the CCR Rule is wrong. The probative question is whether Baykeeper's members would be injured in the same way if APC was closing the impoundment in compliance with the Rule. The answer to that question is plainly "No," based on the allegations in the Complaint and the facts in the record. Saturated coal ash in the unlined impoundment is the cause of the ongoing pollution harming members' use of the River, and it is the basis of the ongoing violations of the Rule's closure standards. The question is not what would happen if the impoundment were not closed at all, but what would happen if APC was closing in a compliant manner by separating the ash from water. In that case, the ongoing contamination would be redressed and would eventually stop, as Baykeeper set out in its Complaint.

The cases the Order cites are not applicable here. In *Walters*, 60 F.4th at 645, plaintiff, who had taken out a loan, sued the lender under the Truth in Lending Act, claiming that the lender's mandatory disclosures were inadequate. Plaintiff argued that he would not have taken the loan if the lender's disclosures had been adequate. However, this Court found the disclosures could not be the cause of the plaintiff's

economic injury because plaintiff had never seen *any* disclosures, precluding factual causation. *Id.* at 650-51.

This Court applied similar analysis in *Swann v. Secretary, Georgia*, 668 F.3d 1285, 1286 (11th Cir. 2012), where an incarcerated citizen claimed that a Georgia statute requiring absentee ballots to be mailed to the voter's residential address violated his constitutional rights. This Court found that the incarcerated citizen lacked standing because his alleged injury—not receiving an absentee ballot in jail— was not due to the statute because the only address the plaintiff provided on his absentee ballot application was his residential address. Causation was lacking because, regardless of the statute, his ballot would have been mailed to that residential address. *Id.* at 1288-89.

Both cases involved a break in the causation chain. In direct contrast, Baykeeper's members would *not* suffer the same injury if APC's closure complied with the law, because there would no longer be ash in contact with groundwater and at risk of storms in perpetuity. Under the analysis conducted in *Walters* and *Swann,* which the Court relied on, Baykeeper's members' injuries are fairly traceable to APC's closure.

The Order also bases its faulty traceability conclusions on incorrect statements of fact, as discussed in detail in Section III. Contrary to the Order, Baykeeper's members would *not* have been injured "in precisely the same way" absent APC's

non-compliant closure. Doc. 108 at 27-28. The state-permitted closure plan APC is implementing leaves ash in water, resulting in discharges of contamination, which *directly* causes Baykeeper's injuries. Baykeeper's members attested that APC's closure is a major concern for them, and non-compliant closure is reducing their use and enjoyment of the Mobile River and the Delta because of the pollution it causes and the ongoing risk of a spill. Doc. 1-3 at 4, 6-7, 10, 15. The factual record demonstrates that these members would *not* be injured "in precisely the same way" if APC was implementing a legal closure plan. Leaving saturated ash in the leaking impoundment permanently extends Baykeeper's injuries.

The causal connection here is different than those in *Walters* and *Swann*, where there was a clear disconnect in the causation chain. Here, APC alone is to blame for all Baykeeper's injuries and those injuries flow directly from APC's illegal conduct. APC built the earthen, unlined impoundment which has contaminated the Mobile River and connected waters for decades. Since 2015, APC has had a duty under federal law to abate that pollution through closure of the impoundment in compliance with closure standards. Had APC "acted to set the process" of compliant closure "in motion," conditions at the Barry impoundment "would have been ameliorated." *Cox*, 256 F.3d at 305. Causation in this instance is direct and clear.

### 2. *Coal Ash Pollution Pre-dating Closure Implementation Is Not a Valid Basis to Reject Standing.*

The Court found a "mismatch" between Baykeeper's injuries and APC's misconduct because "the coal ash pollution about which it complains pre-existed and therefore is not fairly traceable to the <u>challenged action</u> of Alabama Power, the implementation of the closure plan for Plant Barry Ash Pond." Doc. 108 at 26. The Court noted that the pollution at Plant Barry has been occurring for decades. *Id.* The Court found traceability lacking because "installation that began in 2020 and likely will not be completed until 2030 . . ." cannot be the "factual or de facto cause of ground water contamination that allegedly goes back decades." *Id.* at 27. The Court's framework conflicts with established concepts of standing.

The touchstone of traceability is showing "that the injury was likely caused by the defendant." *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021). As noted, APC created and is causing the ongoing pollution and other risks that are affecting Baykeeper's members' use and enjoyment of the waters around the leaking impoundment. APC constructed the impoundment and is responsible for the contamination it has created. There is no intervening cause, attenuated chain of possibilities, or contribution to Baykeeper's injuries by any third party.

The Supreme Court case announcing the "fairly traceable" standard, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, is instructive. 429 U.S. 252 (1977). There, a developer's rezoning request to allow development of low-

income housing was denied. A Black plaintiff alleged the denial was racially discriminatory in violation of the Fourteenth Amendment. Plaintiff alleged he was injured by the rezoning decision because he "seeks and would qualify for the housing [the developer] wants to build in Arlington Heights." *Id.* at 264. Plaintiff testified that if the housing project were built, "he would probably move there, since it is closer to his job." *Id.* The Supreme Court held plaintiff had "adequately averred an 'actionable causal relationship' between Arlington Heights' zoning practices and his asserted injury." *Id.* The Court noted that the injury "focuses on a particular project and is not dependent on speculation about the possible actions of third parties not before the court." *Id.*

The trial Court's premise that traceability is negated if ongoing injury predates the complained of conduct cannot be squared with *Village of Arlington Heights*. There, the misconduct was a rezoning denial in 1987, but the injury—racial discrimination causing the plaintiff to lack affordable housing options—predated this zoning decision by decades; yet, the Court had no difficulty in finding that this injury was "fairly traceable" to the rezoning decision for standing purposes. The Order "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).

The Order's convoluted reasoning misses the direct link between Baykeeper's injuries and APC's ongoing violations of the CCR Rule's standards. APC has a state-issued permit to cap the impoundment and is rapidly implementing that plan. As set out in the Complaint, implementing this closure method violates the Rule's standards because it will not abate the contamination, which is the source of Baykeeper's injuries, as required by the Rule, but instead will allow that contamination to continue indefinitely. Thus, there is clear causation between the current, ongoing legal violations and Baykeeper's injuries. This is a textbook case of causation that easily meets the "less than exacting" standard of causation for standing purposes.

The Court's causation analysis misapprehended the Rule's requirements by incorrectly proclaiming the closure standards do not apply until construction of a final cover system "conclude[s]." Doc. 108 at 27. But the Rule states that free liquids must be eliminated "prior to *installing*" the final cover system. 40 C.F.R. § 257.102(d)(2)(i) (emphasis added). "Installing" is a present participle, which is the verb form that "expresses present action"—not completed action. Doc. 111 at 9 n.5. The text of the Rule refutes the Court's position: this elimination of liquids must be accomplished "*prior to* installing" the final cover system. 40 C.F.R. § 257.102(d)(2)(i) (emphasis added).[4] As the Order correctly notes, "installation . . .

---

[4] As addressed in Section III below, this analysis also directly implicates the merits of the claims, which is inappropriate at the motion to dismiss stage when evaluating subject matter jurisdiction.

began in 2020," Doc. 108 at 27, meaning that the requirement to eliminate free liquids has been enforceable at least since that time. APC's ongoing closure method will not eliminate free liquids and that violation is a direct cause of the ongoing contamination from the impoundment into the surrounding waterways. Thus, the injuries set out in the Complaint are caused by APC's failure to comply with the closure requirements of the Rule—violations which are enforceable now.

APC's past pollution cannot vitiate Baykeeper's standing. If it did, the Rule would be rendered unenforceable by any citizen, simply because the Barry impoundment has been leaking for decades. But that ongoing, legacy pollution was the impetus for the CCR Rule's closure requirements to begin with—they were put in place to ensure this problem would not continue once the impoundments were closed. In the Rule's Preamble, EPA said that "many existing CCR surface impoundments are *currently leaking . . . . These are the risks the disposal rule specifically seeks to address.*" 80 Fed. Reg. at 21,343.

Congress purposefully relied upon citizen enforcement, like this case, to ensure compliance with RCRA regulations: "[A]ny person may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of any . . . standard [or] regulation . . . which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). The Rule was created to regulate the storage and disposal of coal ash under RCRA in a manner that will alleviate the injuries

demonstrated by Baykeeper. *See* 80 Fed. Reg. at 21,312. Violations of the Rule constitute illegal open dumping under RCRA. 42 U.S.C. § 6945; 40 C.F.R. § 257.1(a)(2). Through this statutory and regulatory framework, citizen plaintiffs are empowered to sue for violations of the Rule's closure standards, to ensure impoundments are closed in a manner that will abate the *historical, ongoing* contamination associated with coal ash impoundments. But citizens could never enforce the Rule if pollution targeted by the Rule that began prior to closure somehow invalidated their standing. The Rule specifically provides for citizen enforcement of closure standards at the stage that Baykeeper initiated this case.

Thus, the Court's standing ruling based on the pollution pre-dating the commencement of closure misunderstands the nature of the causal relationship between Baykeeper's injury and the closure requirements. The very purpose of the Rule and the enforcement rights granted by Congress are to ensure that closure stops unlined coal ash impoundments from leaking pollution; past pollution is irrelevant once closure begins and a utility either complies with the closure requirements or violates them by closing in a manner that leaves coal ash saturated and leaching pollutants now and into the future. There is nothing about past pollution at Plant Barry that invalidates the causal relationship between unlawful closure of the impoundment and the ongoing and certainly impending pollution and other harms that closure inflicts on Baykeeper and its members. Citizen plaintiffs enforcing

RCRA under 42 U.S.C. § 6972(a)(1)(A) have standing to address legacy pollution sources in situations like this one where closure requirements would remedy the pollution. *E.g.*, *Cox*, 256 F.3d at 306 (finding traceability requirement was satisfied for enforcement of "uncorrected violations of Saitas's obligations to plan for and accomplish the elimination of the hazards caused by the dumps").

The Order's reliance on *Roanoke River Basin Association v. Duke Energy Progress* is misplaced. Doc. 108 at 28 (citing No. 1:17-cv-707, 2018 WL 2417862 (M.D.N.C. May 29, 2018)). While the Order states that the lack of state approval and far-off commencement of closure in *Roanoke* "is a distinction without a difference with respect to the causation analysis quoted here," *id.* at 28 n.4, there is a very significant difference: the *Roanoke* court held "*preparation* of an *initial* Closure Plan" was not causally linked to members' injuries. 2018 WL 2417862, at *5 (emphasis added). Critically, the *initial* plan was at issue. When the suit was filed, Duke Energy still had more than *twenty months* under state regulations to submit a final plan to state regulators for approval, and it could not begin implementation of the plan until receiving the state's approval. *Id.* at *7. Based on those particular facts—including an intervening state process—the court ruled that the plaintiffs would not necessarily "experience any effects" of the initial plan and deemed claims directed to the plan too remote and speculative to make the case justiciable. *Id.*

This situation is entirely different. As the Order recognizes, APC has been implementing its state-approved closure for years, and it is obligated to do so by the terms of its state permit. Baykeeper is currently suffering the effects: pollution is happening now *because* this unlawful closure fails to comply with the Rule and address the pollution source, coal ash saturated in groundwater. Accordingly, the harms to Baykeeper's members are more than "fairly" traceable to this defective closure—they are directly connected to APC's ongoing closure of the impoundment that leaves coal ash saturated in water.

### B. The Requested Remedy Will Redress Baykeeper's Injuries.

To establish redressability, Baykeeper must demonstrate a substantial likelihood that its members' injuries "will be redressed by a favorable decision." *Black Warrior Riverkeeper*, 781 F.3d at 1279. The standard does not require certainty; instead, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. As the Court noted, at the motion to dismiss stage, "the Court presumes that 'general allegations embrace those specific facts that are necessary to support the claim,'…and general factual allegations of the standing elements may suffice." Doc. 108 at 19 (citing *Wilding*, 941 F.3d at 1124). Baykeeper meets that burden if it shows that "the judicial relief requested will prevent or redress the claimed injury." Doc. 108 at 28 (citing *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 79 (1978)). That is true

even if the redress is partial. *Made in the USA Found. v. United States*, 242 F.3d 1300, 1310-11 (11th Cir. 2001). At the motion to dismiss stage, the burden to prove redressability is "relatively modest." *Bennett*, 520 U.S. at 171.

The Court accurately described some of the injuries to Baykeeper's members: "Here, the Complaint plausibly alleges that Plant Barry is contaminating adjacent waters in the Mobile-Tensaw Delta, which is causing or contributing to the recreational and aesthetic injuries Baykeeper members currently suffer." Doc. 108 at 23. Thus, the issue is whether a ruling in Baykeeper's favor will redress its injuries.

As shown below, the relief sought will undoubtedly remedy Baykeeper's injuries. Among other things, Baykeeper seeks injunctive relief to prohibit the ongoing *implementation* of APC's non-compliant cap-in-place closure procedures. An order directing APC to change course and close the impoundment in a way that removes the ash from contact with liquids, will, over time, *prevent* the formation and discharge of contaminated leachate to adjoining waters, in compliance with Rule standards, which will redress the injuries. Doc. 1 ¶ 15. A favorable decision would directly address the concerns that affect members' use and enjoyment of the waterways surrounding Plant Barry. In contrast, the concrete harm shown to Baykeeper's members will continue unabated if the impoundment is closed in a non-compliant manner, allowing leachate to form and flow into the River. Because an

31

order requiring compliant closure would redress Baykeeper's injuries, the trial Court's analysis should have ended there.

### 1. Baykeeper Is Not Seeking Relief for "Procedural Injury" Alone.

The Order incorrectly concluded that compelling APC to file a compliant closure plan would only alleviate a "procedural injury" and would not make it "substantially likely" the leaching would stop "any time soon." Doc. 108 at 29. The plan is required under the Rule to describe "how the CCR unit will be closed" and to detail the methodology for closure of the impoundment. 40 C.F.R. § 257.102(b). But to change its method of closure, APC must first amend the closure plan. *Id.* Amending the plan here is a necessary requirement for compliant closure, which will redress the members' injuries by abating the pollution causing those injuries. Baykeeper sued to declare the current closure illegal and enjoin ongoing implementation of the illegal plan, as well as to require a closure plan that complies with the Rule by separating coal ash from groundwater, Doc. 1, Prayer for Relief at ¶¶ A–C; it has standing to sue for these forms of relief.

### 2. The Court Improperly Applied Temporal and Completeness Elements to Redressability.

The Court imposed a non-existent timing requirement for standing, writing: "Still, ordering Baykeeper to execute a closure plan that complies with… [the CCR Rule] would not make it 'substantially likely' that Plant Barry's coal ash leaching would *cease any time soon."* Doc. 108 at 29 (emphasis added).

First, the Court's statement of fact directly conflicts with Baykeeper's well-pleaded allegations. The Complaint states, "under Alabama Power's current Closure Plans and the state permit issued by ADEM, contamination will continue indefinitely into the future," Doc. 1 ¶ 49, "causing continued pollution and perpetuating the risks to Baykeeper and its members, as well as the water resources of the Mobile-Tensaw Delta that they depend on—unless the closure requirements of the federal CCR Rule are enforced at Plant Barry." *Id.* ¶ 13. Those allegations should have been credited on a motion to dismiss, and they make clear that the requested relief will stop Baykeeper's injuries.

Second, redressability does not require that requested relief completely and immediately redress plaintiff's injuries if the "risk would be reduced to some extent if petitioners received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *see also Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury"). If the requested relief would partially address Baykeeper's injuries, or address them over time, that is enough to establish standing and the Court erred in ruling otherwise.

The Court provided no explanation of what "soon" means here or why such timing matters for standing purposes. The Court cited no authority for this timing

33

requirement, and it does not appear to exist in the pertinent case law. Standing is not defeated because a court-ordered remedy will take some time to abate contamination. This requirement is not feasible in environmental pollution cases, particularly contaminated site remediation cases under RCRA, which often involve orders that take decades to achieve remediation.

Baykeeper is aware of no case that supports the proposition that redress must come "soon" to count. Redress of environmental injury can take decades. For example, the Order cites *South River Watershed Alliance, Inc. v. Dekalb County*, where EPA and Georgia regulators filed a complaint against the County in 2010 and entered into a consent decree in 2011; South River Watershed Alliance gave notice of intent to sue for violations of the consent decree in 2019, resulting in a modification and additional remedial actions by the County that would not achieve compliance until 2027. 69 F.4th 809 (11th Cir. 2023); Modification to Consent Decree at 21, *United States v. Dekalb Cnty., Ga.*, Civ. No. 1:10-cv-04039-SDG (N.D. Ga. Sept. 22, 2021). The Eleventh Circuit found that the plaintiff met the redressability element of standing because "[t]he water quality of the Chattahoochee and South Rivers would likely be improved if the court implemented an injunction requiring DeKalb County to take additional steps . . . ." 69 F.4th at 820. A particular time limit for complete redress is not a requirement to show redressability.

### 3. The Order Contains Erroneous, Unsupported Factual Statements in Support of the Standing Ruling.

The Order states: "Ordering Alabama Power to *implement* a closure plan today that both eliminates the post-closure infiltration of liquids and releases of CCR into groundwater and precludes the probability of future impoundment of water, sediment, or slurry *cannot redress ongoing leaching* when the law only regulates how a CCR unit is closed." Doc. 108 at 29 (emphasis added). The Order also opines that ordering APC to "eliminate free liquids by removing liquid wastes <u>prior to installing the final cover system</u> would do nothing to address Plant Barry's ongoing groundwater contamination when the system will not be installed until August 2030." *Id.* (emphasis in original). APC did not make such an argument, so Baykeeper had no opportunity to respond to it, there is no factual basis in the record to support the statement, and the Court is simply incorrect. As discussed in Section III, the Court should not have made factual statements or assumptions on critical issues of fact that go to the merits of the claims at the motion to dismiss stage. The Court was wrong to wade into technical issues of fact without expert testimony or an established record. *See Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1257 (11th Cir. 2001) (reversing lower court's order granting summary judgment based on erroneous factual assumption).

At any rate, implementing closure methods that remove free liquids, preclude impoundment of water, and prevent infiltration of liquids into the ash has *immediate*

benefits in reducing pollution levels and risk, long before closure is complete. As shown by the declaration of Baykeeper's expert hydrologist, compliant closure under the Rule "would reduce most of these environmental impacts and reduce the environmental risks (*i.e.*, injuries to Baykeeper will be reduced), and the ultimate removal of all coal ash will then permanently eliminate the environmental impacts and risks (*i.e.*, injuries to Baykeeper will be eliminated)." Doc. 111-1 ¶ 55. Where unlined coal ash impoundments have been closed and excavated in coastal areas like Plant Barry, reduction in pollution of the surrounding environment began soon after ash excavation *started*, years before closure was completed. Closure activities at these sites reduced "the discharge of contaminated groundwater to surface waters, *with beneficial effects long before the completion of closure*." *Id.* ¶¶ 30, 50 (emphasis added). Arsenic levels in nearby groundwater "declined dramatically" after excavation of coal ash began. *Id.* ¶ 49. Further, at one site, compliant closure (excavation) prevented catastrophes in 2018 and 2019, before closure had been completed, when hurricane flood waters inundated the impoundments.[5] The benefits of *proper* closure do not start when the closure is completed, ten or more years after the cleanup begins—pollution declines throughout the process, and the risk of coal ash catastrophe declines with each passing day of ash removal under a compliant

---

[5] *See* Doc. 111 at 21 nn.7-9.

plan. The Order reached the opposite conclusion based on mistaken factual assertions made prior to discovery and without the benefit of a factual record.

The Court also incorrectly held that redressability requires a remedy that will instantly cause the leaching of all contaminants to "cease." Doc. 108 at 29. That is not the law, as the Court acknowledged when it cited a case from this Circuit holding that "partial relief may suffice for redressability." *Id.* (citing *Made in the USA Found.*, 242 F.3d at 1310-1311). Again, ordering a compliant plan and closure implementation would provide immediate, even if partial and gradual, redress for Baykeeper's injuries, and that suffices for redressability.

### 4. Baykeeper Has Standing Now to Assert Justiciable Claims Under RCRA Section 6972(a)(1)(A).

Last, the Order comments on Baykeeper's election to sue under § 6972(a)(1)(A) of RCRA rather than under § 6972(a)(1)(B). But Congress created two RCRA causes of action enforceable by citizen suits, and Baykeeper was not obligated to assert both. Section (a)(1)(A), which provides a claim for violation of any "standard…regulation…or requirement applicable" under RCRA, incorporates the CCR Rule. The Rule and RCRA provide a specific remedy for contamination from coal ash impoundments based on violations of the closure performance standards. Baykeeper's claim under § (a)(1)(A) is directly applicable and carries no additional standing requirements.

## II.    This Case Is Ripe for Adjudication.

The Court dismissed this case based on impermissible speculation: it relied on what it deemed the "likelihood" of multiple "contingencies" to conclude the closure currently being implemented by APC might change. Doc. 108 at 34. It did so by impermissibly citing other actions authorized by Congress under RCRA, which Congress chose not to include among the actions that bar citizen enforcement.

### A.    The Order Violates the Separation of Powers.

The Order correctly notes that ripeness is a doctrine designed in part to advance the separation of powers and respect limitations on judicial power. But the Order uses ripeness to overrule the decisions Congress made when it wrote RCRA and the WIIN Act. Under the Order, citizens cannot enforce the Rule if EPA has merely initiated negotiations with a proposed violator; the statute plainly allows citizen enforcement with one exception—diligent prosecution in court. 42 U.S.C. § 6972(b)(1)(B). The Order also found this action unripe based on the predicted denial of Alabama's CCR permitting program application by EPA, but in the WIIN Act, Congress did not provide that state program applications would block or delay Congressionally-authorized citizen suits.

The Order contravenes the separation of powers. Congress itself enacted citizen enforcement of RCRA regulations. *Williams v. Ala. Dep't of Transp.*, 119 F.Supp.2d 1249, 1256 (M.D. Ala. 2000) ("RCRA's standing provisions allow 'any

person' to bring suit. In choosing this language and conferring standing to the fullest extent permitted by Article III, Congress sought to maximize the number of potential enforcers of environmental regulations.") (internal citation omitted). The matters the Order relies upon to find lack of ripeness are procedures Congress created: EPA's RCRA enforcement activities and EPA's review of a state's CCR Rule permitting program application. In RCRA and the WIIN Act, Congress created these procedures, expressly providing that only EPA court enforcement would preclude a citizen enforcement action; it deliberately did not give such effect to other EPA enforcement activities or EPA review of a state's permitting program application— the "contingencies" cited by the Order. The Order effectively writes into RCRA limitations on Congressionally-authorized citizen enforcement based on procedures created by Congress, when Congress chose not to give those processes that effect.

Moreover, the Order's reliance on these procedures is not an issue of constitutional ripeness that could override Congress's express authorization of citizen enforcement under RCRA. This is not a case where the closure challenged depends upon some separate, future decision before it goes into effect; instead, Alabama has already issued a state permit that authorizes and requires cap-in-place, and APC is in the process of closing the impoundment in that way. *E.g.*, *Wilderness Soc'y v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996) (holding case was not ripe because no action would be taken "without a second stage of decisionmaking"); *see also* Doc.

91 at 29-20. Here, the factors cited by the Order are mistaken, textbook examples of "prudential reasons for refusing to exercise jurisdiction," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010). The Order assumed EPA's discussions with APC and proposed denial of Alabama's request for an approved permitting program would create some "likelihood" that "contingencies" would arise that might change the ongoing closure. These prudential predictions were speculative and inaccurate, but they also violated the clear statutory authorization established by Congress.

B. This Citizen Enforcement Action Satisfies the Ripeness Standard.

The ripeness doctrine bars a plaintiff's claim where judicial review is premature because of speculative injuries that may never occur. *Ala. Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1310 n.9 (11th Cir. 2002)). Here, Baykeeper's injuries are occurring now and are certain to occur going forward, because as set out in the Complaint, APC is actively closing the Barry impoundment in a way that leaves coal ash submerged in groundwater.

The R&R aptly summarized the reasons this case is ripe:

> There is no dispute that Alabama Power has received a permit from ADEM and is moving ahead with its closure plan for the CCR impoundment at Plant Barry. Alabama Power's plan lays out the steps it will take to close the impoundment, and Alabama Power has already begun implementing its plan. Baykeeper has alleged that Alabama Power's activities in connection therewith are continuing and will continue to leach out pollutants into the surrounding waters and perpetuate risks to Baykeeper and its members unless the closure

> requirements of the federal CCR Rule are enforced at Plant Barry. . . .
> As pled, Baykeeper has alleged harm that is not contingent on
> hypothetical future events.

Doc. 91 at 34-35.

The ripeness doctrine bars a plaintiff from relying on future contingencies that are too speculative, but here it was the Court that speculated about such contingencies to conclude that APC's approved and ongoing closure might change in the future.

As one Court of Appeals explained, "when determining whether a case is ripe, 'we must be careful not to . . . speculate about 'hypothetical' or 'imaginary' cases[.]'" *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Likewise, another Circuit Court concluded that the possibility of a future change in position was insufficient to render the case unripe: "The suggestion that the Secretary may reverse his position at a subsequent date is far too speculative to cause us to refrain from deciding a case that is now ripe for decision." *Am. Air Liquide, Inc. v. Comm'r*, 45 F.App'x 721, 722-23 (9th Cir. 2002). A proper ripeness analysis "declines to speculate" whether contingencies may occur in the future. *Wesco Ins. Co. v. M.O.S. Express, Inc.*, No. CV 2:21-00374-KD-N, 2021 WL 6206354, at *7 n.13 (S.D. Ala. Dec. 13, 2021), *report and recommendation adopted*, No. CV 2:21-00374-KD-N, 2022 WL 19352 (S.D. Ala. Jan. 3, 2022).

Baykeeper's claims do not rely on speculation or contingencies—rather, they seek to enforce the closure standards of the Rule to the ongoing closure of the Barry impoundment, which is well underway. This case cannot get any riper. And because of APC's ongoing failure to separate its coal ash from groundwater in compliance with the Rule's closure performance standards, the Court's refusal to enforce those standards harms Baykeeper and its members.

### 1.  *Blocking Enforcement Harms Baykeeper Now.*

The Order relied on the mistaken factual premise that "[t]he Court cannot impose any <u>incremental</u> harm by deferring review to a date closer to the project's estimated 2031 completion date when, even if granted, *Baykeeper's requested relief would not affect the polluting impoundment until that point anyway*." Doc. 108 at 35 (second emphasis added). The Order made the additional factual conclusion that "*granting Baykeeper's relief would not affect the ongoing leaching until much closer to August 2030*." *Id.* (emphasis added). These statements are mistaken facts found on a motion to dismiss, without discovery or the development of a factual record. Thus, the legal conclusions the Court drew from them are erroneous. *See infra* Section III.

Under the Rule, the steps to stop pollution and protect against a coal ash catastrophe start long before the completion of closure. "*[P]rior to installing the final cover system,*" APC must eliminate free liquids—water—from the

42

impoundment. 40 C.F.R. § 257.102(d)(2)(i) (emphasis added). The same is true of the requirements to preclude the probability of future impoundment of water and coal ash slurry and to address the flow of water and contaminants into and out of the impoundment. *Id.* § 257.102(d)(1)(i), (ii). Those requirements do not take effect in 2031; they apply during the years of closure and cleanup of the site. As the process is implemented, the source of the pollution is reduced, as is the magnitude of the consequences of catastrophic failure.

Instead of complying with the Rule's requirements, APC is currently closing the impoundment in a manner that does not separate its coal ash from water and does not prevent pollutants from leaching into the surrounding environment. As recognized in the Order, Doc. 108 at 22-23, Baykeeper's injuries arise directly from the ongoing, serious environmental harm from a leaking and risky impoundment that the Rule was promulgated to abate. Prompt citizen enforcement is the intended mechanism to ensure timely compliance, which will in turn remediate the contamination. Logically, the sooner the remediation begins, the better. Delaying enforcement until completion of a non-compliant closure process, as the Court would do, guarantees additional harm to Baykeeper and the environment, and defeats the purpose and objectives of the Rule.

Once Baykeeper learned of the Court's mistakes of fact in the Order, Baykeeper submitted an expert declaration rebutting the Court's conclusions with

factual examples. Doc. 111-1 ¶¶ 18-19. Baykeeper demonstrated how legally compliant closure reduces pollution and flood risk long before it is complete. *Id.* The Court admitted that had it considered this information, it "may have affected the Court's legal conclusion that Baykeeper's instant harms are not redressable by a favorable decision." Doc. 116 at 2-3. While the Court's statement refers to redressability, the same mistakes of fact equally formed the basis for its ripeness ruling that there would be no incremental harm to Baykeeper from delaying enforcement of the Rule. Indeed, in its reconsideration order, the Court did not attempt to defend its ripeness ruling regarding incremental harm. *See id.* at 3-4.

As discussed below, the Court also relied on improper speculation, citing "several lurking contingencies" that supposedly "increase the likelihood" that APC's closure would change in the future, meaning there would be no hardship from delaying enforcement of the Rule. Doc. 108 at 36. The Court's wholly prudential analysis relied on these supposed "contingencies" to conclude that the closure plan "will likely not crystallize for years." *Id.* This prediction was unfounded.

First, APC has received all necessary approvals and is currently years into constructing its cap-in-place closure. Doc. 60 at 16. APC's state permit requires it to manage its Barry impoundment closure "in accordance with the conditions of the . . . approved permit application," which includes the cap-in-place closure plan that APC is implementing. Doc. 22-1 at 3. As a result, the Court's ripeness analysis

is backwards: Baykeeper's injuries are certain and ongoing because of the closure currently being implemented; it is the possibility relied on by the Court that Baykeeper's injuries might be eliminated in the future by some unspecified change to the closure method that is improperly speculative.

Second, the closure standards being enforced apply now, not at some unspecified point in the future. These standards govern which closure method—cap-in-place or closure by removal—a utility may select in the first place and proceed to implement. A utility cannot *select* a closure option unless it meets all performance standards for that option, "and if it cannot meet all of the performance standards for one option, then it must select the other option and meet all of the performance standards for that option." Doc. 61-1 at 28. The standards clearly impose requirements that apply prior to the completion of closure. *E.g.*, 40 C.F.R. § 257.102(d)(2). Allowing APC to implement its noncompliant, polluting cap-in-place closure method causes harm to Baykeeper now.

The Court properly recognized that *Wilderness Society* was unripe because "no harvesting [of timber] will be done . . . until after the second-stage decisions are made." Doc. 108 at 35 (citing 83 F.3d at 390). But the District Court did not follow this Circuit's reasoning. Here, APC is working on the ground every day to implement its closure of the Barry impoundment and is required to close the impoundment by the terms of its state permit. Doc. 22-1 at 3. No further decisions

or approval are required, and this defective closure is proceeding towards completion.

For the same reasons, the Barry closure is not "preliminary" like the closure plan at issue in *Roanoke River Basin Association v. Duke Energy Progress*, cited by the Court. Doc. 108 at 36. There, state authorization of the closure plan had not yet occurred, and closure would not *begin* for years. Here, the state has authorized APC to implement its closure plan, and closure at Barry is well underway. Doc. 60 at 9.

### C. This Case Is Fit for Adjudication Now.

The Order states that "the final form that the closure plan for the Plant Barry Ash Pond will take is not sufficiently defined and concrete to permit effective decision making by the Court." Doc. 108 at 37. There are several errors in this statement. First, it assumes the Rule's closure performance standards do not apply until closure is complete, but as set out above, these standards apply now. Second, it assumes the plan is not already in its final form, but it is, APC is well underway with closure, and APC is required by its state permit to implement the closure plan that was approved by ADEM. The state permit requires APC to manage its Barry impoundment "in accordance with the conditions of the . . . approved permit application," which includes the cap-in-place closure plan that APC is currently constructing. Doc. 22-1 at 3. Finally, APC has shown no sign of changing its plan— it argued vigorously below that it is allowed to implement its cap-in-place plan under

the Rule, Doc. 60, and APC recently confirmed that "[o]ur plans for all ash ponds remain the same—to close in place—as offered by the EPA rule and approved by ADEM." Doc. 111 at 25 n.12.

In addition, the information outside the Complaint relied on by the Court does not justify its conclusions. The Order correctly predicted that EPA would deny Alabama's application to operate an approved permitting program under the Rule. Doc. 114-1. The Court stated that EPA's denial "would leave Alabama in unchartered [*sic*] waters as the only state with EPA denial of its state CCR permitting program." Doc. 108 at 37. But EPA's denial simply means that nothing has changed: Alabama (like 46 other states) has no approved CCR Rule permitting program; it did not have one when the CCR Rule's closure standards were promulgated in 2015, when ADEM issued its state permit approving APC's closure plan under state regulations, when Baykeeper filed this enforcement action, and when the Court granted the motion to dismiss; and it still does not have one now that EPA has denied its application. Nothing has changed and there was no "contingency" to be concerned with.

The Order mistakenly assumed the denial would likely change the state permit or APC's closure. But the continued lack of an approved permitting program simply means APC remains subject to *both* less-stringent state requirements *and* the federal Rule's standards, and that enforcement of the federal Rule in Alabama must occur

47

through enforcement actions such as this one. APC has been subject to the Rule's standards from the beginning, yet it has spent years and millions of dollars implementing its unlawful cap-in-place closure and stated publicly that it has no intention of changing course. The Court's assumption that the state program denial "makes it more likely that Alabama Power will be forced to amend its closure plan" is baseless—and following EPA's denial, no such plan amendment has occurred.

Next, the Order cites EPA and APC negotiations related to EPA's Notice of Potential Violations. There is no legal basis for finding that these discussions justify the dismissal of litigation for lack of ripeness. In all litigation, there is the possibility that negotiations may change the litigation landscape, but initiation of such discussions does not divest courts of jurisdiction or cause them prudentially to dismiss pending litigation. Negotiation about potential violations is not a basis to conclude that APC will agree to undertake closure obligations that APC has resisted for years. And in fact, the agreement that EPA and APC recently reached notably does not include the issue of impoundment closure. Once more, the Court's prediction proved wrong, revealing the error of basing dismissal on prudential concerns tied to predictions about the future.

Finally, the Order states that the Court would have to engage in speculation to review how APC is going to close its Barry impoundment. *Id.* at 39. But APC is closing the impoundment now pursuant to a binding permit that mandates the closure

48

methodology challenged here, APC is actively carrying out that closure, and admits its ongoing closure is leaving massive amounts of coal ash submerged in groundwater. *See* Doc. 99 at 9, n.4. As the Magistrate Judge correctly noted, the central question in this case is whether APC is allowed to implement closure that is not compliant with the plain language of the CCR Rule. Doc. 91 at 35. Contrary to the Court's conclusion, considering APC's admissions, this is indeed a "purely legal claim." Doc. 108 at 39 (internal citation omitted). Baykeeper seeks an order requiring APC to comply with the Rule by implementing a compliant closure plan now that satisfies the Rule's closure standards by separating the coal ash from groundwater, which the Court is fully capable of ordering. Doc. 1, Prayer for Relief ¶ C.

The cases relied on in the Order in determining that the record is presently unfit for judicial decision are easily distinguishable. In several, the cases were not ripe because there was no real, tangible controversy. For instance, in *Texas v. United States*, Texas sought a declaratory judgment that certain provisions of the Voting Rights Act did not apply to certain sections of the Texas Education Code. 523 U.S. 296 (1998). The Supreme Court determined that the state had not pointed to any situation in which the application of the statute was "currently foreseen or even likely." *Id.* at 300. Similarly, in *Digital Properties v. City of Plantation*, Digital Properties sued challenging the City's zoning regulations before ever receiving a

"binding conclusive administrative decision." 121 F.3d 586, 590 (11th Cir. 1997); *see also Roanoke River Basin Ass'n*, 2018 WL 2417862, at *7 (determining that the action was not ripe because Duke Energy had not received final approval from the state). In contrast to these cases, in *Florida Panthers v. Collier County, Florida*, discussed in the R&R, the court held that because the County had implemented specific permitting policies and continued to implement them, the plaintiffs' assertions "do not rest on contingent, hypothetical future events, and are fit for adjudication." 2016 WL 1394328, at *12 (M.D. Fla. 2016). Likewise, as explained in the R&R, Doc. 91 at 33-35, here APC has received a final closure permit from Alabama and the closure is currently being implemented. Closure is not just something that is "currently foreseen or even likely"—it is occurring. It is not dependent on any contingent future event.

The Order also cited *Harris v. Mexican Specialty Foods*, 564 F.3d 1301 (11th Cir. 2009), a case in which the lower court made assumptions about future events in concluding that the case was ripe. This Court reversed the lower court's ruling, finding that "[o]nce the district court's assumptions are removed, the as-applied excessiveness challenge is not ripe." *Id.* at 1310. The trial Court similarly made assumptions but used them to conclude the case is not ripe. Once those flawed assumptions are removed, it is evident that this case is ripe.

50

**III.    The Order Should be Reversed and Remanded Due to Erroneous and Unsupported Factual Determinations.**

As set out above, the Order should be reversed based on its legal errors in applying the standing and ripeness standards, and nothing more is required. But in the alternative, it should be reversed and remanded for improper fact-finding. As noted, a federal district court may dismiss a case for lack of subject matter jurisdiction by construing the complaint and undisputed facts. *See McElmurray*, 501 F.3d at 1251. But here, the jurisdictional ruling went beyond the Complaint to cite extrinsic, incorrect factual premises that were not argued by the parties or the subject of any evidentiary or adversarial proceedings.

The Court made these material determinations of fact related to the redressability element of standing:

1. Ordering closure procedures now that do not leave coal ash in contact with liquids would not cause leaching of pollutants to cease "soon." Doc. 108 at 29; and

2. Ordering closure procedures now that prevent post-closure infiltration of liquids and future impoundment of water, sediment, and slurry "cannot redress ongoing leaching." *Id.*

The Court made these critical findings of fact related to ripeness:

1. Deferring review of the relief Baykeeper seeks would not impose "incremental harm" because the relief "would not affect the polluting impoundment" until closure is completed in 2031. *Id.* at 35; and

2. Granting Baykeeper's relief "would not affect the ongoing leaching until much closer to August 2030." *Id.*

Part of this Court's review is determining whether the Court's assumed facts "are indeed undisputed." *Williamson*, 645 F.2d at 413. The Court's factual premises are *not* undisputed or correct. Once Baykeeper learned of them, it refuted them through the declaration of its expert hydrologist, Anthony Brown, submitted with its Rule 59 motion. *See* Doc. 111-1. Brown testified that ordering closure now that complies with the Rule's protective standards *would* redress the ongoing leaching as soon as compliant closure implementation began. *Id.* The Court incorrectly concluded that there would be no incremental harm to delaying relief on Baykeeper's claims for years.

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Here, the Court erred by assuming these facts, which reach the merits of the dispute, were undisputed and correct, and by failing to employ procedures for fact development. If the Court wished to delve into complex technical issues going to the meaning of the Rule to

52

adjudicate standing and ripeness, it should have done so through the development of a detailed factual record and summary judgment proceedings.

District courts may make "factual determinations decisive of a motion to dismiss for lack of jurisdiction," but only if they "give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." *Williamson*, 645 F.2d at 414*; accord Local 336, Am. Fed'n of Musicians, AFL-CIO v. Bonatz*, 475 F.2d 433, 437 (3d Cir. 1973) ("the record must clearly establish that after jurisdiction was challenged the plaintiff had an opportunity to present facts by affidavit or by deposition, or in an evidentiary hearing, in support of his jurisdictional contention."). Baykeeper had no opportunity to dispute the Court's jurisdictional factual statements prior to the issuance of the Order. Moreover, the Court acknowledged that its conclusions might have been different if it had considered Brown's declaration prior to ruling, yet still refused to reconsider. Doc. 116 at 3.

In *Bischoff v. Osceola County, Florida*, this Circuit held that a district court "must resolve any genuine disputed factual issue concerning standing, either through a pretrial evidentiary proceeding or a trial itself." 222 F.3d 874, 881 (11th Cir. 2000). Similarly, in *Steele v. National Firearms Act Branch*, this Circuit held that "[f]actual issues concerning the existence of the standing requirements in a particular case are to be resolved in the same manner as any other controverted fact" and thus

"[d]isputed factual issues may be resolved at a pretrial evidentiary hearing or during the course of trial." 755 F.2d 1410, 1414 (11th Cir. 1985).[6] And in *Local 336*, the Third Circuit held that it was improper for a district court to decide a jurisdictional fact on a *sua sponte* Rule 12(b)(1) challenge without a full factual and evidentiary record in the case. 475 F.2d at 437.

Most relevant here, a court should not decide subject matter jurisdiction at the motion to dismiss stage when the jurisdictional facts intertwine with the merits of the case. *Bankston v. Ala. Pub. Serv. Comm'n*, No. 2:21-cv-469, 2024 WL 4363138, at *10 n.8 (M.D. Ala. Sept. 30, 2024) (citing *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)). Rather, the court should limit its jurisdictional analysis to *facial* scrutiny of the complaint (as the Magistrate Judge did) and "reserve factual scrutiny for the merits." *Id.* (quoting *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 494 F.Supp.2d 401, 405 (M.D. La. 2007)). Stated differently, when a factual attack on jurisdiction invades the merits of the claim, the court should decide jurisdiction after discovery, employing summary judgment proceedures and a summary judgment standard. *Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990).

---

[6] The Court there remanded the issue to the district court "to allow appellant to establish the factual background necessary to permit the district court to resolve the standing question." 755 F.2d at 1415.

The Court invaded the merits in its Order, delving into the science concerning the way closure methods and remedial measures will or will not stop leaching and redress Baykeeper's injuries. In doing so, the Court made determinations that should be based on expert testimony and a full factual record. This Court should reverse the Order and remand the case for full discovery on the merits, with the possibility that subject matter jurisdiction, which is intertwined with the merits in the Order, could be revisited at the summary judgment or trial stage if necessary.

Finally, in the alternative, if the Court's factual statements are deemed to be resolving disputed facts based on the rebuttal evidence submitted with the Rule 59 motion, they were "clearly erroneous" because they were made without support in the record, and in direct conflict with credible expert testimony on the issues. *See Williamson*, 645 F.2d at 414; *Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*, 697 F.2d 928 (11th Cir. 1983) ("Our deference to the district court is not unlimited . . . and we will hold a finding of fact clearly erroneous if the record lacks substantial evidence to support it."); *State Ins. Fund v. Ace Transp. Inc.*, 195 F.3d 561, 564 (10th Cir. 1999) (finding of fact may be clearly erroneous if it is "without factual support in the record . . . ."). Because the factual determinations underpinning the Court's jurisdictional rulings were unsupported and incorrect, the challenged Orders should be reversed.

55

## CONCLUSION

For these reasons, the Orders and Final Judgment of the District Court should be reversed.

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies as follows:

1.  This brief contains 12,948 words, excluding the parts of the documents exempted by Rule 32(f), in accordance with Rule 32(a)(7)(B).

2.  The brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6).

Dated: October 15, 2024

s/Barry A. Brock
Barry A. Brock
*One of the Attorneys for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, the foregoing was filed electronically with the Clerk of Court through the appellate CM/ECF system. I further certify that all parties required to be served have been served.

Dated: October 15, 2024

s/Barry A. Brock
Barry A. Brock
*One of the Attorneys for Appellant*
