No. 24-12682-C

# In the United States Court of Appeals
# for the Eleventh Circuit

———————————

MOBILE BAYKEEPER, INC.,
*Plaintiff–Appellant,*

v.

ALABAMA POWER COMPANY,
*Defendant–Appellee.*

———————————

On Appeal from the United States District Court
for the Southern District of Alabama
No. 1:22-cv-00382-KD-B

———————————

## BRIEF OF APPELLEE
## ALABAMA POWER COMPANY

———————————

Jamie W. Betbeze
jbetbeze@maynardnexsen.com
Raymond L. Bell, Jr.
rbell@maynardnexsen.com
MAYNARD NEXSEN P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Tel.: (251) 432-001
Fax: (251) 432-0007

Ed R. Haden
ehaden@balch.com
Charles A. Burkhart
cburkhart@balch.com
Steven A. Burns
sburns@balch.com
Sean W. Shirley
sshirly@balch.com
BALCH & BINGHAM LLP
1901 Sixth Ave. North
Suite 1500
Birmingham, AL 35203
Tel.: (205) 226-8795
Fax: (205) 226-8799

December 16, 2024

No. 24-12682-C

*Mobile Baykeeper, Inc. v. Alabama Power Company*

## CERTIFICATE OF INTERESTED PERSONS

Defendant-Appellee Alabama Power Company submits this Certificate of Interested Persons and Corporate Disclosure Statement. *See* Fed. R. App. P. 26.1; 11th Cir. R. 26.1-1, -2, and -3. Alabama Power Company states that the certificate of interested persons contained in Appellant Mobile Baykeeper, Inc.'s opening Brief is complete. *See* 11th Cir. R. 26.1-2(b).


/s/ *Ed R. Haden*
One of the Attorneys for Defendant-Appellee Alabama Power Company

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

This case is about a multi-year plan to close a coal combustion residuals ("CCR"), or coal ash, impoundment at Plant Barry owned by Alabama Power Company ("Alabama Power") near Mobile, Alabama. Mobile Baykeeper, Inc. ("Baykeeper") sought to have the District Court order a replacement closure plan that would add billions of dollars in costs and would take years to complete far beyond the regulatory deadline for closure, but would not improve the quality of drinking water in the surrounding municipalities that Baykeeper concedes is already safe and clean.

The District Court dismissed Baykeeper's complaint for lack of standing and ripeness. Baykeeper alleged that its members had suffered recreational injuries from CCR for decades—before the U.S. Environmental Protection Agency ("EPA") promulgated regulations governing the closure of ash impoundments and before Alabama Power began implementing its 2020 closure plan. The District Court concluded that the CCR-related injuries that Baykeeper alleged (i.e., recreational and property injuries) were not fairly traceable to Alabama Power's 2020 closure plan's alleged violation of EPA's CCR Regulations.

i

The District Court also concluded Baykeeper's claims were not ripe because (a) Alabama Power was (and still is) in settlement discussions with EPA regarding the closure plan for Plant Barry ash impoundment and (b) EPA had proposed to disapprove the CCR permit program of the Alabama Department of Environmental Management. As to (a), the District Court could not predict what specific engineering controls and other designs would be approved by EPA and ADEM for an amended closure plan for Plant Barry.

Because of the complexity of the CCR Regulations and the closure plan, Alabama Power requests oral argument to provide the Court with answers to any questions it may have regarding this case.

# TABLE OF CONTENTS

Certificate of Interested Persons .......................................... C-1

Statement Regarding Oral Argument ...................................... i

Table of Citations .......................................................... vi

Statement of Subject-Matter  and Appellate Jurisdiction ................. xiii

Introduction.............................................................. 1

Statement of the Issues.................................................. 5

I.    Whether the District Court correctly dismissed Baykeeper's claims for lack of standing when the past alleged contamination is not fairly traceable to the 2020 closure plan's alleged violation of the CCR Regulations and when the future alleged contamination is not imminent because of contingencies. ............. 5

II.   Whether the District Court correctly dismissed Baykeeper's claims because they are not ripe in light of multiple contingencies that must be resolved. ............................... 5

Statement of the Case ................................................... 5

Standard of Review ...................................................... 25

Summary of Argument.................................................... 26

Argument................................................................ 31

I.    The District Court Correctly Dismissed Baykeeper's Claims For Lack Of Standing. ................................................... 31

      A.    To Show Standing, Baykeeper Must Show that the 2020 Closure Plan's Alleged Violation of the CCR Regulations is Fairly Traceable to its Members' Actual or Imminent Injuries in Fact................................................. 33

      B.    Any Past Injury Is Not Fairly Traceable to the Alleged Regulatory Violation and Any Future Injury Is Not Imminent. ........................................................ 35

            1.    Past Alleged Injury from 1991 to 2019 Was Not Caused by, or Fairly Traceable to, the 2020 Closure Plan's Alleged Violation of the CCR Regulations........ 35

2.  Present Alleged Contamination Is No Different Than What Would Occur if Closure by Removal Had Been Adopted in 2020, Because It Would Take Years to Implement That Plan...................................................37

3.  Any Future Impact Is Not "Imminent" or "Fairly Traceable" to the 2020 Closure Plan. ...........................39

C.  Baykeeper's Fear that an Unprecedented Future Storm Might Cause Ash to Spill into the Mobile River at Some Unspecified Future Time is Speculative and is Not Imminent. .................................................................47

D.  Baykeeper's Reliance on Post-Judgment Factual Evidence Fails. .........................................................................50

1.  Baykeeper's Post-Judgment Introduction of Previously Available Evidence Does Not Support Current Harm from the Alleged Regulatory Violation or Create a Fact Issue. ...............................................50

2.  The District Court Did Not Make Unsupported and Erroneous Findings of Fact.............................................53

E.  Whether Some Other Party Could File a Citizen Suit Is Not Relevant to Standing Analysis. .....................................55

F.  Baykeeper's Sought-After Order for a New Closure Plan Will Not Redress Its Injuries for Years. .............................55

II. The District Court Correctly Dismissed Baykeeper's Complaint As Not Ripe......................................................................59

A.  Delaying Judicial Review Will Not Cause Baykeeper Incremental Harm.................................................................59

1.  Baykeeper's Claims are Not Ripe Because They Seek Relief at a Distant Future Time. .................................59

2.  Article III of the Constitution Takes Precedence Over RCRA's Statutory Citizen Suit Provision...........63

B.  The Record is Unfit for Judicial Decision. ...........................65

iv

Conclusion ............................................................................ 68

Certificate of Compliance ...................................................... 70

# TABLE OF CITATIONS

## CASES

*A&M Gerber Chiropractic LLC v. GEICO General Insurance Company*, 925 F.3d 1205 (11th Cir. 2019) ........................................ 45

*Adams v. Atl. Richfield Co.,*
No. 2:18-CV-375-JVB-JPK, 2021 WL 4819608
(N.D. Ind. Oct. 15, 2021) ..................................................................... 22

*American Air Liquide, Inc. v. Commissioner*,
45 F.App'x 721 (9th Cir. 2002) ........................................................... 61

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................... 26, 53

*Ass'n v. Duke Energy Progress*, LLC,
No. 1:17-cv-707, 2018 WL 2417862 (M.D.N.C. May 29, 2018) .......... 63

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) ........................................................... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................ 26

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) .................................................... 22, 25

*Bryant v. Ford*,
967 F.3d 1272 (11th Cir. 2020) ........................................................... 22

*Clapper v. Amnesty International, USA*,
568 U.S. 398 (2013) ............................................. 36, 40, 42, 48, 49, 55

*Cliff v. Payco Gen. Am. Credits, Inc.*,
363 F.3d 1113 (11th Cir. 2004) ........................................................... 26

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) ........................................................... 38

*Dep't of Com. v. N.Y.*,
139 S. Ct. 2551 (2019) ........................................................................ 39

*Duke Power Co. v. Carolina Env't Study Grp.*,
   438 U.S. 59 (1978)..............................................................55

*Einhorn v. Axogen, Inc.*,
   42 F.4th 1218 (11th Cir. 2022) ......................................26

*Electric Energy, Inc. v. EPA*,
   106 F.4th 31 (D.C. Cir. 2024)..........................................23

*Families Concerned About Nerve Gas Incineration v. U.S. Dept. of Army*, 380 F. Supp. 2d 1233 (N.D. Ala. 2005) ....................44

*Focus on the Fam. v. Pinellas Suncoast Transit Auth.*,
   344 F.3d 1263 (11th Cir. 2003) ......................................40

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)..........................................................33

*Harris v. Mex. Specialty Foods*,
   564 F.3d 1301 (11th Cir. 2009)........................................65

*Henley v. Herring*,
   779 F.2d 1553 (11th Cir. 1986)........................................60

*Jaffke v. Dunham*,
   352 U.S. 280 (1957)..........................................................23

*Johnson v. City of Atlanta*,
   107 F.4th 1292 (11th Cir. 2024) ...................................9, 15

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024)......................................................24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).................................. 33, 35, 40, 49, 56

*Mack v. USAA Cas. Ins. Co.*,
   994 F.3d 1353 (11th Cir. 2021)........................................45

*Marbury v. Madison*,
   5 U.S. 137 (1803)..............................................................64

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)..........................................................57

*Massachusetts v. Westcott*,
    431 U.S. 322 (1977)................................................................2, 22

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020).........................................................49

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)......................................................................59

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002).......................................................25

*Regions Bank v. Kearney*,
    597 F. App'x 1012 (11th Cir. 2014)................................................23

*Roanoke R. Basin Ass'n v. Duke Energy Progress, LLC*,
    No. 1:17-cv-561, 2018 WL 1605022 (M.D.N.C. Mar. 29, 2018)....45, 46

*S. River Watershed All., Inc. v. DeKalb Cnty., Georgia*,
    484 F. Supp. 3d 1353 (N.D. Ga. 2020), *aff'd*, 69 F.4th 809
    (11th Cir. 2023)..........................................................................58

*Sanchez v. Disc. Rock & Sand, Inc.*,
    84 F.4th 1283 (11th Cir. 2023) ....................................................xiii

*Scott v. Suncoast Bev. Sales, Ltd.*,
    295 F.3d 1223 (11th Cir. 2002).......................................................51

*SEC v. Miller*,
    No. 1:04-CV-01655, 2010 WL 11508717 (N.D. Ga. Aug. 18, 2010)....23

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1991) ......................................................44

*So. R. Watershed All., Inc. v. Dekalb Cnty, Georgia*,
    69 F. 4th 809 (11th Cir. 2023) ..................................................32, 57

*Spokeo, Inc.* v. *Robins*,
    578 U. S. 330 (2016)....................................................................32

*Support Working Animals, Inc. v. Governor of Florida*,
    8 F.4th 1198 (11th Cir. 2021) .......................................................40

*Swann v. Sec'y, Ga.*,
    668 F.3d 1285 (11th Cir. 2012).......................................................38

*Tex. v. U.S.,*
  523 U.S. 296 (1998)................................................................60, 63

*Timson v. Sampson,*
  518 F.3d 870 (11th Cir. 2008)............................................................52

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021)............................................................................31

*U.S. v. Metro. St. Louis Sewer Dist.,*
  440 F.3d 930 (8th Cir. 2006)............................................................52

*United States v. Howard,*
  28 F.4th 180 (11th Cir. 2022) ......................................................2, 47

*Util. Solid Waste Activities Grp. v. EPA,*
  901 F.3d 414 (D.C. Cir. 2018) ..........................................................12

*Village of Arlington Heights v. Metropolitan Housing Development*
  *Corp.,* 429 U.S. 252 (1977)...............................................................37

*Walters v. FastAC, LLC,*
  60 F.4th 642 (11th Cir. 2023) ....................................................36, 38

*Wilderness Society v. Alcock,*
  83 F.3d 386 (11th Cir. 1996)............................................................62

## STATUTES

5 U.S.C. § 702 ......................................................................................61

28 U.S.C. § 1291 ................................................................................xiii

28 U.S.C. § 1331 ................................................................................xiii

42 U.S.C. § 6904(d)(3)(A) ..................................................................41

42 U.S.C. § 6928 ..................................................................................61

42 U.S.C. § 6944(a) ...................................................................1, 12, 57

42 U.S.C. § 6945(d)(1) ..................................................................20, 44

42 U.S.C. § 6945(d)(2)(B) ..................................................................21

42 U.S.C. § 6945(d)(4)(A)(i) ..............................................................61

42 U.S.C. § 6972(a) ...........................................................................xiii

42 U.S.C. § 6972(a)(1)(A)................................................xiii, 5

42 U.S.C. § 6972(b)(1)(B)....................................................64

42 U.S.C. § 7521(a)(1).........................................................57

42 U.S.C. § 7607(b)(1).........................................................57

42 U.S.C. §§ 6901–6987......................................................11

50 U.S.C. § 1881a ................................................. 36, 42, 43

## RULES

Rule 12(b)(6), Fed. R. Civ. P..............................................22

Rule 59, Fed. R. Civ. P. ....................................................xiii

Rule 201(d), Fed. R. Evid. ......................................... 2, 9, 22

Rule 201, Fed. R. Evid.........................................................47

## REGULATIONS

40 C.F.R, § 257.104(c).........................................................14

40 C.F.R. § 257.102(b)(1)(iii) .......................................17, 54

40 C.F.R. § 257.102(b)(3)(i) ..........................................4, 65

40 C.F.R. § 257.102(d)(1)(i) ................................................17

40 C.F.R. § 257.102(d)(1)(ii) ........................................17, 34

40 C.F.R. § 257.102(d)(2) ....................................................34

40 C.F.R. § 257.102(d)(2)(i) ................................................17

40 C.F.R. § 257.50 .........................................................1, 6

40 C.F.R. § 257.83 ...............................................................47

40 C.F.R. § 257.90 ...............................................................13

40 C.F.R. § 257.91(a)(2) .......................................................19

40 C.F.R. § 257.91-95 ..........................................................19

40 C.F.R. § 257.96-98 ..........................................................13

40 C.F.R. § 257.97 ...............................................................19

x

40 C.F.R. § 261.10 ...................................................................23

40 C.F.R. § 261.11 ...................................................................23

40 C.F.R. §257.102(d)(1)(i) ......................................................34

40 C.F.R. Part 258 ...................................................................12

40 C.F.R. Part 264 ...................................................................12

40 C.F.R. Part 265 ...................................................................12

45 Fed. Reg. 33,150 (May 19, 1980) ........................................12

56 Fed. Reg. 50,978 (Oct. 19, 1991) .........................................12

58 Fed. Reg. 46,466 (Dec. 8, 1987) ..........................................20

59 Fed. Reg. 9,979 (Mar. 2, 1994) ...........................................20

80 Fed. Reg. 21,302 (Apr. 17, 2015 ............................ 1, 10, 12, 13, 14, 16

82 Fed. Reg. 59,601 (Dec. 15, 2017) ........................................20

88 Fed. Reg. 55220-01 (Aug. 14, 2023) ...................................21

88 Fed. Reg. 55274 (Aug. 14, 2023).........................................21

89 Fed. Reg. 48,774 (June 7, 2024) ................................ 20, 21, 44

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 2. ...........................................................31

## OTHER AUTHORITIES

*EPA Reaches Settlement with Alabama Power Company to Address Compliance with Certain Coal Ash Regulations* (Oct. 9, 2024), *available at* https://www.epa.gov/newsreleases/epa-reaches-settlement-alabama-power-company-address-compliance-certain-coal-ash#:~:text=Alabama%20Power%20provides%20energy%20to,civil%20penalty%20of%20%24278%2C000 (last visited Nov. 26, 2024) ..25

EPA, *Final Report: Dam Safety Assessment of CCW Impoundments, James M Barry Electric Generating Plant*, at 15 (Dec. 8, 2010), *available at* https://www3.epa.gov/epawaste/coal/pdf/apc_barry_cbi_final.pdf.....47

EPA, *Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant* 47 (Jan. 11, 2022), *available at* https://www.regulations.gov/document/EPA-HQ-OLEM-2021-0590-0002 (last visited Dec. 13, 2024)..........................................................42

*In re Alabama Power Company*, Dock. No. RCRA-04-2024-4200(b), Consent Agreement and Final Order (EPA Sept. 26, 2024)..............25

NOAA, Historical Hurricane Tracks, https://coast.noaa.gov/hurricanes (search "36512"; select 50 miles under "Search Distance"; select Categories 1-5 and Tropical Storm under "Storm Categories"; select years 1965-2023 under "Year(s)") ...........................................................................................48

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The District Court had subject-matter jurisdiction over the claims filed by Mobile Baykeeper, Inc. under 42 U.S.C. § 6972(a)(1)(A). The Court had federal question jurisdiction over the claim under 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331.

The District Court entered its final judgment on January 4, 2024. (Doc.108.) The District Court's decision was final because it, and the preceding orders, disposed of all claims for all parties. *See Sanchez v. Disc. Rock & Sand, Inc.*, 84 F.4th 1283, 1291 (11th Cir. 2023) ("Ordinarily, a final judgment resolves conclusively the substance of all claims, rights, and liabilities of *all parties* to an action.") (internal citation omitted).

Baykeeper timely filed a post-judgment motion under Fed. R. Civ. P. 59(e) on February 1, 2024. (Doc.111.)  The District Court denied Baykeeper's post-judgment motion on July 22, 2024. (Doc.116.) Baykeeper timely filed its notice of appeal on August 20, 2024. (Doc.117.) *See* Fed. R. App. P. 4(a)(4)(A)(iv).

This Court has jurisdiction over this appeal from the final decision of the District Court.  *See* 28 U.S.C. § 1291 ("The courts of appeals …

shall have jurisdiction of appeals from all final decisions of the district

courts of the United States….").

## INTRODUCTION

For decades, Alabama Power Company ("Alabama Power") has burned coal to produce steam that generated electricity at Plant Barry in Mobile County, Alabama. This process produced coal combustion residuals ("CCR"), or coal ash. Since 1965, Alabama Power placed the CCR in a facility at the plant called an "impoundment," which is formed of dikes built on top of the ground.

For fifty years, neither the federal government nor the State of Alabama regulated the disposal of this CCR. In 2015, however, the Environmental Protection Agency ("EPA") issued regulations governing the management of CCR as a non-hazardous "solid waste" under the Resource Conservation and Recovery Act ("RCRA"). *See* 40 C.F.R. §§ 257.50, *et seq*.; 80 Fed. Reg. 21,302, 21,326-27). The purpose of RCRA is to prevent "adverse effects on health or the environment…." 42 U.S.C. § 6944(a).

The municipalities in Mobile and Baldwin Counties around Plant Barry test their drinking water regularly and the test results show their

1

drinking water is safe and clean.  *See* (Doc.72-1—72-5.)[1]  Mobile

Baykeeper, Inc. ("Baykeeper") has publicly admitted that the drinking

water is safe and clean.  *See* (Doc.76-1-PageID.18535.)[2]  With respect to

the environment, test results in the Mobile River near Plant Barry have

not shown any contaminants from CCR in excess of EPA's limits that are

designed to ensure adequate protection.  (Doc.113-Pg.15; Doc.72-1-Pg.2-

3; Doc.103-1-PageID.19385-19393.)

The CCR Regulations required CCR impoundments to close using

one of two methods: (1) remove liquid, arrange the CCR into its closure

configuration, and place a cover on top of the CCR to keep rain out ("close

in place"); or (2) dig up the CCR and truck it to another disposal facility

---

[1] This Court may take judicial notice of the drinking water test results on file with ADEM.  *See* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding."); *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2 (1977) ("The fact that respondent holds such a license has been ascertained from the records of the Merchant Vessel Documentation Division of the Coast Guard. These records may be judicially noticed."); *United States v. Howard*, 28 F.4th 180, 186 n.2 (11th Cir. 2022) (taking judicial notice of state agency record of doctor surrendering her medical license that was publicly available on agency's website).

[2] Citations to the record are to the document number on PACER followed by either (1) the page number listed on the document, or, if there is not a document page number, (2) the District Court "PageID" (i.e., the PACER page number).

("excavation" or "removal").  In the commentary to the 2015 CCR Regulations, EPA stated that it expected most CCR impoundments to close in place because of the high cost of the excavation process.  *See* 80 Fed. Reg. at 21,412.

In 2020, Alabama Power submitted a revised closure plan to the Alabama Department of Environmental Management ("ADEM") for its review and approval.  In 2021, ADEM approved the plan and issued a permit authorizing Alabama Power to close the CCR impoundment at Plant Barry by 2031 using the close in place method.

In January of 2022, EPA advanced a new interpretation of the 2015 CCR Regulations.  For the first time, EPA prohibited closure of a surface impoundment if it left CCR within the impoundment in contact with groundwater (i.e., below the water table, which is the top surface of the groundwater).  A facility must now either excavate the CCR from the impoundment or implement engineering controls that EPA has yet to identify or define.  EPA's directive applies even if drinking water is safe and clean and regardless of the facility's plans to address groundwater quality.

3

In any event, the only purportedly "compliant" plan identified by Baykeeper would require excavation of the CCR and disposal of it elsewhere. (Baykeeper's Br.36-37.) According to ADEM, this process would add approximately $4 billion to the cost of closure for the Plant Barry CCR impoundment alone and take 20-25 years. (Doc.98-1-Pgs.21-24.) Barry is one of nine plants with CCR impoundments in Alabama.

Notwithstanding ADEM's approval of Alabama Power's 2020 closure in place plan, EPA and Alabama Power are currently in discussions to resolve a Notice of Potential Violation ("NOPV") proceeding regarding how the current closure plan may be modified. Even if there were pollution in the river as Baykeeper alleges, resolution of the NOPV proceeding could address it. If changes to the closure plan are necessary, Alabama Power would have to apply to ADEM for a modification of the permit ADEM previously issued to close the CCR impoundment in place.

The owner or operator of a CCR impoundment may amend the written closure plan at any time. 40 C.F.R. § 257.102(b)(3)(i). Alabama Power has already amended its closure plan for the Plant Barry Ash Pond twice: in July 2019, *see* (Doc.40-1-

4

PageID.5888-5940), and again in April 2020, *see* (Doc.51-1-PageID.13634-13661; Docs.27-1–36-1; Doc.37-1-PageID.5453). And the differing positions of ADEM and EPA may well require another amendment.

## STATEMENT OF THE ISSUES

I.    Whether the District Court correctly dismissed Baykeeper's claims for lack of standing when the past alleged contamination is not fairly traceable to the 2020 closure plan's alleged violation of the CCR Regulations and when the future alleged contamination is not imminent because of contingencies.

II.   Whether the District Court correctly dismissed Baykeeper's claims because they are not ripe in light of multiple contingencies that must be resolved.

## STATEMENT OF THE CASE

### THE NATURE OF THE CASE

This is a citizen suit under RCRA that challenges the plan to close the CCR impoundment at Plant Barry owned by Alabama Power. *See* 42 U.S.C. § 6972(a)(1)(A) (citizen suit for "violation of any" "regulation"). Baykeeper alleges that Alabama Power's closure plan violates EPA's

2015 Coal Combustion Residuals Rule (the "CCR Rule" or the "CCR Regulations"), 40 C.F.R. § 257.50, *et seq.*  (Doc.1.)

On the merits, Baykeeper argues that the CCR Rule prohibits the closure of a CCR impoundment with ash in contact with groundwater.  Alabama Power argues that the CCR Rule does not categorically prohibit closing with CCR in contact with groundwater inside the impoundment if certain engineering controls can be implemented.  Baykeeper seeks (a) a declaratory judgment stating that Alabama Power's closure plan violates the CCR Rule, (b) injunctive relief barring Alabama Power from implementing its current closure plan, and (c) injunctive relief requiring Alabama Power to file an amended closure plan that is consistent with Baykeeper's interpretation of the CCR Regulations.  (Doc.1-Pg.17.)

## COURSE OF PROCEEDINGS AND DISPOSITION IN THE COURT BELOW

Baykeeper's Complaint: Baykeeper filed its complaint on September 26, 2022.  (Doc.1.)  Baykeeper's complaint contained three claims alleging that Alabama Power's 2020 closure plan did not comply with the CCR Rule because: (1) the closure plan would not eliminate free liquids prior to closure; (2) the closure plan would not  preclude the probability of future impoundment of water, sediment, or slurry; and (3)

the closure plan would not control post-closure infiltration of liquids into the waste or releases of pollution to ground water will be controlled. (Doc.1-Pgs.16-17.)

Alabama Power's Motion to Dismiss:    On January 10, 2023, Alabama Power filed its corrected motion to dismiss, arguing that Baykeeper's interpretation of the CCR Rule was contradicted by the technical meaning of the terms of the CCR Rule. (Doc.60.)  Baykeeper responded, arguing that EPA supported its position.  (Doc.61.)  Alabama Power's reply pointed out 22 times in which EPA has approved the closure of waste impoundments with waste in contact with groundwater and argued that the claims were not ripe because of several contingencies.  (Doc.63.)[3]

The District Court's Final Judgment: After a hearing on May 11, 2023, and post-hearing filings, Magistrate Judge Bivins issued a report and recommendation, recommending that the District Court deny Alabama Power's corrected motion to dismiss. (Doc.91.) Alabama Power filed objections to the report and recommendation.  (Doc.94.)   On December 12, 2023, the parties addressed standing and ripeness at a

---

[3] *See infra* note 10.

7

hearing before the Honorable Kristi DuBose. *See* (Doc.99; Doc.101.) On January 4, 2024, the District Court granted Alabama Power's motion to dismiss on both standing and ripeness grounds. (Doc.108.)

The District Court held that Baykeeper did not have standing to sue because the alleged contamination, which according to Baykeeper dates back to 1991, was not fairly traceable to the closure plan that was not drafted and filed with ADEM until 2020 and will not be complete until 2030. (*Id.* at 27.) The District Court also held that Baykeeper's claims were not ripe because deferring review to a date closer to 2031 would not cause Baykeeper incremental harm and would allow for resolution of multiple contingencies. (*Id.* at 35.) Finally, the District Court held that the record was unfit for review given contingencies, including EPA and Alabama Power's negotiations over the NOPV that could lead to an amendment of the closure plan that is expressly allowed by the CCR Regulations. (*Id.* at 38.)

Baykeeper's Post-Judgment Motion: On February 1, 2024, Baykeeper filed a motion to reconsider under Federal Rule of Civil Procedure 59(e) and included an expert witness's declaration based on information from 2001 to 2018. (Doc.111; Doc.111-1.) Alabama Power

moved to strike the evidence because, among other things, the evidence was previously available.  (Doc.113-Pgs.19-22.)  On July 22, 2024, the District Court denied Baykeeper's motion to reconsider and concluded that the declaration had not been properly submitted.  (Doc.116-Pg.3 n.3.)

Baykeeper's Appeal:  On August 20, 2024, Baykeeper appealed the final judgment and the order denying the motion to reconsider. (Doc.117.)

## STATEMENT OF THE FACTS

### The Plant Barry CCR Impoundment

Plant Barry is located near Bucks, Alabama, on the banks of the Mobile River, approximately 18 miles upstream from Mobile. *See* (Ex. A) (Doc.22-1-PageID.107).[4]  The process of generating electricity at Plant Barry produces CCR.  *See* (Doc.27-1-PageID.4852).

Alabama Power has transported CCR by water (sluicing in pipes) from Plant Barry to a storage area on the plant property.  The storage

---

[4] The complaint alleges that ADEM issued the permit that approved the closure plan that violates the CCR Regulations.  (Doc.1-Pgs.3-7, 16.) This makes the permit (which is also judicially noticeable) and the closure plan central to the complaint and available for review at the motion to dismiss stage.  *See* Fed. R. Evid. 201(d); *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024).

area is located on a natural surface of the ground and is surrounded by engineered earthen dikes approximately 20 feet high—the CCR impoundment. *See id.*; 80 Fed. Reg. at 21,303. Constructed in 1965, the Plant Barry CCR impoundment covers roughly 597 acres. *See id.* The Plant Barry CCR impoundment is illustrated below:

**<u>Plant Barry CCR Impoundment Before Closure Activities Began</u>**



(Doc.76-1-PageID.15518) (not to scale).

Municipalities in Mobile and Baldwin Counties Alabama test their drinking water supplies regularly for arsenic and other contaminants. *See* (Doc.72-PageID.1); *see generally* ADEM Admin. Code Ch. 335-7-1 (requiring publication of health-related information). The test results have shown that the drinking water is clean and safe to drink, i.e., free from any influence from the CCR impoundment at issue in this case. *See (*Doc.72-Pg.1-3). Baykeeper admits this. *See* (Doc.75-PageID.32; Doc.76-1-PageID.18535).

In the six decades that Alabama Power has stored coal ash at Plant Barry, the dikes have performed continuously as intended, with no failure of CCR containment, despite extreme weather events passing through the area, including several Category 5 hurricanes.[5] *Cf.* (Doc.1-Pgs.4-5, 12-13-¶¶ 12-13, 41.)

EPA Begins Regulating CCR in 2015

RCRA governs solid waste disposal. 42 U.S.C. §§ 6901–6987. EPA has regulated the disposal of hazardous waste under RCRA Subtitle C

---

[5] *See* (Doc.60-Pg. 4, n.2) (citing NOAA, *Historical Hurricane Tracks, available at* https://coast.noaa.gov/hurricanes (search "36512"; select 50 miles under "Search Distance"; select Categories 1-5 and Tropical Storm under "Storm Categories"; select years 1965-2022 under "Year(s)")).

since 1980 and municipal solid waste under Subtitle D since 1991. *See* 40 C.F.R. Parts 258, 264, 265; 45 Fed. Reg. 33,150 (May 19, 1980); 56 Fed. Reg. 50,978 (Oct. 19, 1991). RCRA disposal regulations for non-hazardous solid waste like CCR must ensure "no reasonable probability of adverse effects on health or the environment…." *See* 42 U.S.C. § 6944(a).

In 2015, EPA published the federal CCR Regulations to "establish[] nationally applicable minimum criteria for the safe disposal of [CCR] in landfills and surface impoundments." 80 Fed. Reg. at 21,303. In doing so, EPA sought to avoid the situation where CCR within an impoundment could impact groundwater that could then contaminate drinking water. *See Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 421 (D.C. Cir. 2018) ("The main exposure pathways the EPA found were through waste that escapes landfills and surface impoundments and then contaminates groundwater tapped as drinking water …."). The drinking water in Mobile and Baldwin Counties is tested at regular intervals and is safe and clean. *See* (Doc.72-1 to -5.)

In drafting the CCR Rule, EPA did not write on a blank slate. Instead, it relied on decades of experience in implementing prior

regulations for municipal landfills and hazardous waste facilities, as well as a sister federal agency's regulations for mining operations.[6]

In its CCR Regulations, EPA recognized two methods of closure:

(1) excavation and removal of the CCR; and

(2) closure in place.

*Id.* at 21,412.

The CCR Regulations also require the operator of a CCR impoundment to drill monitoring wells around the impoundment so that the facility can extract samples of water and send them to a lab to determine whether levels of regulated substances ("constituents") exceed EPA-designated limits. *See* 40 C.F.R. §§ 257.90–98. If so, the operator must take "corrective action" to reduce the contaminant levels below EPA limits. *See id.* § 257.96—98.[7] Groundwater monitoring must continue

---

[6] *See, e.g.*, 80 Fed. Reg. at 21,330 (stating that "EPA drew most heavily on the existing 40 CFR part 258 program applicable to [municipal solid waste landfills]" when developing the CCR program under RCRA Subtitle D); *id.* ("several" of the CCR Rule's requirements "were modeled after the existing subtitle C [hazardous waste] requirements…"); *id.* at 21,376 (stating that the agency "relied extensively on existing [Mine Safety and Health Administration] requirements…).

[7] Baykeeper cites Alabama Power's motion to dismiss for the proposition that Alabama Power "did not dispute below" that its operations would "continue to contaminate the surrounding environment." (Baykeeper's Br.6-7.) To the contrary, "Alabama Power

for at least 30 years after closure and for as long as it takes to reach EPA's groundwater protection standards. *Id*. at § 257.104(c).

In preparing to issue the final rule, EPA assessed CCR impoundments around the country and found that some "come in direct contact with the water table [i.e., groundwater] for at least part of the year." *See* (Doc.47-1-PageID.8900.) Nonetheless, "EPA did not propose to require" closure by excavation and removal under the federal CCR Rule, and EPA anticipated that "most facilities" would not close their CCR units by excavation and removal "given the expense and difficulty of such an operation." 80 Fed. Reg. at 21,412. *See* (Doc.49-1-PageID.10205.)

Alabama Power's Closure Plan for the Plant Barry CCR Impoundment

In 2016, Alabama Power drafted a closure plan for the Plant Barry CCR impoundment. (Doc.60-Pg.7.) The plan has been revised to the current 2020 plan. *See* (Doc.51-1-PageID.13634-13661; Docs.24-1—36-

---

Is Implementing Corrective Action for Groundwater Impacts." (Doc.60-Pgs.8-9.)

1; Doc.37-1-PageID.5453.)[8]  The closure plan calls for the following activities to close the impoundment over an eleven-year period:

- **Site Preparation:** Site preparation activities have been performed, including: "contractor mobilization, vegetation management, implementation of erosion and sediment control measures, installation of auxiliary equipment including a temporary wastewater treatment system …, pumps and corresponding pump pad, and piping." *See* (Doc.27-1-PageID.4855).

- **Dewatering:** Free liquids contained within the CCR Impoundment must be removed as per a dewatering plan submitted to ADEM. *Id.*

- **Treatment:** "Interstitial (pore) water removed from CCR to support CCR excavation and placement activities will be treated as per the Dewatering Plan." *Id.*

- **Consolidation:** "Excavated and dewatered CCR" must be "placed and compacted within the consolidated footprint." *Id.*

- **Containment:** "A soil containment berm will be constructed to contain the CCR and provide separation between the consolidated footprint and areas where CCR will be excavated and relocated to the consolidated footprint." *Id.*

- **Covering:** "The final cover system and stormwater management systems" must be installed after the "area of the consolidated footprint is complete and final grades are achieved." *Id.*

---

[8] This Court can take judicial notice of the closure plan that is central to the complaint at the motion to dismiss stage. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024); (Doc.1-Pg.16) (each claim alleging the closure plan violated the 2015 CCR Regulations).

By pumping and removing free liquids, i.e., water in a pond and any water that drains freely from saturated CCR ("dewatering"), the hydraulic head, or pressure, pushing contaminants through the CCR into the groundwater will be reduced.  *See* (Doc.27-1-PageID.4870); *see also* 80 Fed. Reg. 21,302, 21,357 (Apr. 17, 2015) (noting that it is the "large amount of CCR managed with water, under a hydraulic head that promotes the rapid leaching of contaminants").  The critical final step of the closure plan will be to install the final cover system that is designed to "[m]inimize infiltration of precipitation into the waste management unit" in order "to minimize generation of leachates [i.e., polluted waters]... by promoting surface drainage and maximizing runoff." (Doc.49-1-PageID.10924.)

The closure plan calls for the installation of the final cover system to cap the impoundment in 2030 and completion of final closure in 2031. *See* (Doc.27-1-PageID.4878).  The final cover system is an engineered material (similar to astroturf) designed to shed rain so it does not penetrate into the CCR and produce leachate (polluted water) that could convey contaminants to groundwater.  *See* (*Id.*-PageID.4866-4868).

16

The closure plan "discuss[es] how the **final cover system will achieve the performance standards** specified in paragraph (d) of this section." 40 C.F.R. § 257.102(b)(1)(iii) (emphasis added). For purposes of this case, the important obligations under the performance standards are to "[c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure **infiltration** of liquids,…" 40 C.F.R. § 257.102(d)(1)(i) (emphasis added); "[p]reclude the probability of **future impoundment** of water,…" *id*. § 257.102(d)(1)(ii) (emphasis added); and eliminate **free liquids,** *id*. § 257.102(d)(2)(i) (emphasis added). *See also* 2022 Annual Groundwater Report (noting that closure "reduc[es] the leaching potential of [pollution] to groundwater") (Doc.45-1-PageID.6607.)

The following graphic illustrates what the Plant Barry CCR impoundment would look like if it is closed in place according to the 2020 closure plan:

17



Not to scale.

(Doc.62-2.)

Alabama Power completed initial dewatering of the CCR Impoundment at Plant Barry in 2019 and is now moving CCR into its final closure configuration and building the features that will contain the CCR and manage precipitation and leachate. (Doc.27-1-PageID.4878.)

The complaint alleges that the closed impoundment will leave ash in contact with groundwater. (Doc.1-Pg.2-¶2.) While Alabama Power does not agree with Baykeeper's characterization of this water as "groundwater," for purposes of the motion to dismiss, Alabama Power does not dispute this. *See, e.g.,* (Doc.1-Pg.4-¶12.)

18

Having established a plan to close with CCR in place, Alabama Power subsequently prepared and certified a groundwater remedy selection report and submitted it to ADEM for review and approval in 2022, where it remains under consideration. *See* (Doc.45-1-PageID.6563-7428; Doc.46-1; Doc.47-1-PageID.7941-8800); 40 C.F.R. § 257.97. Referring to the figure immediately above, groundwater quality is measured in the "uppermost aquifer" below the site. *See id.* § 257.91(a)(2).

Alabama Power must monitor groundwater quality as directed by EPA. *See id.* §§ 257.91-95. That means Alabama Power will gather objective evidence over time to discern how well its plans for closure and corrective action are working. Alabama Power expects any remaining CCR constituents to "attenuate," or diminish naturally,[9] and has

---

[9] EPA's modeling showed that arsenic levels in excess of EPA limits in groundwater generally drop below regulatory limits at a distance of 1,500 meters away from a CCR impoundment. *See* EPA, *Human and Ecological Risk Assessment of Coal Combustion Residuals*, EPA-HQ-RCRA-2009-0640-11993, at 5-39 (Dec. 2014) (Ex. R) (Doc.47-1—49-1, PageID.8929).

19

identified another corrective measure if impacts persists.  *See* (Doc.45-1-PageID.6606-6610.)

ADEM Issues a Permit to Close the Plant Barry CCR
Impoundment in Place Under the Closure Plan

In 2016, Congress passed the Water Infrastructure Improvements for the Nation Act (the "WIIN Act"), which included an amendment to RCRA to authorize States to implement CCR Regulation permitting programs and seek EPA's approval of those programs.  42 U.S.C. § 6945(d)(1).  Before EPA approves a state permitting program, a state permit may continue to govern the facility as state law may dictate, but federal regulations also continue to apply.  A CCR permit from an "approved" state governs in place of federal regulations.  *Id.* § 6945(d)(3)(A).

ADEM already successfully administers other RCRA programs with EPA's approval. EPA first approved ADEM's hazardous waste program in 1987 and its municipal landfill program in 1994. 58 Fed. Reg. 46,466 (Dec. 8, 1987); 59 Fed. Reg. 9,979 (Mar. 2, 1994); *see also* 82 Fed. Reg. 59,601 (Dec. 15, 2017).  ADEM established its own permitting program for CCR and applied to EPA for approval of that program in December 2021.  *See* 89 Fed. Reg. 48,774, 48,775 (June 7, 2024.)  So,

20

before EPA announced its no-ash-in-contact-with-groundwater interpretation in January of 2022, ADEM began issuing permits to close CCR impoundments, including the one at Plant Barry.

Alabama Power applied for a permit to close the Plant Barry CCR impoundment, and ADEM issued the permit in July 2021. *See* (Doc.22-1-PageID.104-118).

## EPA Denies ADEM's Application for Approval of its CCR Permit Program

In August 2023, EPA proposed to deny approval of ADEM's permitting program because, among other things, EPA differed from ADEM on the interpretation of the CCR Rule—EPA interpreted the rule to bar closure with CCR in contact with groundwater. 88 Fed. Reg. 55,220, 55,274 (Aug. 14, 2023). In June 2024, EPA issued a final denial of ADEM's application for approval of its CCR permit program. *See* 89 Fed. Reg. 48,774 (June 7, 2024). The WIIN Act also authorizes EPA to create a federal permitting program, but, to date, EPA has not done so. 42 U.S.C. § 6945(d)(2)(B).

This leaves the ADEM permit for Plant Barry in place as a matter of state law, but EPA's current position is adverse to the closure plan authorized by the ADEM permit.

21

EPA's January 2022 Interpretation of the 2015 CCR Rule

In January 2022, EPA announced its interpretation of the CCR Rule to prohibit closure leaving ash below the water table (i.e., the top of the groundwater). *See* (Doc.1-Pg.8.) That interpretation differed from EPA's previous interpretation of its hazardous waste regulations over four decades, upon which Alabama Power relied, and which allowed closure of at least 22 hazardous waste sites with waste in contact with groundwater as long as the drinking water was protected. (Docs. 62-3–62-26).[10] EPA did so despite the fact that hazardous waste, by definition,

---

[10] In the District Court, Alabama Power submitted the EPA records of decision with its reply brief in support of its motion to dismiss. (Docs. 62-3–62-26.) Baykeeper moved to strike them. (Doc.66.) The Magistrate Judge did not consider them. (Doc.91.) This was an abuse of discretion. *See Bryant v. Ford*, 967 F.3d 1272, 1276 (11th Cir. 2020). The District Court did not reach this issue, because it ruled on standing and ripeness. (Doc.108.) In any event, this Court may take judicial notice of publicly available EPA administrative decisions for background purposes. *See* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding."); *Massachusetts. v. Westcott*, 431 U.S. 322, 323 n.2 (1977) ("The fact that respondent holds such a license has been ascertained from the records of the Merchant Vessel Documentation Division of the Coast Guard. These records may be judicially noticed."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (taking "judicial notice" of "public documents required to be filed with the SEC"); *Adams v. Atl. Richfield Co.,* No. 2:18-CV-375-JVB-JPK, 2021 WL 4819608, at *2 (N.D. Ind. Oct. 15, 2021) (at the Rule 12(b)(6) stage, taking judicial notice of an EPA "Record of Decision") And EPA decisions, like court decisions, may be cited for the first time in reply briefs in support of arguments

poses greater risk than non-hazardous solid waste like CCR. *See* 40 C.F.R. §§ 261.10, 261.11.

In a separate case involving different parties, not Alabama Power, *Electric Energy, Inc. v. EPA*, 106 F.4th 31 (D.C. Cir. 2024), the D.C. Circuit, in an opinion not binding in this Circuit, sided with EPA's broad interpretation.   EPA's interpretation of the CCR Regulations is not connected to the history of the regulations or to historic practice.   The *Electric Energy* Court had no request before it to take judicial notice of any of EPA's 22 administrative decisions closing hazardous waste sites with waste in contact with groundwater as long as the drinking water was safe.   *See* (Docs.62-3–62-26).   And the D.C. Circuit did not consider

---

made in the original motion. *See SEC v. Miller,* No. 1:04-CV-01655, 2010 WL 11508717, at *3 (N.D. Ga. Aug. 18, 2010) (J. Carnes, C.J.) (unpublished) (stating,"[i]n his Reply [165], however, defendant cited additional, more apt authority" and addressing cases cited for the first time in reply in support of motion); *see generally Regions Bank v. Kearney,* 597 F. App'x 1012, 1013 (11th Cir. 2014) (addressing case "cite[d], for the first time in their reply brief"). Alabama Power argued in its original motion that EPA administrative history on hazardous waste sites, on which EPA said it based the CCR Rule, showed that hazardous waste sites had been closed with waste in contact with groundwater. (Doc.60-Pgs.20-21.)   Because reviewing these administrative decisions would not enlarge the judgment for Alabama Power, it was not required to file a notice of cross-appeal on this issue. *See Jaffke v. Dunham*, 352 U.S. 280 (1957).

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which was decided on the same day (though the *EEI* opinion's scant analysis of complex regulatory terminology amounted to a deferral to EPA, *see* 106 F.4th at 40-42). No petition for rehearing was filed.

<u>EPA's Notice of Potential Violation and Ongoing Negotiations</u>

On January 31, 2023, consistent with its January 2022 interpretation, EPA issued a Notice of Potential Violations at Plant Barry ("NOPV"). *See* (Doc.62-1). The NOPV pointed to concerns regarding potentially inadequate: (1) engineering controls to control groundwater interaction with ash and slope stability analysis to support the final cover system; (2) placement of groundwater monitoring wells and the need for more information concerning aquifer thickness and geologic units; and (3) assessment of storm events for the impoundment's emergency action plan. (*Id*. at Pgs.9, 12, 14.)

EPA and Alabama Power have engaged in discussions to resolve these alleged potential violations. *See* (Doc.106-1-Pgs.1-2.) To date, EPA and Alabama Power have resolved potential violations concerning the groundwater monitoring system and the emergency action plan for the

Plant Barry CCR impoundment.[11]  *See In re Alabama Power Company,* Dock. No. RCRA-04-2024-4200(b), Consent Agreement and Final Order (EPA Sept. 26, 2024).  EPA and Alabama Power are continuing to discuss possible resolution of the remaining issues, including how to address EPA's concerns with the closure plan.

## STANDARD OF REVIEW

"We review the dismissal of a complaint for lack of jurisdiction *de novo,* … , including for lack of standing, …, mootness, …, and lack of ripeness …." *Baughcum v. Jackson,* 92 F.4th 1024, 1030 (11th Cir. 2024) (citations omitted).  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir. 2002).

---

[11] *See EPA Reaches Settlement with Alabama Power Company to Address Compliance with Certain Coal Ash Regulations* (Oct. 9, 2024), *available at* https://www.epa.gov/newsreleases/epa-reaches-settlement-alabama-power-company-address-compliance-certain-coal-ash#:~:text=Alabama%20Power%20provides%20energy%20to,civil%20penalty%20of%20%24278%2C000 (last visited Nov. 26, 2024).  *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1280 (11th Cir. 1999) (taking judicial notice of filings with the SEC).

"To survive a motion to dismiss, a complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1222 (11th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

At the motion to dismiss stage, a court may consider documents that are central to the complaint (e.g., Alabama Power's closure plan, ADEM's permit) and those that are judicially noticeable (e.g., drinking water test results, EPA administrative decisions). *See Johnson*, 107 F.4th at 1298.

This Court reviews "the denial of [a] motion for reconsideration for an abuse of discretion." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1121 (11th Cir. 2004).

## SUMMARY OF ARGUMENT

Baykeeper alleges that Alabama Power generally caused contamination that harms its members. Its claims, however,

26

concern particular violations of the CCR Regulations and RCRA by the 2020 closure plan. Precedents from the Supreme Court and this Court hold that the specific harm alleged by a plaintiff must be fairly traceable to the statutory/regulatory violation.

Alabama Power does not concede that the Plant Barry CCR impoundment has harmed any person, fish, or animal or reached any property beyond Alabama Power's land. And Baykeeper has offered no test result or personal observation to show harm (other than Alabama Power's self-reported groundwater information, which is not disputed). But at the motion to dismiss stage, we must assume that Baykeeper's allegations are true. The complaint alleges past, present, and future recreational and property injuries from alleged contamination from the CCR impoundment. (Doc.1-Pg.13) ("the unlined Plant Barry coal ash impoundment has been contaminating water for decades. A 1991 site assessment … [a]rsenic was found in groundwater"); (*id*.) ("This contamination continues today ….") (*id*.-Pg.15) ("contamination will continue indefinitely into the future.").

27

Baykeeeper alleges the 2020 closure plan violates the CCR Regulations by leaving CCR in contact with groundwater.

Baykeeper's allegations of past injury from 1991 to 2019 cannot be traced to the 2020 closure plan's purported violation of the CCR Regulations. (*Id.*-Pg.13.) Because the 2020 closure plan did not exist from 1991 to 2019, it is a logical impossibility for that plan to have caused the alleged contamination during those years. In standing parlance, the 1991 to 2019 alleged injuries are not "fairly traceable" to a violation that did not occur until 2020.

Baykeeper's present alleged injuries fare no better. (*Id.*) Even if Alabama Power had started implementing a closure by removal plan in 2020, the plan would not be completed for 20 years. Put differently, whatever injury Baykeeper's members suffer today, it would be the same regardless of which closure plan Alabama Power adopted. Because the alleged injury at issue would remain the same under the current plan (closure in place) and Baykeeper's purportedly "compliant" plan (closure by

28

removal), the 2020 violation did not cause, and is not fairly traceable to, the present alleged injury.

As to future alleged injuries, (*Id.*-Pg.15), Baykeeper says that it will be harmed in the future by alleged contamination that would be abated if a new closure plan requiring excavation and removal of the CCR were filed with ADEM. (*Id.*-Pg.5) ("continued pollution ... unless the closure requirements of the federal CCR Rule are enforced at Plant Barry [i.e., closure by removal]"). Again, without conceding any environmental impact off site, such an excavation plan would likely not be completed for at least 20 years. Between now and then two key contingencies must be resolved: (1) whether ADEM will modify the permit to close the Plant Barry CCR impoundment in place; and (2) how EPA will apply its interpretation of the CCR Regulation to the closure plan for the Plant Barry CCR impoundment (not to mention whatever else might happen over 20 years). These contingencies mean that the injury of future ongoing alleged contamination is not "imminent," but speculative.

## Baykeeper's Alleged Harm of Ongoing Contamination Is Not Fairly Traceable to Closure-in-Place Plan or is Not Imminent



Similarly, Baykeeper's allegation that some future storm, worse than all storms since 1965, might cause a spill of CCR into the Mobile River, at some unspecified time, despite Alabama Power's undisputed efforts to maintain dike integrity, is speculative.

These same contingencies that deprive Baykeeper's claims of standing also deprive them of ripeness. And the claims are also not ripe because the record is currently unfit for review.  On the current record, to reach the merits, the District Court would be tasked with selecting engineering controls or requiring the ratepayers to pay $4 billion to excavate the Plant Barry CCR impoundment even though that would not increase the quality of drinking water at all.

## ARGUMENT

### I.   The District Court Correctly Dismissed Baykeeper's Claims For Lack Of Standing.

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  *See* U.S. Const. art. III, § 2.  "For there to be a case or

controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, *standing*." *Id*. at 423 (emphasis added) (citation omitted). The Supreme Court emphasized in *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 340 (2016), "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion*, 594 U.S. at 426.

Baykeeper relies on associational standing, which requires that one or more of its members "have standing to sue in their own right." (Doc.99-Pg.2) (internal quotation marks and citation omitted). *So. R. Watershed All., Inc. v. Dekalb Cnty, Georgia*, 69 F. 4th 809, 819 (11th Cir. 2023) (applying *TransUnion* in a Clean Water Act citizen suit) (internal quotation marks and citations omitted). For an individual member of Baykeeper to have standing in his or her own right, (1) the member must have "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) actual or imminent, not 'conjectural' or 'hypothetical'"; (2) "the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, ...'" and (3) it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S.

555, 560-61 (1992) (citations omitted).  "[I]t is the plaintiff's burden, in a lawsuit brought to force compliance, to establish standing ...." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 170 (2000).  "The relevant showing for purposes of Article III standing ... is not injury to the environment but injury *to the plaintiff.*" *Id.* at 181 (emphasis added).

Baykeeper alleges a variety of subjective concerns, but the specific harms *to itself and its members* boil down to two:  diminishment of recreational opportunities (e.g., fishing and swimming)[12] and property damage, including the fear that such things could happen in the future.

### A.    To Show Standing, Baykeeper Must Show that the 2020 Closure Plan's Alleged Violation of the CCR Regulations is Fairly Traceable to its Members' Actual or Imminent Injuries in Fact.

While Baykeeper argues generalized contamination injuries in its Brief at page 24, its complaint alleges its members suffered specific

---

[12] Despite Baykeeper's reference to mercury (Baykeeper's Br.3), no exceedance of mercury is alleged or has occurred at the Plant Barry CCR impoundment.  The only relevant record evidence is a "do not eat" fish advisory for mercury near Plant Barry.  (Doc.101-Pg.10 & n.11.)  Without an actual, measured exceedance from the CCR impoundment, this case cannot affect the advisory.

recreational and property injuries because Alabama Power's plan to close

the CCR impoundment in place violates the CCR Regulations:

| Baykeeper's Claims | |
|---|---|
| **Claim** | **Allegation** |
| 1 | "53. In **violation of 40 C.F.R. § 257.102(d)(2) and RCRA**, Alabama Power's **closure plan** for the Plant Barry coal ash impoundment fails to satisfy the CCR Rule's standard to eliminate free liquids prior to capping in place." (Doc.1-Pg.16) (emphases added). |
| 2 | "54. In **violation of 40 C.F.R. § 257.102(d)(1)(ii) and RCRA**, Alabama Power's **closure plan** for the Plant Barry coal ash will result in the continued impoundment of water, sediment, or slurry, and fails to preclude the probability of future impoundment of water, sediment, or slurry." (*Id.*) (emphases added). |
| 3 | "55. In **violation of 40 C.F.R. §257.102(d)(1)(i) and RCRA**, Alabama Power's cap-in-place **closure plan** does not control, minimize, or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste or releases of CCR pollution to ground or surface waters." (*Id.*) (emphases added). |

The standing requirement is precise: "Only those plaintiffs who

have been *concretely harmed* by a defendant's statutory violation may sue

that private defendant of that violation in federal court." *TransUnion*,

594 U.S. at 427. "Congress did not ... afford federal 'citizen suit'-style

causes of action to private plaintiffs who did not suffer concrete harms."
*Id.* at 428 n.1.

For Baykeeper, its alleged regulatory violations—the allegedly non-compliant 2020 closure plan (Doc.1-Pg.16)—must be fairly traceable to actual or imminent injury *to Baykeeper or its members*—in this case, recreational injuries or property damage arising from alleged contamination from the CCR impoundment, *see, e.g.*, (Doc.1-3). *See Lujan*, 504 U.S. at 560-61.

**B.    Any Past Injury Is Not Fairly Traceable to the Alleged Regulatory Violation and Any Future Injury Is Not Imminent.**

**1.    Past Alleged Injury from 1991 to 2019 Was Not Caused by, or Fairly Traceable to, the 2020 Closure Plan's Alleged Violation of the CCR Regulations.**

Baykeeper alleges that Alabama Power's 2020 closure plan for the Plant Barry CCR impoundment violates the CCR Regulations. (Doc.1-Pg.16.) And Baykeeper alleges that the CCR impoundment has been contaminating surrounding waters since 1991. (*Id.*-Pg.13.) As the District Court held, logic dictates that any pollution that occurred from 1991 to 2019 could not have been caused by the 2020 closure plan's violation of the CCR Rule. *See Walters v. FastAC, LLC*, 60 F.4th 642, 650

35

(11th Cir. 2023) ("A plaintiff must at least demonstrate *factual* causation between his injuries and the defendant's misconduct."); (Doc.108-Pg.27).

Similarly, in *Clapper v. Amnesty International, USA*, 568 U.S. 398, 404-06 (2013), the Supreme Court held that a harm that had been ongoing for years cannot be traced to a new government rule. In *Clapper*, *id*., Congress enacted a new surveillance provision, 50 U.S.C. § 1881a, that authorized the interception of certain communications of overseas suspected terrorists. Reporters and lawyers challenged the new surveillance provision because they feared interception of their own communications. They alleged that they had been the subject of government surveillance even before Congress enacted § 1881a and were incurring costs to avoid future surveillance under the new statutory provision. *Id*. at 415. The Supreme Court held that the reporters and lawyers lacked standing, explaining: "[B]ecause the Government was allegedly conducting surveillance of [a lawyer's] client before Congress enacted § 1881a, it is difficult to see how the safeguards that Mr. McKay now claims to have implemented can be *traced* to § 1881a." *Id*. at 417 (emphasis added).

36

Baykeeper argues that in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), racial discrimination pre-dated a rezoning denial in 1987 by decades, and the Supreme Court held that the injury complained of was fairly traceable. (Baykeeper's Br.24-25.)   But in that case, the plaintiff housing corporation did not trace his injury of losing the opportunity to build low-income housing to prior decades of discrimination.  Instead, it traced the Village's 1987 discriminatory denial of a rezoning request for low-income housing to its loss of the opportunity to build the project.  *Village of Arlington Heights*, 429 U.S. at 264.  Racial discrimination in general or in zoning in prior years did not cause the denial of its application for re-zoning in 1987, the 1987 discriminatory decision did.

> **2.    Present Alleged Contamination Is No Different Than What Would Occur if Closure by Removal Had Been Adopted in 2020, Because It Would Take Years to Implement That Plan.**

For present alleged contamination, (Doc.1-Pg.13), Baykeeper cannot show that its injuries are any different under the closure in place plan that allegedly violates the CCR Regulations than it would be under a closure by removal plan. Even if Alabama Power had started implementing a closure by

37

removal plan in 2020, the plan would not be completed for 20 years.    (Doc.98-1-Pgs.21-24.)    If the closure plan's alleged violation is CCR below the water table, the location for that is at the bottom of the pile, so it would be the last to be removed.  That means from 2020 to 2040, whatever harm Baykeeper's members may suffer from the alleged violation, it would continue precisely the same way for that length of time regardless.

This Court has "held traceability to be lacking if the plaintiff 'would have been injured in precisely the same way' without the defendant's alleged misconduct." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (citing *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019), and *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1289 (11th Cir. 2012)). In short, Baykeeper cannot show that the 2020 closure plan was the factual—but for—cause of pollution if the condition is no different today than it would be under the plan Baykeeper seeks. *See Walters*, 60 F.4th at 650 ("A plaintiff must at least demonstrate *factual* causation between his injuries and the defendant's misconduct."); *Dep't of Com. v. N.Y.*, 139 S. Ct. 2551,

38

2556 (2019) ("Article III requires no more than *de facto* causality
...."). Because any present alleged pollution would be the same
with a violation (closure in place plan) and without a violation
(closure by removal plan), the 2020 violation did not cause, and
is not fairly traceable to, any present alleged pollution.

> **3. Any Future Impact Is Not "Imminent" or "Fairly Traceable" to the 2020 Closure Plan.**

> **a) Future impacts are not imminent or certainly impending because of contingencies.**

As to future harm, Baykeeper says that it will be harmed by
allegedly continuing contamination that would be abated if a new closure
plan requiring excavation and removal of the CCR were filed with ADEM.
(Doc.1.-Pgs.5-15.) But the excavation plan would not be completed for
20-25 years—in 2044 to 2045. (Doc.98-1-Pgs.21-24.) Between now and
then two key contingencies must be resolved: (1) whether ADEM will
modify the permit to close the Plant Barry CCR impoundment in place;
and (2) how EPA will apply its interpretation of the CCR Regulations to
the closure plan for the Plant Barry CCR impoundment. These
contingencies mean that the injury of future ongoing alleged pollution

caused by a violation of the CCR Regulations is not "imminent," but speculative.

For standing purposes, an injury that will happen in the future must be "imminent." *Lujan*, 504 U.S. at 560-61. Because pollution occurring beyond 2031 to 2044 or 2049 is not yet actual, Baykeeper must show that it is "imminent." The Supreme Court has explained: "[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that [**a]llegations of possible future injury are not sufficient**." *Clapper*, 568 U.S. at 409 (bold emphasis added) (internal quotation marks and citation omitted). In *Clapper*, the Supreme Court held that a future injury was not imminent or certainly impending when contingencies existed that could mean no injury caused by the violation would happen at all.

When this lawsuit was filed on September 26, 2022, (Doc.1), two contingencies existed.[13] First, ADEM had issued its permit in 2021

---

[13] Article III standing must be determined as of the time at which the complaint is filed. *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003). The standing analysis focuses on contingencies existing at the time the complaint was filed, and notes their subsequent development. *See Support Working Animals, Inc. v. Governor of Florida,* 8 F.4th 1198, 1201, 1204-05 (11th Cir. 2021) (considering post-complaint developments in pre-existing contingencies

allowing Alabama Power to close the Plant Barry CCR impoundment in place even though some CCR would be in contact with water (Baykeeper alleges contact with ground-water, *id.*-Pg.8), but had not received approval of its permit program by EPA (*id.*-Pg.4). EPA approval of a state permitting program means that a valid state CCR permit becomes the governing law rather than federal regulations, and thus would change the source of law governing a case such as this. 42 U.S.C. § 6904(d)(3)(A). Thus, EPA action on the state program was a significant contingency when the complaint was filed. After the complaint was filed, EPA denied ADEM's program, which means ADEM must either revise its regulations to meet EPA's demands or challenge EPA's decision if the State wishes to operate under federal approval. These outcomes would change either closure plan or the law governing this case (or both).

Second, EPA had announced its position in January of 2022 that closure plans that would leave CCR in contact with groundwater would require modification. *See* (Doc.1-Pg.8.) How would EPA develop and apply this new interpretation to Plant Barry? As of the date of the

_____

regarding what penalties would be imposed by what state agency for gambling on dog racing).

complaint, EPA could have issued a Notice of Potential Violation ("NOPV") for the Plant Barry CCR impoundment to apply its new interpretation (and later did). Given the cost of excavation, EPA could allow modifications to closure plans to include, for example, engineering controls to address ground-water in contact with CCR. *See* EPA, *Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant* 47 (Jan. 11, 2022), *available at* https://www.regulations.gov/document/EPA-HQ-OLEM-2021-0590-0002 (last visited Dec. 13, 2024) (stating the need for "engineering controls" to control the movement of liquids into CCR). If EPA approved of the modifications and ADEM modified its permit to match EPA's approval, the modified permit would not violate the CCR Regulations.

In *Clapper*, 568 U.S. at 410, the future injury was government interception of suspected terrorists' communications with reporters and lawyers under a new amendment to the Foreign Intelligence Surveillance Act ("FISA"). But there were contingencies. For example, "respondents can only speculate as to whether the Government will seek to use § 1881a-authorized surveillance (rather than other methods) to do so. The Government has numerous other methods of conducting

surveillance, none of which is challenged here." *Id.* at 412—13. Further, "[s]ection 1881a mandates that the Government must obtain the Foreign Intelligence Surveillance Court's approval of targeting procedures, minimization procedures, and a governmental certification regarding proposed surveillance." *Id.* at 414. And "respondents can only speculate as to whether *their own communications* with their foreign contacts would be incidentally acquired." *Id.* (emphasis in original). So the Supreme Court held: "In sum, respondents' speculative chain of possibilities does not establish that injury based on potential future surveillance is certainly impending or fairly traceable to § 1881a." *Id.*

Similarly, Baykeeper can only speculate as to whether the Government (EPA) will agree with Alabama Power to allow it to close the CCR impoundment in place as provided in the 2020 closure plan and thus bring about Baykeeper's future injury of ongoing alleged contamination. No one can say whether EPA might deem some set of relatively manageable engineering controls to comply with the CCR Regulations and allow closure in place to continue. Further, under ADEM Administrative Code rule 335-13-5-.06(b)(6), Alabama Power must obtain ADEM's approval of modifications to the permit for any changes to the

43

closure plan that EPA and Alabama Power agree on in the NOPV proceeding, such as engineering controls that address ash in groundwater. If EPA and ADEM required excavation, there would be no injury under Baykeeper's theory. If EPA and ADEM agreed on a modification of the closure plan, and EPA approved ADEM's modified permit program, there would be no violation because ADEM's permit would be deemed governing federal law. *See generally* 42 U.S.C. § 6945(d)(1)(A); 89 Fed. Reg. at 48,774, 48,777; *Families Concerned About Nerve Gas Incineration v. U.S. Dept. of Army*, 380 F. Supp. 2d 1233, 1244—45 (N.D. Ala. 2005) (citing *Shell Oil Co. v. EPA*, 950 F.2d 741, 761-65 (D.C. Cir. 1991)).

And Baykeeper can only speculate as to whether its members' own properties and surrounding waters would be harmed from any potential contamination if the CCR impoundment was closed under a modified closure plan approved by EPA and permitted by ADEM. In sum, Baykeeper's speculative chain of possibilities does not establish that

injury based on potential future contamination is certainly impending or fairly traceable to a violation of the CCR Regulations. [14]

### b) Any future impact is not directly linked to the 2020 closure plan.

Even assuming an alleged violation will occur years from now, that alleged violation is not *directly linked* to any alleged ongoing pollution today, as the District Court correctly held. *See Roanoke R. Basin Ass'n v. Duke Energy Progress, LLC,* No. 1:17-cv-561, 2018 WL 1605022 (M.D.N.C. Mar. 29, 2018) (holding that "diminished use and enjoyment" of local waters was "not *directly linked* to [the defendant]'s preparation of an initial closure plan that allegedly fail[ed] to comply with the CCR Rule's requirements regarding its contents") (emphasis added).

---

[14] Baykeeper's claim for a declaratory judgment that the plan violates the CCR Regulations also lacks standing because of the same lack of causation for past contamination and contingencies. *See* (Doc.1-Pg.17); *Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1357 (11th Cir. 2021) ("[I]f a plaintiff seeks *prospective* relief, such as a declaratory judgment, he must "'allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'" … [W]e held in *A&M Gerber Chiropractic LLC v. GEICO General Insurance Company*, that "'the possibility that [a plaintiff] may someday be in another car accident ... and still be insured by [the insurance company] under the same or a similar policy being interpreted the same way, thereby having this issue present itself again ... is too contingent to constitute a 'substantial likelihood' of future injury.'" 925 F.3d 1205, 1215 (11th Cir. 2019).") (citations omitted).

45

There were two parallel *Roanoke River Basin* cases that the district court in North Carolina dismissed for the same reasons. *See Roanoke R. Basin,* No. 1:17-cv-707, 2018 WL 2417862; *Roanoke R. Basin Ass'n v. Duke Energy Progress, LLC,* No. 1:17-cv-561, 2018 WL 1605022, *4 (M.D.N.C. Mar. 29, 2018).  In both cases, the standing question was not whether the initial closure plan would become final and go into effect, but whether the environmental group's members' "diminished use and enjoyment" of local waters was "*directly linked* to [the defendant]'s preparation of an initial closure plan that allegedly fail[ed] to comply with the CCR Rule's requirements regarding its contents." *Roanoke River Basin, 2018* WL 1605022, at *4 (emphasis added). Because the alleged inadequacy of the contents of the CCR impoundment closure plan did not cause—was not fairly traceable to—the environmental group's members' recreational injuries, the court found no standing and dismissed the citizen suit.  Both that court and the District Court in this case were correct.

46

**C.    Baykeeper's Fear that an Unprecedented Future Storm Might Cause Ash to Spill into the Mobile River at Some Unspecified Future Time is Speculative and is Not Imminent.**

Baykeeper's complaint asserts that its members fear a severe storm or hurricane might cause a catastrophic spill of the ash into the Mobile River.  (Doc.1-Pg.4.)   Such a future spill would depend on a highly attenuated chain of events.  First, failure of the existing dikes containing ash at Plant Barry would depend on those dikes becoming unstable.  But EPA inspected the dikes in 2010 and then awarded the highest available rating for stability,[15] and they undergo rigorous dam safety inspections on intervals specified by EPA. *See* 40 C.F.R. § 257.83.  Second, Alabama Power's closure plan provides for the installation of new, additional berms that further reduce the risk of a spill. (Doc.27-1-PageID.4866.)  Third, Baykeeper alleges no facts by which a storm event could cause a spill to occur. In almost 60 years, through a number of hurricanes,

---

[15]    EPA, *Final Report: Dam Safety Assessment of CCW Impoundments, James M Barry Electric Generating Plant*, at 15 (Dec. 8, 2010),                      *available                      at* https://www3.epa.gov/epawaste/coal/pdf/apc_barry_cbi_final.pdf.    This Court can take judicial notice of documents filed with governmental agencies. *See* Fed. R. Evid. 201; *U.S. v. Howard*, 28 F.4th 180, 186 n.2 (11th Cir. 2022).

including Category 5 hurricanes, the dikes have never failed.[16]
Baykeeper assumes a failure could happen, but alleges no flaw in facility
design, construction, or maintenance that could lead to a spill at some
point in the future. Such a chain of events illustrates why Baykeeper's
ultimate future injury is not certainly impending and its members'
current fear of such a future event is speculative.

In *Clapper*, 568 U.S. at 410, the Supreme Court held there was no
imminent threat of the injury of surveillance of plaintiffs'
communications with suspected terrorists because plaintiffs relied on a
"highly attenuated chain of possibilities"—that the government would
target suspected terrorists with which plaintiffs would communicate,
that the government would use its authority under the challenged FISA
amendments (as opposed to some other statute) to conduct the
surveillance, that the FISA court would approve the surveillance
procedures, that the government would succeed in intercepting the
communications, and that plaintiffs would be parties to the particular

---

[16] *See* NOAA, Historical Hurricane Tracks,
https://coast.noaa.gov/hurricanes (search "36512"; select 50 miles under
"Search Distance"; select Categories 1-5 and Tropical Storm under
"Storm Categories"; select years 1965-2023 under "Year(s)").

targeted communications. *Id.* at 410. This was not sufficient to establish that the FISA surveillance of plaintiffs' communications was "certainly impending." *Id.  See id. at* 415-16 (rejecting the lower court's reasoning that the reporters and lawyers "suffered *present* injuries in fact— economic and professional harms—stemming from a reasonable fear of *future* harmful government conduct ….")  (internal quotation marks and citation omitted); *TransUnion*, 594 U.S. at 436-38 (possibility that credit reports that had not been sent to third parties would, in the future, be sent to third parties was "too speculative to support Article III standing"); *Lujan*, 504 U.S. at 564 (possibly incurring harm "some day" insufficient to establish standing); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 933 (11th Cir. 2020) (en banc) (holding allegation that defendant exposed class members "to an elevated risk of identity theft" were insufficient to confer standing where "[n]othing indicates how much risk this might be, however, and no facts alleged in the complaint provide insight into what degree of 'elevated risk' Muransky faced, or why").

Here, as in *Clapper*, the "chain of possibilities" that would cause a catastrophic dike failure (an unprecedented storm, a discontinuation of

adequate dike maintenance, etc.) is too speculative to support Article III standing.

### D. Baykeeper's Reliance on Post-Judgment Factual Evidence Fails.

#### 1. Baykeeper's Post-Judgment Introduction of Previously Available Evidence Does Not Support Current Harm from the Alleged Regulatory Violation or Create a Fact Issue.

Baykeeper takes issue with the District Court's statement in its final judgment that ordering Alabama Power to "eliminate free liquids by removing liquid wastes prior to installing the final cover system would do nothing to address Plant Barry's ongoing groundwater contamination when the system will not be installed until August 2030." (Baykeeper's Br.35) (quoting Doc.108-Pg.29). Baykeeper says, "APC did not make such an argument, so Baykeeper had no opportunity to respond to it, there is no factual basis in the record to support the statement, and the [District] Court is simply incorrect." (*Id.*) Baykeeper is mistaken.

First, Alabama Power argued at the December 12, 2023, hearing that "nothing is going to change for the whole of 2024 because these plans are not going to be implemented. And their harm of no reduction in pollution in 2031 won't happen for 5 or 6 years from now." (Doc.110-

Pg.44.) "First, we'd have to get a new plan. They [Alabama Power] have to get a new permit. They would have to start. So that would be 5, 6 years down the road. And so, okay, between now and then, nothing changes, whether it's their plan, our plan, or a modified plan." (*Id.*) Baykeeper responded to this argument, but did not file any materials regarding it. (*Id.* at 47.)

Second, after the District Court entered final judgment on January 4, 2024, Baykeeper submitted a declaration of its expert on February 1, 2024, with is motion for reconsideration of the judgment. (Doc.111-1.) The expert declaration was not central to the complaint, nor judicially noticeable. *See Johnson*, 107 F.4th at 1298.

Third, the declaration was based on alleged facts ranging from 2001 to 2018 that were previously available. So the District Court properly did not consider the new evidence submitted after judgment. *See Scott v. Suncoast Bev. Sales, Ltd.*, 295 F.3d 1223, 1231 (11th Cir. 2002) ("Suncoast could have timely produced the testimony of its own employees, so there is no excuse for its failure to produce that evidence earlier. … The denial of the motion to reconsider was not an abuse of discretion."); *see also U.S. v. Metro. St. Louis Sewer Dist.,* 440 F.3d 930,

51

935 (8th Cir. 2006) (affirming district court's denial of motion for reconsideration where the expert report submitted in support of the motion was "merely a newly created opinion based on facts known to or accessible by [the movant] at the time of the … hearing").  Moreover, Baykeeper does not argue that the District Court erred in not considering the evidence, so the issue is abandoned.  *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) ("Timson, however, fails to address the issue in his opening brief. … [I]ssues not briefed on appeal by a … litigant are deemed abandoned….") (internal citations omitted).

Fourth, Baykeeper offered the report for a factual proposition that cuts against the allegations in its complaint.  According to Baykeeper, the report shows that there are "benefits of proper closure" that start before "closure is completed." (Doc.111-Pgs.15-16).[17] Alabama Power

---

[17] According to Baykeeper, "Arsenic levels in nearby groundwater declined dramatically after excavation of coal ash *began*." (Baykeeper's Br.36 (quotations omitted; emphasis added).)  The expert declaration shows arsenic levels going *down* from 2014 to 2018, years before excavation was mostly complete in 2019.  (Doc.111-1-Pgs.7,65,67-69.) Presumably, the bottom of the CCR was below groundwater—why else would Baykeeper refer to it?  If the coal ash at the bottom was the last dug out, nearby groundwater improved while some ash remained in contact with groundwater.  This is consistent with the notion that it is the greater hydraulic head or pressure associated with the weight of a full pool of water that drove an increase in constituents, as Alabama

disagrees that excavation is necessary for that result, although it is plausible that alleged pollution levels would drop after removing most of the water in the pond as documented in the report. (Doc.111-1-Pg.7). Nevertheless, for present purposes, the complaint does not plausibly allege that current, incremental improvements in pollution would immediately or imminently follow adoption of a plan to close by excavation. None of these supporting factual allegations are found in the complaint. This is a post-hoc argument, and this Court should reject it. *See Iqbal*, 556 U.S. at 678.

And, in any event, Baykeeper had the opportunity to respond to the District Court's statement in its post-judgment motion.

### 2. The District Court Did Not Make Unsupported and Erroneous Findings of Fact.

On appeal, Baykeeper attempts to re-style its submission of previously available evidence as an argument that the District Court made unsupported and erroneous findings of fact. (Baykeeper's Br.51-55.) Baykeeper points to the District Court's statement that ongoing leaching would not stop "until much closer to 2030." (*Id.* at 52.) These

---

Power contends and EPA has stated, *see* (Doc.27-1-PageID.4870), and not just the state of being wet.

statements come from Baykeeper's complaint, the closure plan central to the complaint, and the CCR Regulations.

Baykeeper's complaint states that "this dangerous and defective plan [—Alabama Power's 2020 closure plan—] will be implemented—causing continued pollution and perpetuating the risks to Baykeeper and its members, as well as the water resources of the Mobile-Tensaw Delta that they depend on—unless the closure requirements of the federal CCR Rule are enforced at Plant Barry." (Doc.1-Pg.5.) The District Court's use of the term "ongoing leaching" is the equivalent of "continued pollution" from the complaint. The closure plan provides that the final cover system will be installed in 2030 and final closure will occur in 2031. *See* (Doc.22-1-Pgs.14-15); (Doc.27-1-PageID.4878). The CCR Regulations also look to when a closure plan is complete. *See* 40 C.F.R. § 257.102(b)(1)(iii) (when the final cover system is installed for closure in place); *id.* at (c) (when CCR has been removed for closure by excavation).

Baykeeper says that it requests relief intended to stop ongoing pollution. (Doc.1-Pg.5.) But no relief could come until after however many years or decades it would take to develop and execute a plan to separate CCR from groundwater—sometime between 2031 and 2049.

This is not imminent. Any flaw is in Baykeeper's complaint, not the District Court's reading of it.

### E. Whether Some Other Party Could File a Citizen Suit Is Not Relevant to Standing Analysis.

Baykeeper argues that "past pollution cannot vitiate Baykeeper's standing. If it did, the Rule would be rendered unenforceable by any citizen, simply because the Barry impoundment has been leaking for decades." (Baykeeper's Br. 27.) But "[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Clapper,* 568 U.S. at 420-21 (internal quotation marks and citation omitted). In any event, Baykeeper's assumption is not true, at least as to ongoing or imminent conduct. Compliance with the closure performance standards under the CCR Regulations should be evaluated "much sooner to closure project completion." (Doc.108-Pg.35.)

### F. Baykeeper's Sought-After Order for a New Closure Plan Will Not Redress Its Injuries for Years.

To satisfy Article III standing's redressability element, a plaintiff must demonstrate a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury. *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 79 (1978).

55

A court order to file a different closure plan "could only possibly alleviate a procedural injury, not Baykeeper's concrete injuries in fact." (Doc.1-Pg.17); *see* (Doc.108-Pg.29). In any event, it would not make it "substantially likely" that Plant Barry's closure plan would redress the alleged conditions of which Baykeeper complains any time soon, as explained above. *See Duke Power Co.*, 438 U.S. at 79. The reason is that whatever may be the effect of eliminating "free liquids" or controlling "infiltration" or precluding "future impoundment," even under Baykeeper's interpretations of those terms, it would not be felt until years in the future—2031 to 2044. That, in turn, raises the contingencies discussed above—e.g., how EPA would apply its January 2022 interpretation to the CCR impoundment at Plant Barry, whether ADEM would approve modified permit providing for closure-by-removal or closure-in-place with additional engineering controls. *See supra,* Argument I.B.3.

In short, there are many moving parts in this matter. Whether the District Court could hold a trial and enter an order before the matter is resolved or substantially changed is speculative. *See Lujan,* 504 U.S. at 561 (plaintiff must show that it is "'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision'")
(citation omitted). A hypothetical order as requested by Baykeeper would
not redress Baykeeper's alleged harms for years and may even prove to
be unnecessary.[18]  And the order could be for naught if it addresses a
different closure plan than the one that actually, ultimately takes effect.

Baykeeper argues that *South River Watershed Alliance v. Dekalb
County,* 69 F.4th 809 (11th Cir. 2023), confirms that a remedy that can
take years to implement does not necessarily affect redressability. In

---

[18] Baykeeper cites *Massachusetts v. EPA*, 549 U.S. 497 (2007), for
the proposition that redressability may be found even if the requested
relief does not completely eliminate the risk of harm and instead only
reduces it to some extent. (Baykeeper's Br.33.)  To the extent the point
matters, the analysis of that case is hardly an ideal match for this one.
The 5-4 majority opinion of *Massachusetts* (2007) significantly pre-dated
*TransUnion* (2021).  And the Court's opinion reflected much different
factors than those presented here.  The specific statutory questions in
*Massachusetts* related to a *mandatory* statutory duty of EPA to respond
to petitions and a *mandatory* obligation of EPA to regulate automobile
emissions if EPA found them to "cause, or contribute to, air pollution
which may reasonably be anticipated to endanger public health or
welfare."  *Id.* at 519-20 (citing 42 U.S.C. § 7607(b)(1) and quoting *id.*
§ 7521(a)(1))  (internal quotation marks omitted).   By contrast,
Baykeeper's claims turn on no mandatory ("shall") statutory obligation
other than that regulations must protect human health and the
environment, *see* 42 U.S.C. § 6944(a), which is not disputed.  The Court
also placed special significance on the petitioner being a sovereign State,
which had a "stake in protecting its quasi-sovereign interests" and was
thus "entitled to special solicitude in our standing analysis." *Id.* at 520.
Baykeeper sports no quasi-sovereign status.

57

that case, the injury to be redressed was that one member obtained "aesthetic enjoyment" from "us[ing] the South River and Chattahoochee watersheds less due to pollution." *Id.* at 819-20. The pollution complained of was the "illicit discharge of sewage spills." *Id.* at 818. The district court explained that the pollution included defendant's "dumping millions of gallons of untreated sewage into the watersheds." *S. River Watershed All., Inc. v. DeKalb Cnty., Georgia,* 484 F. Supp. 3d 1353, 1369 (N.D. Ga. 2020), *aff'd*, 69 F.4th 809 (11th Cir. 2023). The amended consent decree would require the county to cease discharging the raw sewage at once—thus ongoing pollution would stop promptly even though the plan called for years of additional remediation. *See South R. Watershed,* 69 F. 4th at 818. This is a vastly different situation than excavation of CCR at Plant Barry, which is subject to the contingencies and procedures identified above—how EPA will apply its new interpretation to the Plant Barry CCR impoundment, whether ADEM will modify its permit for the Plant Barry CCR impoundment, and whether a modified closure plan would violate the CCR Regulations or address the alleged contamination. *See supra* Argument I.B.3.

58

Similarly, as explained above, Baykeeper's members' fear of a "catastrophic failure" of the dikes due to a historic storm or flood, which would be relieved if all the CCR were removed in 20 years, is speculative when no major storms have had any such effect in the last six decades. *See supra*, Argument I.C.

Baykeeper's requested relief is not substantially likely to redress its members' injuries. Baykeeper has no standing.

## II. The District Court Correctly Dismissed Baykeeper's Complaint As Not Ripe.

To establish ripeness, Baykeeper must show: (1) hardship to the parties of withholding court consideration; and (2) fitness of the record for judicial decision. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

### A. Delaying Judicial Review Will Not Cause Baykeeper Incremental Harm.

#### 1. Baykeeper's Claims are Not Ripe Because They Seek Relief at a Distant Future Time.

There is no incremental hardship from deferring review when a future injury is speculative. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or

59

indeed may not occur at all." *Tex. v. U.S.*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted).

Baykeeper does not seek to clean up alleged contamination on its members' properties or in the Mobile-Tensaw Delta. Instead, Baykeeper seeks to stop what it says will be "continued" contamination from the current close-in-place plan for the Plant Barry CCR Impoundment, which will not be completed until 2031. (Doc.1-Pg.5.) After the complaint was filed,[19] EPA issued an NOPV to Alabama Power. *See* (Doc.62-1). EPA and Alabama Power began discussions about how to close the Plant Barry CCR Impoundment and those discussions are ongoing. *See* (Doc.106.)

But any consequence of closing by excavation would not arise, if at all, until after many years in the future and beyond the date for closure under the current plan—in 2044 or 2049. As previously explained, the relief Baykeeper seeks is subject to significant contingencies and delays— the outcome of the NOPV discussions, the outcome of the ADEM permitting process, and whether a modified plan would either violate the

---

[19] See *Henley v. Herring*, 779 F.2d 1553, 1555 (11th Cir. 1986) (considering events subsequent to the filing of the complaint, stating that ripeness is a question of timing, and concluding that the case was ripe when the district court ruled).

CCR Regulations or pollute Baykeeper's members' properties and surrounding waters. *See supra,* Argument I.B.2.

Baykeeper relies on *American Air Liquide, Inc. v. Commissioner*, 45 F.App'x 721, 723 (9th Cir. 2002) (unpublished), for the proposition that "[t]he suggestion that the Secretary may reverse his position at a subsequent date is far too speculative to cause us to refrain from deciding a case that is now ripe for decision." (Baykeeper's Br.41.) But Alabama Power is not arguing the hypotheticals, such as Congress repealing RCRA or EPA withdrawing its CCR Regulations. EPA did in fact start the NOPV proceedings by sending Alabama Power a NOPV on January 31, 2023. *See* (Doc.62-1).

If EPA and Alabama Power are unable to resolve the issues, the next step may be a civil action or, perhaps, an administrative enforcement action between EPA and Alabama Power. *See* 5 U.S.C. §§ 702-704 (authorizing an aggrieved person to file a lawsuit in federal district court against a federal agency to challenge a final agency action); *see, e.g.*, 42 U.S.C. § 6945(d)(4)(A)(i) (authorizing EPA to use its authority provided in RCRA 42 U.S.C. § 6928 to enforce the CCR Rule). On the other hand, if the NOPV proceeding resulted in a modification of the

61

closure plan, ADEM would have to exercise its discretion to issue a modified permit before Alabama Power could close under that plan.  *See* ADEM Admin. Code r. 335-13-5-.06(b)(6).  Those two contingencies are real and confirm that this case is not ripe for adjudication.

In *Wilderness Society v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996), this Court held that claims from environmental groups against the Secretary of Agriculture and Forest Service officials challenging a land and resource management plan for a national forest were not ripe.  While the Forest Service had adopted a land management plan, "no site-specific action will be taken pursuant to the Plan without a second stage of decisionmaking".  *Id.*

Similarly, before any change to the current closure plan and permit to address the alleged regulatory violations could take effect, EPA is going to have to decide how it will resolve the NOPV proceeding.  ADEM will then have to decide whether it will modify the permit consistent with EPA's decision.  So, there will have to be second-stage and third-stage administrative decisionmaking.

Because we cannot say today whether any alleged contamination would really go unstopped through 2031 and beyond under the current

closure plan, Baykeeper's claims of future injury are not ripe. *See Texas*, 523 U.S. at 300; *Wilderness Society*, 83 F.3d at 390; *Ass'n v. Duke Energy Progress,* LLC, No. 1:17-cv-707, 2018 WL 2417862, at *7 (M.D.N.C. May 29, 2018) (unpublished) ("The uncertainty as to whether, and in what form, Duke Energy's Initial Closure Plan will ultimately be implemented weighs against a finding that this matter is now ripe for a judicial decision.").

And whatever harm Baykeeper suffers from the alleged regulatory violation, any benefits from excavation would not be realized for many years even if Baykeeper obtained an order today requiring Alabama Power to file a close-by-excavation plan. Thus, deferring judicial review will not cause incremental harm. *Cf. Duke Power*, 438 U.S. at 82 (stopping construction of a nuclear plant while court deferred ruling would inflict incremental harm and thus, claim was ripe).

## 2. Article III of the Constitution Takes Precedence Over RCRA's Statutory Citizen Suit Provision.

Baykeeper contends that the District Court's order violates the separation of powers principle because citizens suits can generally proceed under RCRA, if state or federal enforcement action begins after the citizen suit complaint is filed. (Baykeeper's Br.38) (citing 42 U.S.C.

§ 6972(b)(1)(B)). This argument fails because it assumes a current injury, such as current pollution that could be stopped immediately or be cleaned up. In this case, the purported injury is not current, but speculative future harm—impacts that are supposed to stop when all the CCR is removed between 2031 and 2049.

Moreover, no statute of Congress can undo what the Constitution requires. "It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). As the District Court recognized: "To the extent that the ripeness problem in a particular case is of a constitutional character, Congress is powerless to override it. (Doc.108-Pg.31 n.6.) *See TransUnion,* 594 U.S. at 426 ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether the law violates the First Amendment.").

64

**B.      The Record is Unfit for Judicial Decision.**

Under the fitness prong of the ripeness analysis, "the claim must be sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision making by the court." *Harris v. Mex. Specialty Foods*, 564 F.3d 1301,1308 (11th Cir. 2009) (internal quotations and citation omitted).  Because we do not know what the closure plan will look like a few years from now, the record is unfit for a determination of whether the plan violates the CCR Regulations.

Baykeeper also argues that the contingencies, such as the NOPV proceeding and the ADEM permit modification, do not deprive this case of ripeness.  (Baykeeper's Br.47-49.)  Again, the NOPV proceeding is not possible or hypothetical.  It has already begun.  *See* (Doc.62-1-Pgs.8-11). And the requirement for a modified permit from ADEM if the closure plan changes materially is binding regulatory law.  *See* ADEM Admin. Code r. 335-13-5-.06(b)(6).  The CCR Regulations and ADEM's current permit are real, and they specify when amendments are required.  *See id.*; 40 C.F.R. § 257.102(b)(3)(i); (Doc.22-1Pgs.7,9).

65

Without a new final closure plan or EPA's sign-off on it, the District Court will have to answer numerous highly technical questions in the first instance. For example:

- Is the cutoff, or barrier, wall shown in the diagram below thick enough, deep enough, and high enough to impede the sideways movement of any water that may be located in the CCR impoundment? And what material should the cutoff wall be made of—plastic, cement, something else?

### **Barrier Wall Engineering Control**



(Drawing 030) (feature labeled "low permeability cutoff wall") (Doc.33-1-PageID.5367.)

- Given the geological profile below, will the clay layer (labeled "Unit 1") prevent the downward migration of contamination from the CCR (labeled "Dike Fill") after most of the water is removed, the hydraulic head is reduced commensurately, and the final cover is installed?

66

## Geologic Cross-Section of CCR Impoundment at Plant Barry



Notes: 1. Source of ground surface elevation data: Lidar
2. Source of Discharge Canal depth: Bathymetry
3. NAVD88 indicates North American Vertical Datum of 1988.
4. Groundwater elevations were measured on May 24, 2021.
5. K indicates hydraulic conductivity.
6. Units 1, 2, and 4 hydraulic conductivity calculated from Shelby tube permeameter testing on undisturbed soil samples.
7. Unit 3 hydraulic conductivity calculated from long duration pumping test data.
8. V indicates groundwater flow velocity.
9. Vertical exaggeration: 25x.

(Doc.45-1-PageID.6845.)

- Are there any other engineering controls available and necessary to keep CCR safely contained inside the waste disposal unit, so that it does not enter groundwater in the surrounding environment?

The District Judge and Magistrate Judge in this case are esteemed

jurists. Yet their litigation experience, like that of the lawyers in this

case, may not yield the best answers to the numerous technical questions

67

like those above on the record as it stands now. By waiting for the experts from EPA, ADEM, and Alabama Power to state what the closure plan will actually look like in the future, the record will become one more appropriate for judicial review. The limited Article III judicial power respects this reality.

## CONCLUSION[20]

This Court should affirm the District Court's dismissal of Baykeeper's case "without prejudice." (Doc.109.) When the record is more mature, and the injuries more certain, Baykeeper will be free to file its lawsuit again.

---

[20]Alabama Power incorporates every argument and citation of law and the record for each argument made in this Brief to every other argument in this Brief.

Respectfully submitted on this the 16th day of December, 2024.

/s/ Ed R. Haden

Ed R. Haden
*One of the Attorneys for Defendant–
Appellee Alabama Power Company*

Of Counsel:

Jamie W. Betbeze
jbetbeze@maynardnexsen.com
Raymond L. Bell, Jr.
rbell@maynardnexsen.com
MAYNARD NEXSEN P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Tel.: (251) 432-001
Fax: (251) 432-0007

Ed R. Haden
ehaden@balch.com
Charles A. Burkhart
cburkhart@balch.com
Steven A. Burns
sburns@balch.com
Sean W. Shirley
sshirly@balch.com
BALCH & BINGHAM LLP
1901 Sixth Ave. North
Suite 1500
Birmingham, AL 35203
Tel.: (205) 226-8795

69

## CERTIFICATE OF COMPLIANCE

As required by Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I certify as follows:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief contains 12,652 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

In addition, this brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure. This brief has been prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

Respectfully submitted this the 16th day of December, 2024.

*/s/ Ed R. Haden*

Ed R. Haden
*One of the Attorneys for Defendant-
Appellee Alabama Power Company*

70