**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-12682
_____

MOBILE BAYKEEPER, INC.,

*Plaintiff-Appellant,*

*versus*

ALABAMA POWER COMPANY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:22-cv-00382-KD-B
_____

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

In the early stages, a lot of environmental litigation looks alike. One company or another is allegedly engaged in activity that violates federal law and harms the environment. Local citizens then assert that the unlawful activity burdens their use or

enjoyment of natural resources, and sue the company to stop the harm.

As with any other lawsuit, environmental plaintiffs must satisfy the three traditional elements of standing: injury, causation, and redressability. Usually, it is easy to see that they have pleaded all three. Injury? The burden on their use or enjoyment. *Check.* Causation? The company's unlawful activity causes the burden. *Check.* Redressability? Making the company comply with federal law would eliminate the burden. *Check.*

The standing analysis in this case is no different. Mobile Baykeeper's members include local Alabamians who say their use and enjoyment of the Mobile River and neighboring waterways have been harmed by toxic leaching from a coal ash impoundment at one of Alabama Power's plants. The organization sued, alleging that a closure plan Alabama Power is already implementing violates EPA regulations, and that a lawful plan would ease or eliminate the harms its members suffer.

Sounds like run-of-the-mill environmental litigation so far. But after Alabama Power's motion to dismiss, the district court asked whether Mobile Baykeeper had standing to bring suit, ordered supplemental briefing, and held a hearing. Ultimately the district court dismissed the complaint, finding both that Mobile Baykeeper lacked standing and that its claims were not ripe for review. We disagree on both points.

## I.

We first describe the legal framework surrounding coal ash removal, then turn to the factual and procedural background for this appeal.

## A.

Coal ash is dangerous and dirty—"one of the largest industrial waste streams generated in the U.S."  Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities ("Coal Ash Rule"), 80 Fed. Reg. 21302, 21303 (Apr. 17, 2015) (codified at 40 C.F.R. pts. 257, 261). Formally known as "coal combustion residuals," it consists of byproducts from coal combustion at electric plants and includes "fly ash, bottom ash, boiler slag, and flue gas desulfurization materials." *Id.*

Utilities store this hazardous waste in various ways, including both landfills and "surface impoundments," which are in-ground storage facilities, usually covered.  But over time it has become clear that many of these facilities are leaking contaminants into the groundwater. *Id.* at 21343.  To address this problem, EPA issued a rule in 2015 establishing "minimum national criteria" for coal ash landfills, surface impoundments, and "all lateral expansions" of coal ash units. *Id.* at 21304.

According to that Rule, all existing coal ash storage facilities needed to close "in accordance with specified standards," which could happen two ways: (1) cap-in-place, leaving the coal ash where it was and "installing a final cover system"; or (2) removal,

removing the coal ash and decontaminating the old storage unit. *Id.* at 21305; *see* 40 C.F.R. § 257.101.  The Rule also provided specific performance standards for these closure plans, which were due no later than October 17, 2016.   40 C.F.R. § 257.102(b)(2)(i).  For example, cap-in-place plans must ensure that the closure will control, minimize, or eliminate, "to the maximum extent feasible," infiltration of liquids into the coal ash and release of pollution into the environment.  *Id.* § 257.102(d)(1)(i).  They must also preclude "the probability of future impoundment of water, sediment, or slurry," with liquid wastes removed or solidified to eliminate free liquids.  *Id.* § 257.102(d)(1)(ii), (d)(2)(i).  And the final cover system must be "designed to minimize infiltration and erosion."  *Id.* § 257.102(d)(3).  In other words, no liquids in—and no liquids out.

In 2016, the same year the Rule's closure plans were due, Congress passed a statute allowing states to establish their own permitting programs for coal ash storage with EPA approval. Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, § 2301, 130 Stat. 1628, 1736 (2016) (codified at 42 U.S.C. § 6945(d)).  These programs have to ensure that utilities satisfy the Coal Ash Rule's requirements.  42 U.S.C. § 6945(d)(1)(B). Several states have since had plans approved: Georgia, North Dakota, Oklahoma, Texas, and Wyoming.  *See* 85 Fed. Reg. 1269 (Ga.); 90 Fed. Reg. 51168 (N.D.); 83 Fed. Reg. 30356 (Okla.); 86 Fed. Reg. 33892 (Tex.); 91 Fed. Reg. 9459 (Wyo.).  But not Alabama, whose application was denied by EPA in 2024.  *See* 89 Fed. Reg. 48774.  It is not clear if or when the State will apply again, or whether its program will be approved the next time around.

## B.

The James M. Barry Electric Generating Plant, operated by Alabama Power, is one of the plants subject to the Coal Ash Rule.[1] Plant Barry stores over 21 million tons of coal ash in an unlined impoundment that the complaint characterizes as built on top of a tributary of the Mobile River and in the middle of wetlands adjacent to the river. Alabama Power, for its part, describes the impoundment as "on the banks of the Mobile River."

In 2020, Alabama Power developed an amended cap-in-place closure plan for the Plant Barry impoundment. Implementation is well underway: by its own admission, the utility company has already spent more than $250 million carrying out the plan, and expects that the total cost will exceed $1 billion when all is said and done.

Residents have long expressed concern about the impoundment's potential impact on natural resources. One local organization, Mobile Baykeeper, is dedicated to protecting the water resources of the Mobile Bay watershed. In September 2022, the organization filed a citizen suit against Alabama Power, challenging its closure plan for the Plant Barry impoundment. The group contends that the Alabama Power plan violates EPA's Coal

---

[1] Because this case comes to us on a motion to dismiss, we accept the complaint's factual allegations as true and construe them in Mobile Baykeeper's favor. *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1177 (11th Cir. 2025).

Ash Rule because large quantities of coal ash will remain in contact with groundwater even after the closure is complete.

Alabama Power moved to dismiss the complaint. The utility did not dispute that coal ash remains in contact with water under its closure plan, but argued that the plan was compliant with the Coal Ash Rule anyway. It also contended that Mobile Baykeeper was estopped from suing in federal court because its claims had already been adjudicated and rejected by the state agency that issued the permit for the plan. After Mobile Baykeeper filed its response, Alabama Power's reply brief argued—for the first time—that the claims were not ripe. According to Alabama Power, the crux of Mobile Baykeeper's complaint was that the ultimate closure of the Plant Barry impoundment would not meet the Coal Ash Rule's cap-in-place performance standards. And since the closure would not be complete until 2031, Alabama Power said, the plan's compliance was not yet ripe for judicial review.

The motion to dismiss was referred to a magistrate judge, who recommended denying it and concluding that Mobile Baykeeper's claims were ripe. But after considering the magistrate judge's Report and Recommendation, as well as Alabama Power's objections, the district court ordered supplemental briefing on a different question—standing. The parties had not yet addressed that issue, and after they did, the court held a hearing on both standing and ripeness. A few weeks later, the court dismissed the suit on both grounds.

24-12682                Opinion of the Court                7

For standing, the court concluded that Mobile Baykeeper had satisfied the first element (injury-in-fact), but not the other two (causation and redressability).  For causation, it explained that because the toxic leaching from the Plant Barry impoundment has been going on for decades, Alabama Power's allegedly noncompliant closure plan could not have caused Mobile Baykeeper's injury.  As for redressability, the court said, because any order to file a compliant closure plan would take years to implement, and would not eliminate leaching in the meantime, Mobile Baykeeper's injury could not be redressed by a favorable judicial decision.

The district court went on to conclude that Mobile Baykeeper's claims were not ripe, failing on both hardship and fitness.  *First*, the court saw no incremental harm in delaying review until "a date closer to the project's estimated 2031 completion date."  No guidance was offered on how the parties would know when the right time had arrived.  *Second*, the court cited uncertainty about what form the closure plan would ultimately assume, and took that to mean that the record was not fit for judicial review.

Mobile Baykeeper filed a motion for reconsideration, which the district court denied.  Mobile Baykeeper now appeals from both the dismissal of its complaint and the denial of its request for reconsideration.

## II.

We review de novo the dismissal of a complaint for lack of jurisdiction, including questions of both standing and ripeness. *Baughcum v. Jackson*, 92 F.4th 1024, 1030 (11th Cir. 2024).

Even when considering the denial of a motion for reconsideration, "we review the original disposition itself under whatever standard of review we would normally use." *ECB USA, Inc. v. Chubb Ins. Co. of N.J.*, 113 F.4th 1312, 1318 (11th Cir. 2024). So here we need only review the underlying dismissal of Mobile Baykeeper's complaint "without regard to the denial of the motion for reconsideration." *Id.*

## III.

Mobile Baykeeper has satisfied all three standing requirements, and its claims are ripe, too—despite Alabama Power's spirited efforts to overcomplicate these questions.

We have no trouble rejecting the notion that an illegal closure plan can only be challenged after that plan is fully implemented. Same goes for the idea that failure to properly clean up a longstanding environmental harm cannot be legally challenged because the harm existed before the cleanup was required. Equally unconvincing is the contention that a state agency's discordant view of federal law would tie the hands of the federal courts.

These arguments, and several others that orbit them, cannot obscure that Mobile Baykeeper's complaint adequately alleges that

Plant Barry's coal ash pollution burdens members' use and enjoyment of local waters, that the plant's closure plan does not meet EPA's requirements for such plans, that a compliant plan would alleviate or mitigate those harms, and that federal courts can require such a plan.  This case should not have been dismissed.

## A.

To establish standing, a plaintiff "must have suffered an injury in fact, fairly traceable to the defendant, that the court can redress with an order directed at the defendant." *Baughcum*, 92 F.4th at 1031; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  And an organization has standing to sue on behalf of its members if one or more of them has standing in their own right and it meets two other requirements not disputed here.[2] *Baughcum*, 92 F.4th at 1031.  Mobile Baykeeper's complaint plausibly alleges injuries to its members' recreational and aesthetic interests caused by toxic leaching from the Plant Barry impoundment, and it asks the district court to declare the Plant Barry coal ash "closure" plan unlawful, as well as provide appropriate injunctive relief.  That should have been enough for standing at the pleading stage: an injury (recreational and aesthetic harm) caused by Alabama Power (leaching coal ash toxins from its

---

[2] To establish associational standing, an organization must also show (1) that the lawsuit seeks to protect interests germane to the organization's purpose, and (2) that the claim can be resolved and the requested relief granted without individual members' participation.  *Baughcum*, 92 F.4th at 1031.  Alabama Power does not dispute that Mobile Baykeeper meets these requirements.

allegedly noncompliant closure) and redressable by the courts (who could enjoin the noncompliant plan and require a compliant one). Even so, the district court dismissed for lack of standing, citing deficiencies in both causation and redressability. We disagree.

The district court concluded that Mobile Baykeeper's allegations of injury-in-fact were plausible, and this element is not contested on appeal. That's no surprise. An individual "may show injury-in-fact by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015) (quotation omitted). And environmental organizations have shown standing when they identified even "one specific member" who used a watershed less often because of pollution. *S. River Watershed All., Inc. v. DeKalb County*, 69 F.4th 809, 820 (11th Cir. 2023).

Still, we describe the alleged injuries here because they provide helpful context for the other parts of the standing inquiry. Mobile Baykeeper's complaint and the accompanying declarations from its members sufficiently allege that Alabama Power's noncompliant closure has injured them. For example, three members who own property downstream from Plant Barry and have a history of fishing in the area declare that they will not fish around the plant—or eat fish that were caught there—because they are concerned about toxic leaching from the coal ash

impoundment. And one adds that he will not let his grandchildren swim in that part of the river because of his concerns about coal ash contaminants. That is enough to show injury. If the Plant Barry impoundment is not closed as required under federal regulations, then Mobile Baykeeper and its members will be "directly confronted with the risks" that the Coal Ash Rule sought to minimize. *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 (11th Cir. 2004) (quotation omitted).

The second element of standing can be referred to as either causation or traceability, and requires plaintiffs to allege that their injuries are caused by the conduct they challenge. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). This is "not an exacting standard." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023). Traceability "demands less than a showing of proximate cause and is satisfied when a defendant indirectly causes a plaintiff's injury." *Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1310 n.7 (11th Cir. 2021) (alteration adopted and quotations omitted). Sometimes, "even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

Mobile Baykeeper's complaint easily satisfies that standard, too. The parties agree that federal law requires Alabama Power to close the Plant Barry coal ash impoundment. And to do so, it must meet the performance standards in EPA's regulations, standards designed to prevent the kind of toxic leaching Mobile Baykeeper's

members say is causing their injuries.    40 C.F.R. §§ 257.101, 257.102; *see* Coal Ash Rule, 80 Fed. Reg. at 21304.  A compliant plan for Alabama Power would prevent the leaching, and thus the injuries, Mobile Baykeeper says—but the current plan flouts the regulations, allows the leaching, and harms its members.  At this stage of the case, we must assume that Mobile Baykeeper is correct, and traceability doesn't get much more straightforward than that.

Alabama Power's surprising objection is that Mobile Baykeeper's own allegations show that Plant Barry has been poisoning the Mobile River for *decades*, so its members' injuries cannot be traced to a 2020 closure plan that won't be completed until at least 2031.  The argument that Plant Barry's coal ash impoundment has been contaminating local waters since long before the closure plan was in place is—to say the least—not the most obvious defense to a request for a safe closure.  Mobile Baykeeper's injury is fairly traceable to leaching that the allegedly noncompliant closure plan perpetuates, and past environmental degradation does not vitiate Mobile Baykeeper's current standing.  If the rule were otherwise, no environmental plaintiff would *ever* have standing to sue over a failure to comply with *any* pollution remediation plan.  As it is, the organization has shown causation.

Now to redressability, the requirements for which are similarly "modest."  *Bennett v. Spear*, 520 U.S. 154, 171 (1997).  Indeed, redressability is often just the flip side of causation: "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (quotation omitted). To evaluate, "we usually ask whether a court decision can either eliminate the harm or compensate for it." *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1356 (11th Cir. 2024) (quotation omitted).

Alabama Power argues that Mobile Baykeeper has not shown redressability because there are just too many unknowns. Even if the noncompliant plan is causing injury, the utility insists, the courts have no way to help because of the trail of contingencies between harm and relief. After all, the company says, the existing closure plan won't be fully implemented for many years, and a new closure plan could not be implemented without a new permit from the Alabama Department of Environmental Management.

One might wonder why it would matter that a new plan requires a new permit, but the utility offers an answer. Alabama regulators, it says, may interpret federal law differently than the federal courts, and thus refuse to approve a new plan—even if federal law requires one. Remarkable. State law cannot immunize a party's violation of federal law. U.S. Const. art. VI, cl. 2. But we see no reason to think that Alabama's environmental agency would attempt to make Alabama Power do so. Nor do we see any reason to assume that the benefit of that move would flow to Alabama Power.[3]

---

[3] And if Alabama Power was intending to argue a more narrow point, that state regulators may wish to attach *additional* requirements to a future permit

Keep in mind that EPA has rejected Alabama's permitting program as noncompliant with federal law. *See* 89 Fed. Reg. 48774. Even so, Alabama Power goes on to argue that the state agency could still successfully challenge EPA's denial of its permitting program. How? And why would that two-years-later appeal succeed? Alabama Power does not say.

Yet another possibility, according to the utility, is that EPA could change its current approach to enforcing the Coal Ash Rule, adapting its approach to allow closure plans that leave coal ash in contact with groundwater, so long as those plans include certain other (unspecified) engineering modifications. Well, anything could happen. But until it does, this is the rule on the books. And federal courts cannot refuse to decide cases based on bare speculation that a current rule might, someday, be changed.

Meanwhile, Alabama Power adds, it is already in negotiations with EPA over potential Plant Barry coal ash violations the agency identified in 2023. Among the many concerns outlined, EPA suggested that the closure plan does not "describe any adequate engineering measures" to ensure compliance with the Coal Ash Rule. Under the current plan, the agency said, the impoundment "will continue releasing [coal ash] contaminants indefinitely." And because the plan does not address the fact that "groundwater will continue to flow into and out of the unit in perpetuity," EPA contended that it does not seem to comply

---

that did not conflict with federal law, that would pose no hazard to redressability.

with the requirement that free liquids be eliminated.  *See* 40 C.F.R. § 257.102(d)(2)(i).

But EPA's concerns, according to Alabama Power, are not so much evidence of an unlawful closure plan as they are an opportunity—a chance for Plant Barry to adjust its plan in ways that might address Mobile Baykeeper's toxic-leaching concerns without the need for litigation.  That is quite an argument.  We can see why Mobile Baykeeper is not satisfied by the idea that Alabama Power may one day agree with EPA that its closure plan is unlawful and change it.  The law does not require a plaintiff to sit on legitimate claims while the defendant considers changing its mind.

In truth, none of these arguments have anything to do—at all—with whether Mobile Baykeeper has pleaded redressability.  A compliant plan would have to meet EPA's performance standards for cap-in-place closure.  And such a plan, according to EPA regulations, would eliminate free liquids, preclude the probability of future impoundment of liquids and solids, and eliminate—to the maximum extent feasible—further infiltration of liquids into the coal ash and the release of pollution into the environment.  *See* 40 C.F.R. § 257.102(d).  Mobile Baykeeper alleges that no such plan exists today because Alabama Power's current plan leaves at least one million tons of coal ash saturated in water.  Given that, implementation of a compliant plan would provide at least partial relief for Mobile Baykeeper's injuries.

And partial is enough.  The prospect of complete relief is not required for standing: it is enough if the alleged injury "would be

reduced to some extent if petitioners received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007).  Indeed, we have found redressability in similar cases at the motion-to-dismiss stage when plaintiffs adequately demonstrated that water quality "would likely be improved" by an injunction requiring the defendant to take steps to stop discharging pollution.  *S. River Watershed*, 69 F.4th at 820.

Nor is it a problem that complete relief could be a long time coming—immediacy is not required.  The idea that "relief must be immediate to satisfy constitutional standing finds no support in our precedent."  *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 162 (3d Cir. 2015); *see Lujan*, 504 U.S. at 561.  Redressability depends on whether relief can be had, not whether it can be had the moment a court hands down its order. For the purposes of standing, "the fact that the effectiveness of a remedy might be delayed" while the remedy is being implemented is "essentially irrelevant."  *Massachusetts*, 549 U.S. at 525.  What's more, in contexts like this one—which invariably will feature a lengthy delay between a court's judgment and a party's relief—an immediacy requirement for redressability would shut the door on whole categories of claims our courts have long adjudicated.  *See Shalom Pentecostal*, 783 F.3d at 162; *cf. Made in the USA Found. v. United States*, 242 F.3d 1300, 1311 (11th Cir. 2001).  Indeed, "redressability in circumstances like these is ordinarily seen as so obvious that we have dispatched with it in just a few sentences." *Ctr. for a Sustainable Coast*, 100 F.4th at 1357.  Because Mobile

Baykeeper has adequately alleged that a compliant closure plan would likely diminish its injuries, its claims are redressable.

★    ★    ★

The sum of it is that the complaint properly alleges standing. If "certainty about future administrative outcomes was needed to show standing, citizen-suit provisions would be a dead letter." *Id.* (quotation omitted). It's true that relief for Mobile Baykeeper's members' recreational and aesthetic injuries may depend on various administrative actions that would follow Alabama Power's submission of a compliant plan. As the utility puts it, "there are many moving parts in this matter." Fair enough. But focusing on them overcomplicates something simple: Mobile Baykeeper has satisfied the Article III standing requirements, effectively pleading injury, causation, and redressability.

## B.

We next evaluate ripeness—an efficient inquiry because many of the arguments here overlap with those Alabama Power pressed for standing.

The point of the ripeness doctrine is to keep courts from deciding cases prematurely, engaging in speculation, or wasting resources on merely potential or abstract disputes. *See Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006); *Maron v. Chief Fin. Off. of Fla.*, 136 F.4th 1322, 1332 (11th Cir. 2025). Put differently, we ask whether the claim is mature and defined enough "to permit effective decision-making by the court." *Baughcum*, 92 F.4th at 1036 (quotation omitted). The test has two formal prongs:

"(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Maron*, 136 F.4th at 1332 (quotations omitted).

As we have explained, "a claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (quotation omitted). Attempting to apply that logic, Alabama Power argues that because "we do not know what the closure plan will look like a few years from now, the record is unfit for a determination of whether the plan violates" the Coal Ash Rule. Yet however much contingent future events may impact the ultimate implementation of the closure plan, Mobile Baykeeper's claim does not rest on those events; it rests on the plan that Alabama Power is implementing now.

*First*, the straightforward issue at the heart of this case is whether federal law allows for an impoundment to be capped in place with coal ash still in contact with groundwater. Federal courts can answer that question. And because it is "purely legal," "we do not fear that a decision will be tantamount to entangling ourselves in abstract disagreements over administrative policies." *Ala. Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1310 (11th Cir. 2002) (alteration adopted and quotations omitted).

*Second*, the hardship prong favors Mobile Baykeeper, too. Alabama Power has no legitimate interest in violating federal law. In fact, if it needs to adjust its closure plan, it may even benefit from being ordered into compliance sooner rather than later—by its own telling, the company will spend over $1 billion to finalize its

current plan. Mobile Baykeeper's members, in contrast, are suffering injury now. While it may be true that it will take years for any relief ordered by the court to redress those injuries, any delay in deciding whether relief is due only pushes it further into the future.

Against this conclusion, Alabama Power recycles several of its arguments against standing: Mobile Baykeeper has no present injury, any possible relief is too far off, and the ultimate closure is subject to too many future contingencies. For the reasons we have already given, not one of these objections holds water. And Mobile Baykeeper does not ask the courts to "entangl[e] ourselves in abstract disagreements over administrative policies." *Id.* (alteration adopted and quotation omitted). Instead, it asks us to enforce existing federal administrative policies. Time will tell which party's stance on the regulation is correct, but for now, the complaint outlines a run-of-the-mill regulatory challenge that is ripe for decision.

★    ★    ★

A "federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quotations omitted). Here, Mobile Baykeeper's complaint alleges real, concrete injuries traceable to Alabama Power's closure plan, injuries that could be redressed by the requested relief. The complaint presents a true Article III case or controversy. The

district court thus had subject-matter jurisdiction to adjudicate the dispute and erred in granting Alabama Power's motion to dismiss.

We **REVERSE** the district court's judgment and **REMAND** for proceedings consistent with this opinion.